LOUISVILLE & N. R. CO. v. BOSWORTH et al.

(District Court, E. D. Kentucky, Frankfort Division.    September 22, 1913.)

No. 729.

1. STATES (§ 191*)—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.
The right to maintain a suit in a federal court against state officers to enjoin them from taking action which they threaten to take in the name of and for the state, is not limited to cases where such action is to enforce or pursuant to an unconstitutional statute; but such suit is not one against the state and is maintainable if for any reason the officers have no right to take such action and it will be a wrong to plaintiff such as equity will enjoin.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 179–184;  Dec. Dig. § 191.*]

2. STATES (§ 191*)—JURISDICTION OF FEDERAL COURTS—"SUIT AGAINST THE STATE."
The true test of the maintainability in a federal court of a suit to enjoin state officers from doing an act in the name of and for the state, as against the objection that it is a suit against the state, is to be found in the consideration of the relief sought therein.   If it is relief against the state, the suit is not maintainable, since the state, although not made a party to the record, is an indispensable party to the suit;  but, if the sole relief sought is relief against the officers, it is maintainable, although the state may be affected by the result and would be a proper party.

.  [Ed. Note.—For other cases, see States, Cent. Dig. §§ 179–184;  Dec. Dig. § 191.*

For other definitions, see Words and Phrases, vol. 7, p. 6778;   vol. 8, p. 7809.]

3. STATES (§ 191*)—JURISDICTION OF FEDERAL COURTS—SUIT AGAINST STATE.
A suit is maintainable in a federal court against the members of the State Board of Valuation and Assessment of Kentucky, the State Auditor and the Attorney General, and other law officers of the state charged with the duty of bringing and prosecuting actions to enforce payment of delinquent taxes, to enjoin the defendants from apportioning and certifying an assessment of complainants' property alleged to be unconstitutional and void, to the several counties and municipalities for local taxation and the taking of any action by defendants to enforce payment to the state of taxes levied on such assessment.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 179–184;  Dec. Dig. § 191.*]

4. TAXATION (§ 376*)—FRANCHISE OF RAILROAD COMPANY—KENTUCKY STATUTE.
The provisions of Ky. St. § 4081, as amended by Act June 9, 1893 (Laws 1891–92–93, c. 217), and Act March 15, 1906 (Laws 1906, c. 22), for the assessment of the franchises of railroad companies, etc., whose lines are partly within and partly without the state, and which provide that, after the valuation of the capital stock of the company has been fixed by the Board of Valuation and Assessment, "that proportion of the value of the capital stock which the length of the lines operated, owned, leased or controlled in this state bears to the total length of the lines, operated, owned, leased, or controlled in this state and elsewhere shall be considered in fixing the value of the corporate franchise of such corporation liable for taxation in this state," contemplate an assessment on a mileage basis, but are not exclusive of the making of a deduction from or addition to the part of the capital stock apportioned to the state on such basis if, owing to special circumstances, there is a proportional excess of value of tangible property elsewhere or within the state, as the case may require.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The proper procedure is for the board, after fixing the valuation of the entire capital and assets of the company, if no such special circumstances exist, to take such proportion of that valuation as the mileage within the state bears to the entire mileage, and from such sum deduct the assessed value of the tangible property of the company within the state, the remainder being the value of its franchise for taxation by the state and to be apportioned between the counties and municipalities through which its lines run according to mileage for local taxation. If by reason of special circumstances the tangible property of the company within the state is of greatly larger proportional value than that without the state, or the contrary, a proper addition to or deduction from the mileage proportion apportioned to the state should be made of the excess, so that all property within, but none without, the state, shall be taxed.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

**5. TAXATION (§ 376*)—FRANCHISE OF RAILROAD COMPANY—KENTUCKY STATUTE.**

Where such excess value exists within the state, the statute affords no warrant for arriving at its value by taking an average of the mileage proportion of the property, the proportion of gross earnings, and the proportion of net income apportionable to the state as the proportion of the capital stock so apportionable, the last two elements having no relation to the value of the tangible property, and an assessment so made is void.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

**6. TAXATION (§ 407*)—FRANCHISE OF RAILROAD COMPANY—ASSESSMENT—KENTUCKY STATUTE.**

Ky. St. § 4083, which is a part of the statute providing for assessment by the Board of Valuation and Assessment of franchises of corporations, provides that "it shall be the duty of the Auditor immediately after fixing such value by said board to notify the corporation of the fact; and all such corporations shall have thirty days from the time of receiving the notice to go before such board and ask a change of the valuation, and may introduce evidence. * * *" *Held,* that where the notice given to an interstate railroad company stated merely the valuation placed upon its property in the state, the assessed value of its tangible property, therein, deducted, and the resulting assessment of its franchise in the state, without giving the methods adopted or the steps taken in reaching such valuation, some of which were expressly prescribed by the statute, and the minutes of the board contained nothing whatever with respect to the preliminary assessment, so that the company was not advised as to whether or not the board had followed the statutory methods and requirements at the time of the hearing, it did not have the notice or hearing to which it was entitled under the statute.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 674; Dec. Dig. § 407.*]

**7. TAXATION (§ 376*)—FRANCHISE OF RAILROAD COMPANY—ASSESSMENT.**

In making an assessment of the franchise of a railroad company under such statute, the board did not have the right to use statistics taken from a report made by the company to its stockholders for an entirely different purpose without giving it an opportunity to explain the statements if desired.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

**8. CONSTITUTIONAL LAW (§§ 211, 253*)—DUE PROCESS OF LAW—NATURE OF ACTS PROHIBITED.**

The provisions of the fourteenth constitutional amendment prohibiting a state from depriving any person of life, liberty, or property without due process of law, or denying him the equal protection of the laws, is

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

directed against the government and officers of the state, and not against the state itself, as a political entity, and the fact that an act of state officers done in the name of and for the state was not authorized by the state laws does not prevent it from being in violation of such provision.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 678, 732–735; Dec. Dig. §§ 211, 253.*]

9. CONSTITUTIONAL LAW (§ 229*)—DENIAL OF EQUAL PROTECTION OF LAWS—DISCRIMINATION IN ASSESSMENT.

Under the Constitution and statutes of Kentucky, which require all property in the state to be assessed at its actual cash value and that taxes on all property shall be uniform, the assessment of the franchise of a railroad company at not less than its fair cash value, while other property in the state, except perhaps other railroad franchises, is assessed at an average of 80 per cent., or less, of such value, although in part by different assessing bodies, is a denial to the company of the equal protection of the laws in violation of the fourteenth constitutional amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 685; Dec. Dig. § 229.*]

10. TAXATION (§ 610*)—PRELIMINARY INJUNCTION TO RESTRAIN COLLECTION OF TAX—CONDITIONS.

The granting of a preliminary injunction is a matter of discretion, and the court may attach any equitable conditions thereto; and, where it is sought to enjoin enforcement of a tax on the ground of the invalidity of the assessment, a proper condition is the payment of so much of the tax as would be due on a fair assessment.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1244; Dec. Dig. § 610.*]

11. TAXATION (§ 376*)—LEVY AND ASSESSMENT—CORPORATE FRANCHISE—"CAPITAL STOCK."

The words "capital stock," as used in Ky. St. § 4079, providing for the determination of the value of a corporate franchise for purposes of taxation, by taking the value of the capital stock of a corporation and deducting from that the assessed value of all tangible property assessed in the state, mean the entire property of the company, tangible and intangible.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*

For other definitions, see Words and Phrases, vol. 1, pp. 959–967; vol. 8, p. 7595.]

In Equity. Suit by the Louisville & Nashville Railroad Company against H. M. Bosworth, Thomas S. Rhea, and C. F. Crecilius, individually and as constituting the Board of Valuation and Assessment of the State of Kentucky, H. M. Bosworth, Auditor of Public Accounts of the State of Kentucky, G. B. Likens, Assistant Auditor of Public Accounts of the State of Kentucky, James Garnett, Attorney General of the State of Kentucky, C. H. Morris, First Assistant Attorney General of the State of Kentucky, M. M. Logan, Second Assistant Attorney General of the State of Kentucky, O. S. Hogan, Third Assistant Attorney General of the State of Kentucky, Robert B. Franklin, Commonwealth's Attorney for the Franklin Circuit Court of the State of Kentucky, and W. C. Marshall, County Attorney of Franklin County, State of Kentucky. On motion for preliminary in-

junction and demurrer to bill. Demurrer overruled and injunction granted on condition.

See, also, 209 Fed. 465, 469.

Henry L. Stone, Helm Bruce, Ed. S. Jouett, Wm. A. Colston, and Robt. E. Fleming, all of Louisville, Ky., for complainant.

James Garnett, Atty. Gen., and M. M. Logan, Chas. H. Morris, O. S. Hogan, and D. O. Myatt, Asst. Attys. Gen., of Frankfort, Ky., and John L. Rich, of Covington, Ky., for defendants.

COCHRAN, District Judge. This cause is before me on motion for a preliminary injunction and demurrer to the bill. The plaintiff is a Kentucky corporation, and the defendants are citizens and officers of the state of Kentucky. The injunction sought is to restrain the defendants from taking certain action which they threaten to take in relation to an assessment of certain of plaintiff's property for taxation made by the Board of Valuation and Assessment of the State, August 31, 1912, for the year 1912. The defendants Bosworth, Rhea, and Crecilius are, respectively, Auditor, Treasurer, and Secretary of State and, as such, constitute the board which made the assessment. The action which they threaten to take is to apportion the assessment to the several counties, cities, towns, and taxing districts through which plaintiff's railroad runs in order to the collection of local taxes. This is the only further action which it is within their power to take in relation thereto in such capacity. That which the defendants Bosworth and Likens threaten to take in their capacities as Auditor and Assistant Auditor is to certify such apportionments to the county clerks of the several counties through which plaintiff's railroad runs, a further step essential to the collection of local taxes, to enter in account, as a demand payable at the treasury of the state, the taxes due to the state based on the assessment, to report to the Attorney General the delinquency on plaintiff's part arising from a failure to pay those taxes, and to cause proceedings to be instituted against it because of its failure to pay them. And that which the other defendants, to wit, Garnett, Morris, Logan, and Hogan, respectively, Attorney-General and Assistants Attorney Generals, the defendant Franklin, Commonwealth's attorney for the Franklin circuit court, and the defendant Marshall, county attorney of Franklin county, threaten to take in such capacities, is to institute and prosecute proceedings against plaintiff by indictment and civil action to recover such taxes and penalties because of its delinquency in failing to pay them. All of this action is action to enforce the assessment.

The plaintiff claims that the assessment is void, and that therefore the defendants have no right to take such action, and the taking thereof will be a wrong to it. The assessment was made by the board under sections 4077 to 4081, inclusive, and section 4083, of the Kentucky Statutes, the constitutionality of which is unquestioned. The plaintiff's property consists of its railroad, rolling stock, stations, terminal facilities, rights to be and to do, and its good will. All of these constitute a physical and organic unit. This unit covers 13 different states, including Kentucky. On a mileage basis, a larger part thereof

is in Kentucky than in any other state. That which was assessable by the board under these statutory provisions was the part of plaintiff's intangible property located in this state. Those provisions characterize it as its franchise or corporate franchise therein. The judicial phrase, therefore, is its intangible property so located. In the numerous cases which have arisen under these statutory provisions, the phrases "corporate franchise" and "intangible property" are treated as synonymous. I will hereafter refer to it as plaintiff's franchise in this state. These provisions have been the law of this state, substantially as they are now, for over 20 years. The assessment made by the board for the previous year, i. e., 1911, amounted to $11,899,200. The state tax thereon was $59,496, and the local taxes $86,994.41, or the two together, $167,644.37. The assessment that year was larger than it had been any previous year. The assessment complained of herein amounts to $45,428,074. The state taxes thereon amount to $227,- 140.37, and the local taxes to $332,166.52, or, the two together, to $559,306.89. By reason thereof, if it stands, the plaintiff will be compelled to pay $412,816.48 more than it paid the previous year, and it is reasonable to expect that hereafter it will have to pay at least this increased amount each year of its existence. This increase is not due to any change in the value of the plaintiff's intangible property in this state. It is due solely to a change in the judgment of the board as to its value. It should be noted, however, that there has been a change in the constituent members of the board, and the one here in issue is the first assessment which has been made by the board as it is now constituted.

Mr. Justice Brewer, referring to an increase in the assessment of a railroad's property by an Indiana board in the case of Pittsburg, etc., R. R. Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031, which he characterized as "a great increase," but which was not as great an increase as here, said that it suggested "that which is unfortunately too common—an effort to cast an unreasonable proportion of the public burden upon corporate property." He added, however:

"Still it must be borne in mind that a mere increase in the assessment does not prove that the last assessment is wrong. Something more is necessary before it can be adjudged that the assessment is illegal and excessive, and the question which is to be now considered is whether the testimony shows that the assessment made by the state board can be judged illegal."

And the court in that case upheld the assessment.

1. The plaintiff claims that the assessment is void on two grounds. One is that it violates the fourteenth amendment to the federal Constitution, in that it denies it the equal protection of the laws. The other is that the board did not follow the statute. It is because of the former claim that this court has essential jurisdiction of this suit. It would not otherwise have it. This is so because there is no diversity of citizenship between the parties hereto. Plaintiff, however, does not have to make this claim good. It is sufficient if the claim is not colorable, or, in other words, is made in good faith. As to this there can be no doubt.

The plaintiff, therefore, is entitled to the relief it seeks if it does no more than make good the other claim, to wit, that the board in

máking the assessment did not follow the statute. Siler v. L. & N. R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753.

[1] 2. But before I can consider this claim of plaintiff I must notice and dispose of a preliminary contention put forth by the defendants. It is that this is a suit against the state of Kentucky and forbidden by the eleventh amendment to the federal Constitution, and that therefore it is not maintainable, even though the assessment complained of is void on both grounds relied on by plaintiff. As heretofore stated, the relief sought herein is an injunction against the defendants restraining them from taking certain action which they are threatening to take in the name and for the state, under color of their respective offices. What that action is has also already been set forth in detail. This contention, then, is that a suit in a federal court against state officers to enjoin them from taking action which they threaten to take, in the name and for the state, and under color of their offices, to enforce an assessment made by a board under a constitutional statute, as the one involved here is, is a suit against the state and so forbidden, and hence not maintainable, even though the assessment is void. The plaintiff meets the contention with the cases of Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; W. U. Tel. Co. v. Andrews, 216 U. S. 165, 30 Sup. Ct. 286, 54 L. Ed. 430. It claims that they are conclusively against it. The defendants, on the other hand, say that, instead of this being so, these cases conclusively support their contention. This radical difference between the parties is not as to the thing decided in these cases. They agree as to what was decided in each. It was decided therein that a suit in a federal court against state officials to enjoin them from taking action which they threaten to take in the name of and for the state, under color of their offices, to enforce an unconstitutional statute, is not a suit against the state and so forbidden, and that such a suit is maintainable. The kernel of Mr. Justice Peckham's opinion in the Young Case is to be found in that portion thereof quoted by Mr. Justice Day in the W. U. Tel. Co. Case, which is in these words, to wit:

"The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or a criminal nature, to enforce against parties affected an unconstitutional act, violating the federal Constitution, may be enjoined by a federal court of equity from such action."

Where they differ is as to what follows from this decision. According to defendants, it follows therefrom that such suit is maintainable only when the threatened action sought to be restrained is action to enforce an unconstitutional act of the Legislature, i. e., an unconstitutional statute. And it is because this suit is not a suit to enjoin threatened action of that character that they claim that these cases support this contention of theirs as to the maintainability of this suit. According to plaintiff, it follows therefrom that any suit where the threatened action sought to be enjoined is action to enforce an unconstitutional act of any state officer or officers, whether legislators or not, is main-

209 F.—25

tainable. And it is because this suit is a suit to enjoin threatened action to enforce an unconstitutional act of the Board of Valuation and Assessment, to wit, the assessment complained of herein, though made under a constitutional statute, that they claim that these cases are against this contention. These two cases are not the only cases in the Supreme Court of the United States where the thing decided therein has been decided as there. There are quite a number of others. Such as the following, to wit: Osborn v. Bank of the United States, 9 Wheat. 738, 6 L. Ed. 204; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Board of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; In re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, 37 L. Ed. 689; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584; Herndon v. Chicago, R. I. & P. R. Co., 218 U. S. 135, 30 Sup. Ct. 633, 54 L. Ed. 970.

In each of these eight cases, as in each of the other two, it was decided that a suit in a federal court against state officers to enjoin them from taking action which they threaten to take in the name and for the state, under color of their offices, to enforce or in pursuance to an unconstitutional statute, is maintainable. They, likewise, support or are against defendant's contention according to which of the parties is right as to what follows from such a decision. Here then are ten cases in that court which decide exactly the same thing, and there is a radical difference of opinion as to what follows therefrom. As I view the matter, the defendants are wholly wrong, and the plaintiff does not claim the whole truth. Defendant's position is wrong because it proceeds on the assumption that those cases cover the whole law on the subject of the maintainability of suits in federal courts against state officers to enjoin them from taking action which they threaten to take in their capacities as such and for and on behalf of the state. They do not cover the whole law thereon. On the contrary, what is within the principle underlying that which was decided therein is as much the law as what was decided. That the suit is maintainable where the threatened action sought to be enjoined is action to enforce an unconstitutional act on the part of any state officers or officer, as plaintiff claims, was decided by the Supreme Court in the case of Reagan v. Farmers' Loan & Trust Company, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, cited and approved in the Young Case. There the threatened action sought to be enjoined was not action to enforce or in pursuance of an unconstitutional statute, but action to enforce transportation rates fixed by the Texas Railroad Commission under a constitutional statute empowering it to fix such rates, on the ground that the rates so fixed were confiscatory, and hence that the act of the Railroad Commission—not the statute—was unconstitutional. The suit was held to be maintainable. To the same effect is the case of Prentis v. Atlantic Coast Line R. R. Co., 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150.

Plaintiff's position does not cover the whole truth, because the principle underlying the decision that the suit is maintainable if the threatened action sought to be enjoined is action to enforce an unconstitu-

tional statute is not limited to suits where the threatened action sought to be enjoined is action to enforce an unconstitutional act on the part of some state officers or officer. It gives that principle a too narrow range. And, if it has no wider scope, then this suit, in so far as it is based on the claim that the assessment complained of is void because the Board of Valuation and Assessment did not follow the statute, is not maintainable. If, then, defendants are wrong as to what follows from what was decided in those ten cases and what plaintiff claims follows therefrom is not the whole truth what is the whole truth that follows therefrom? An ascertainment of this will help us to correctly dispose of this contention of defendants. It is to be found in the principle underlying what was decided therein. What then is that principle? What was the ratio decidendi of what was decided therein? Why was it decided therein that the suit is maintainable if the threatened action sought to be enjoined is action to enforce or in pursuance to an unconstitutional statute? It was so decided because the sole basis of the action sought to be enjoined was the unconstitutional statute, and, this being so, the state officers sued had no right to take it, and the taking thereof would be a wrong to the plaintiff. In other words, it was so decided because the action which the defendants were threatening to take would, if taken, be a wrong to the plaintiff, or what they were sought to be enjoined from doing was the commission of a threatened wrong to plaintiff.

The threatened action sought to be enjoined in the Bank of the United States and the Tyler Cases was the seizure of the plaintiff's property in payment of a tax. The statute imposing the tax was unconstitutional. This being so, the defendants had no right to take the action, and the taking thereof would be a wrong to the plaintiff. · It would deprive it of its property without right. One who deprives another of his property without right commits a wrong against him. That sought to be enjoined in the McComb Case was the delivery of a portion of a certain issue of state bonds in breach of a contract of the state with plaintiffs, holders of the other portion thereof. It was authorized by a statute which was unconstitutional as impairing the obligation of that contract. This being so, the defendants had no right to take the action, and the taking thereof would be a wrong to plaintiffs. It would depreciate the value of the bonds which they held, and hence would in this way deprive them of their property. That sought to be enjoined in the Gray and McConnaughy Cases was the issue of land grants in the name of the state covering land previously granted to plaintiffs. The issue thereof was to be pursuant to a statute which was unconstitutional as impairing the obligation of the contract contained in the previous grants to the plaintiffs. The statute being unconstitutional, the defendants had no right to take the action, and the taking thereof would be a wrong to plaintiff. It would cast a cloud on the title to the land covered by his grant and thereby deprive him of his property. That in the Ames, Starr, Young, W. U. Tel. Co., and Chicago, R. I. & P. R. Co. Cases was the institution and prosecution of suits and other proceedings against the plaintiff for failure to comply with a certain statute. This statute was unconstitutional,

and hence the plaintiff was not liable to be so proceeded against for such failure. This being so, the defendants had no right to institute and prosecute the suits and other proceedings, and, because of the multiplicity thereof, the institution and prosecution thereof would be a wrong to plaintiff. In defending same it would be deprived of its property. It is possible for one to wrong another by instituting and prosecuting a suit or other proceeding against him. If he so does with malice and without probable cause, he can be made to respond in damages at law. If he institutes and prosecutes a multiplicity of suits, all involving the same question, and groundless, he also commits a wrong; and it is such as equity will enjoin. It was such a wrong as this, i. e., the institution and prosecution of a multiplicity of groundless suits, all involving the same question, that was sought to be enjoined in these five cases, and because thereof the suits were held maintainable. The suits and other proceedings enjoined were groundless because they were to enforce an unconstitutional statute, i. e., to recover penalties for failure to comply therewith. To no other extent did the unconstitutionality of the statute affect the maintainability of the suits.

Such then being the reason why it was decided in these ten cases that the suit was maintainable, it follows therefrom that any suit is maintainable in a federal court against state officers to enjoin them from taking any action which they threaten to take if they have no right to take such action and the taking thereof will be a wrong to the plaintiff. It is not essential that the action be to enforce, or in pursuance of, an unconstitutional statute. Nor is it essential that it be action to enforce or in pursuance to an unconstitutional act on the part of some state officers or officer. It is sufficient that they have no right to take the action and that the taking thereof will be a wrong to the plaintiff. But the wrong must be such as equity will enjoin. It is not otherwise material what may be the character of the action. Such then I take to be the whole truth as to what follows from what was decided in those ten cases. The same principle which underlay what was decided therein underlies what was decided in the Farmers' Loan & Trust Co. and Atlantic Coast Line Co. Cases, and the same result follows therefrom. The threatened action sought to be enjoined therein was the institution and prosecution of suits and other proceedings for failure to comply with the act of a Railroad Commission under a constitutional statute, which was unconstitutional because confiscatory, and thereby to enforce such act. The act of the Railroad Commission being unconstitutional, the plaintiff was not liable to such suits and proceedings, the defendants had no right to institute and prosecute them, and the institution and prosecution thereof would be a wrong to plaintiff and that such as equity will enjoin. It was on this ground that the suits were held maintainable. Here then are twelve cases in the Supreme Court from the decisions in which it follows that a suit is maintainable in a federal court against state officers to enjoin them from committing a threatened wrong to the plaintiff if the wrong is such as equity will enjoin.

That in order to the maintainability of the suit there is no other essential characteristic of the threatened wrong than that it be such as

equity will enjoin is made certain by the following cases in that court, to wit: Allen v. Baltimore & Ohio Railroad Company, 114 U. S. 311, 5 Sup. Ct. 925, 962, 24 L. Ed. 200; Scully v. Bird, 209 U. S. 481, 28 Sup. Ct. 597, 52 L. Ed. 899; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570, in each of which, except the Philadelphia Company Case, a suit in a federal court against state officers to enjoin action which they threatened to take in the name and for the state and under color of their offices was held maintainable. In the Philadelphia Company Case the suit was not against state officers but against United States officers. Though the eleventh amendment could not apply to such a case, the common-law rule that a sovereign is not suable could, and this raised the same question as to the maintainability of the suit. It was held to be maintainable. The threatened wrong sought to be enjoined in the Baltimore & Ohio Railroad Company Case was the seizure of the rolling stock, etc., of a railroad to collect a valid tax after a tender of tax receivable coupons in payment thereof. The threatened wrong sought to be enjoined in the Scully Case was the taking of certain action by a dairy and food commissioner under cover of his office, but alleged to be a violation of the state laws, which if taken would injuriously affect the reputation and sale of certain products manufactured by plaintiff. And the threatened wrong sought to be enjoined in the Philadelphia Company Case was the institution and prosecution of criminal proceedings against the plaintiff because of its reclamation and occupation of its land within certain harbor lines in the harbor of Pittsburgh, Pa. It is to be noted as to this case that an injunction against such proceedings was not the only relief sought therein. It was also sought to have the harbor lines which had been established by the Secretary of War set aside. In so far, no doubt, the suit was not maintainable. But no notice seems to have been taken of this. The fact is that a suit in a federal court against state officers to enjoin them from committing a threatened wrong in the name and for the state and under color of their offices depends as to its maintainability on no more than what is essential to the maintainability of a suit against them to enjoin them from committing a threatened wrong in their individual capacities. In such a suit it is essential that the wrong be such as equity will enjoin. This and nothing more is required. That they are threatening to commit the wrong in the name and for the state, under color of their offices, without any personal interest in the matter, is of no significance whatever.

The conclusion thus reached as to the maintainability of suits against state officers in a federal court to enjoin them from taking action which they so threaten to take has been reached from a consideration of the case in the Supreme Court involving such action. The same conclusion follows from a consideration of two other classes of cases in the Supreme Court—those involving past action on the part of state officers, in the name and for the state and under color of their offices, and those involving present action of this character. Cases belonging to the first of these two classes are the following, to wit: Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75; Bates v. Clark, 95 U. S. 234, 24 L. Ed. 471; White v. Greenhow, 114 U. S. 307, 5 Sup. Ct. 923, 962,

29 L. Ed. 199; Chaffin v. Taylor, 114 U. S. 310, 5 Sup. Ct. 924, 962, 29 L. Ed. 198; Belknap v. Schild, 161 U. S. 10, 16 Sup. Ct. 443, 40 L. Ed. 599; Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632; Hopkins v. Clemson Agricultural College, 221 U. S. 636, 31 Sup. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243. In each of these cases, except the Hopkins Case, the suit was against an officer or officers, state or federal, to recover damages for action which they had so taken. The action taken had been taken in the name and for the state and under color of their offices, believing in good faith that they had the right to take it. They had no personal interest in the matter whatever. But in each case also they had no right to take the action and the taking of same was a wrong to plaintiff. The Hopkins Case was not a suit against state officers, but against a private corporation, which may be said to have been a state agent, which had acted in its own name, but under authority of the state and possibly may be said to have acted on its own behalf. The suit was held maintainable in each case. In the Clark Case Mr. Justice Miller said that one cannot protect himself "by orders emanating from a source which is itself without authority.". In the Schild Case the claim for damages was asserted in a suit for an injunction against threatened action, and the decision was that it should have been asserted at law.

Cases belonging to the other class are as follows, to wit: United States v. Lee, 106 U. S. 196, 1 Sup. Ct. 240, 27 L. Ed. 171; Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962, 29 L. Ed. 185; Tindal v. Wesley, 167 U. S. 204, 17 Sup. Ct. 770, 42 L. Ed. 137. In each of these cases present action on the part of the officer or officers sued was complained of. It consisted of withholding from plaintiff the possession of property to which he was entitled and the withholding of which was a wrong to him. In the Lee and Wesley Cases the property withheld was real estate and in the Poindexter Case personal estate. The withholding was in the name and for the state and under color of their offices in the belief in good faith that they had a right to withhold it. They had no personal interest in the matter whatever. The suit was to recover possession of the property withheld. In each case it was held that the suit was maintainable. The Bank of the United States Case, heretofore placed in the class having to do with threatened wrongs, also belongs here, in so far as the amended bill against the State Treasurer to compel him to restore to the plaintiff the $100,000 in money which the Auditor's appointee had, after the preliminary injunction was granted against him, on the original bill, forcibly taken from it and turned over to the Treasurer, but which the latter had not mingled with the state's funds, was concerned, which was held maintainable.

Now here are three classes of cases exactly alike in certain particulars. In each class the action complained of is action on the part of the officers sued in the name and for the state and under color of their offices in the belief that they had or have the right to take it and without any personal interest in the matter whatever. And in each class that action was a wrong against the plaintiff of which he had a right to complain. They differed only in this: That in one class

of cases the action was threatened; in the other, past and over; and, in the other, then on hand. There is nothing whatever in this difference that could have any bearing on the question of the maintainability of the suit in relation thereto except that, as the relief against the threatened action sought in the first class of cases could only be obtained in equity, the action had to be such as equity will enjoin. It is therefore a legitimate inference from the maintainability of suits having to do with past and present wrongs that suits having to do with threatened wrongs are maintainable if the wrongs complained of are such as equity will enjoin. They are no more suits against the state and forbidden by the eleventh amendment than are suits which have to do with past or present wrongs.

Thus far I have limited myself to cases in the Supreme Court in which suits in a federal court against state officers have been held maintainable and have gathered from them that such a suit is maintainable to enjoin them from taking action which they threaten to take in the name and for the state and under color of their offices, if they have no right to take such action and the taking thereof will be a wrong to plaintiff, such as equity will enjoin. There are a number of cases in which suits in a federal court against state officers have been held not to be maintainable. It should be considered whether these cases or any of them are against this conclusion. Such are the following cases, to wit: Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448; Cunningham v. Macon, etc., R. Co., 109 U. S. 446, 3 Sup. Ct. 292, 609, 27 L. Ed. 992; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608, 29 L. Ed. 805; In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; Christian v. Atlanta & N. C. R. Co., 133 U. S. 233, 10 Sup. Ct. 260, 33 L. Ed. 589; Belknap v. Schild, 161 U. S. 10, 16 Sup. Ct. 443, 40 L. Ed. 599; Fitts v. McGhee, 172 U. S. 516, 19 Sup. Ct. 269, 43 L. Ed. 535; Smith v. Reeves, 178 U. S. 436, 20 Sup. Ct. 919, 44 L. Ed. 1140; International Postal Supply Co. v. Bruce, 194 U. S. 601, 24 Sup. Ct. 820, 48 L. Ed. 1134.

I have heretofore considered the Schild Case, in so far as it had to do with the right to recover damages for a past wrong. It is classed here so far as it had to do with the right to enjoin a future or threatened wrong. The decisions in these cases that the suits were not maintainable do not conflict with the cases heretofore considered, and they are not against the conclusion which I have gathered therefrom, except the Schild, and possibly the Postal Supply, Cases. As I read the Schild Case, the relief sought, other than for damages, was against the continued use of the patented caisson gate, for the past use of which the damages were claimed, and the destruction thereof. In so far as the relief sought included the destruction of the gate, undoubtedly plaintiff was not entitled to it. The gate had been made by the Union Iron Works of San Francisco, and then put in place and continued to be used by the defendants acting on behalf of the United States. Though the making and use of the gate was an infringement of the patent, and therefore wrongful, the title to the gate was in the United States. It owned the gate and was entitled to its possession, subject to the right of destruction which plaintiff had. It had this

right in order to prevent its use in derogation of the patent. It, however, was a right which plaintiff could not assert in a suit against the United States, because it was not suable; and it was not a right which could be asserted against the officers sued in that case, because they had no interest in the matter whatever, and the decreeing of destruction of the gate would not be the granting of relief as against them, the only relief which could be granted. But I am unable to see why the plaintiff was not entitled to the injunction against the continued use of the gate by the officers sued. The use thereof was a wrong to plaintiff for which in the past it was held they were liable in damages.

The case so far seems to be based on the English case of Vavasseur v. Krupp, L. R. 9 Ch. Div. 351. It was there held by the Chancery Court of England that a suit was not maintainable by an English patentee against the agents of a foreign sovereign stationed in England and in possession of shells, the making and use of which was an infringement of the patent, to enjoin the agents from delivering them to the sovereign. But a delivery of the shells to the sovereign was not a use of them in violation of the patent. The foreign sovereign owned the shells and was entitled to their possession. The patentee's sole right was to have the shells destroyed. But that was a right which could not be asserted in a suit against the agents. This case supports the decision in the Schild Case in so far as it held that the plaintiff was not entitled to a destruction of the gate. It does not support it in so far as it was held that the officers sued were not enjoinable from further using the gate. The Postal Supply Company Case was based on the decision in the Schild Case. Mr. Justice Holmes approved the holding therein that a patentee is not entitled to an injunction against the officers of the United States enjoining them from using an article infringing a patent. In referring to the Schild Case, he said:

"It was pointed out that the defendants had no personal interest in the continuance of the use, and that so far as the injunction was concerned the suit was really against the United States. Of course, if those defendants were enjoined, other persons attempting to use the caisson gate would be, and thus the injunction would practically work a prohibition against its use by the United States."

But this is what happened in all cases above referred to in which suits have been held maintainable against the officers of a state enjoining them from acting on behalf of the state. The injunction granted in effect prevented the state from so acting, or rather its officers from so acting, on its behalf. The Postal Supply Company Case, however, apart from this feature of it, would seem to have been decided right. It appeared that the Syracuse postmaster, who was sued, had himself never used the canceling and postmarking machine. It had only been used by two subordinates in the office. Of course, if any one was to be enjoined, it should have been those guilty of using it, and not the postmaster.

In none of the other cases had the state officials sued either committed any wrong against the plaintiff, or were they then committing any wrong against them, or were they threatening to commit any wrong against them. In the Cunningham and Christian Cases no relief even

was sought against the state officers sued. In each case the suit was to subject property, the title to which was in the state, to the payment of an indebtedness on its part. In the Cunningham Case the property was the railroad which the state of Georgia had purchased under the first mortgage and the title to which it had acquired, and it was sought to be subjected to the payment of second mortgage bonds indorsed by the state. In the Christian Case the property was stock in a certain railroad and dividends thereon owned by the state and in the possession of the State Treasurer, and they were sought to be subjected to payment of the bonds of the state to whose payment they had been pledged. Such relief was not relief against the Governor and Treasurer of the state, defendants in the one case, or against the Treasurer of the state, defendant in the other case; but in each case the relief sought was against the state whose officers or officer alone had been sued.

In the Jumel, Southern, and Smith Cases, though relief was sought against the state officers sued, it was not to make compensation for a past wrong or to cease withholding property owned by plaintiff and which they were withholding from him, or to enjoin them from committing a threatened wrong. It was to compel the state officers to do something which the plaintiffs had no right to have them do, i. e., to take funds of the state over which they had more or less control and pay the state's debts with them. There was no statute in force imposing the duty on the state officers sued of doing that which it was sought to compel them to do. The relief sought was to compel the state whose officers were sued to pay their debts by acting on those officers.

The Ayers and McGhee Cases, of all these cases where it was rightly held that the suits were not maintainable, are probably the most difficult to distinguish from those where it has been held that the suit was maintainable. The Ayers Case is one of a number of cases in the Supreme Court of the United States known as the "Virginia Coupon Cases." The state of Virginia had issued bonds containing a provision that the bonds and coupons should be receivable in payment of taxes due on it. The state desired to repudiate the bonds, and, in order to understand the Ayers Case, a brief résumé of the means resorted to by the Legislature of the state to embarrass and prevent the use of the coupons cut from these bonds in payment of taxes will be helpful. The first step was an enactment that only gold or silver coin or United States treasury or national bank notes should be receivable in payment thereof. This act was held unconstitutional by the Supreme Court of Virginia. The Legislature then enacted that the bonds should be subject to a certain tax and the tax collectors should deduct this tax from the coupons when tendered and credit only balance of the coupons on the taxes. This was overthrown by the Supreme Court of the United States in the case of Hartman v. Greenhow, 102 U. S. 672, 26 L. Ed. 271. The suits in which the legislation down to this last act had been invalidated were suits in mandamus, and by them, notwithstanding such legislation, the tax collectors were compelled to accept the coupons in payment of taxes. The Legislature then directed

its attention to suits in mandamus in such cases. It provided for troublesome proceedings for the establishment of the genuineness of the coupons before the writ could issue. This legislation was upheld by the Supreme Court of the United States in the case of Antoni v. Greenhow, 107 U. S. 769, 2 Sup. Ct. 91, 27 L. Ed. 468. The result was that the taxpayers quit resorting to mandamus proceedings. They tendered their coupons and then rested on their oars. This forced the tax collectors to take action, for the state wanted its taxes. Suits could not be brought to collect them, for there was no legislation authorizing suits, and there had to be such legislation in order that suits might be brought. The only action which they could take was to distrain and levy for taxes, and this they did.

Thereupon arose the White and Chaffin Cases, hereinbefore cited, which were suits in trespass by taxpayers against the tax collectors to recover damages, and the Poindexter Case, hereinbefore cited, which was a suit by a taxpayer against the tax collector to recover the property levied on, which suits were held maintainable as heretofore shown. It was evidently these decisions which brought about the legislation out of which arose the Ayers Case. That legislation authorized suits to be brought for the recovery of taxes in the name of the state and provided further that, if the defendant relied on a tender of coupons as payment of the taxes, the burden should be on him to prove both the tender and the genuineness of the bonds. The legislation was valid. No fault was or could have been found with it. The collection of taxes by suit may be authorized, and the taxpayers had no right to tender in payment of their taxes coupons unless they were genuine. There had been, however, previous legislation providing that in suits where the tender of coupons was involved the taxpayer should produce the original bonds from which they were cut, and that expert evidence as to genuineness was not admissible, and the claim on behalf of the state was that this legislation applied to suits for the collection of taxes authorized by this subsequent legislation. Thereupon a suit was brought in the United States Circuit Court for Virginia against the Attorney General of that state and certain other officers charged with the bringing of such suits to enjoin them from so doing, on the ground that the previous legislation practically cut off the defense that genuine coupons had been tendered, and hence impaired the obligation of the contract under which they had been issued and accepted. That court having granted a restraining order and confined the Attorney General for disobeying it, the matter was brought before the Supreme Court by writ of habeas corpus. It held that the lower court had no right to make the restraining order and released the Attorney General.

It is to be noted that the suit had been brought, not by any taxpayer, but by an Englishman who had bought up the coupons on a speculation and sold them to taxpayers. He therefore had no direct interest in the matter of enjoining the bringing of the suits against the taxpayer. His interest was consequential solely—the effect that the right to bring such suits and to hamper the defense to them would have upon the coupons which he still had. He had no right to bring the

suit, as had been held in the previous case of Marye v. Parsons, 114 U. S. 325, 5 Sup. Ct. 932, 962, 29 L. Ed. 205. But, this apart, the Attorney General and other prosecuting officers had the right to bring suits the bringing of which was sought to be enjoined. The statute authorized it and was valid. The tender of the coupons was a good defense only in case the coupons tendered were genuine and the state had the right to litigate the matter. The question of the application of the previous legislation as to the production of the bonds from which the coupons had been cut and exclusion of expert evidence and the validity thereof could come up in these suits and there be disposed of. The suits, therefore, which the officers were sought to be enjoined from bringing, were not groundless suits, but suits which they had a right to bring. In bringing them no wrong would be done the taxpayer. The threatened action which was sought to be enjoined would not, if taken, be a wrong to the plaintiff. Besides each taxpayer was threatened with but a single suit. Hence it was properly held that suit against the state officers was not maintainable. The ground of the decision, therefore, was not that the suit was against the state, but because the state officers were not about to do that which would be a wrong to the plaintiff.

In the McGhee Case the Legislature of Alabama had passed an act fixing maximum rates of toll for passage over a certain bridge and provided penalty for any charge in excess thereof, recoverable by the person overcharged. No other than the person overcharged had any right to sue for the penalty. There was a general statute making it an offense for any bridge company, or any of its officers or agents, to charge tolls in excess of those authorized by its charter, or, if the charter did not specify the amounts to be charged, in excess of a reasonable toll, and prescribing a fine for so doing. Prosecutions under this statute were by indictment in the name of the state. After the passage of the special act, a large number of indictments—100 or more—were found against the bridge company's tollgate keeper. They were and could only have been found under the general statute. The suit as originally brought was against the state of Alabama, the Governor and Attorney General thereof as such—they being called on to answer on behalf of the state—and the state's attorney for the county wherein the indictments were found. The bill claimed that the special act was unconstitutional in that the rates fixed thereby were confiscatory. Subsequently the case was dismissed as to the state, and the call on the Governor to answer on behalf of the state was stricken out. Pending the suit, a preliminary injunction was granted against the Attorney General restraining him from instituting proceedings in mandamus to compel the bridge company to charge tolls in accordance with the special act or forfeiting its charter for charging in excess thereof and also one against the state's attorney restraining the prosecution of the indictments. The final decree adjudged the special act unconstitutional and made the preliminary injunctions perpetual. The decree was reversed and the lower court directed to dismiss the bill. The sole ground upon which it was held that the plaintiff was not entitled to a decree against the state's attorney having in charge the pros-

ecution of the indictments enjoining him from prosecuting them was that they were criminal proceedings. This much of the holding was not placed on the ground that, in so far, the suit was one against the state of Alabama. It might also have been placed on the ground that the state's attorney had the right to prosecute those indictments. The statute under which they had been found was not, and was not claimed to be, unconstitutional. What he was about to do, therefore, was not a wrong to the plaintiff. The ground upon which it was held that plaintiff was not entitled to any relief as to the Attorney General does not so clearly appear. The confusion, if such there is, grows out of the uncertainty as to what relief other than an injunction restraining the prosecution of the indictments the bill was construed as seeking. There is room to think that all the other relief which the bill was construed as seeking was an adjudication that the special act was unconstitutional. Of course, if such was the case, no relief whatever was sought against the Attorney General; and as was said by Mr. Justice Peckham in the Young Case:

"A state superintendent of schools might as well have been made a party."

It is possible, however, that it was construed as seeking an injunction against the Attorney General in the matter of suits to recover penalties for excess charges of tolls under the special act and further restraining him from instituting a proceeding in mandamus to compel obedience to the act or one forfeiting its charter for disobedience thereof. If it was construed as seeking an injunction against him in the matter of suits to recover the penalties, the ground upon which it was held—that the suit, in so far, was not maintainable—undoubtedly was that the Attorney General had and could have no connection with the bringing of those suits. The penalties were recoverable only by the person overcharged. That the bill should have been construed as seeking an injunction against the Attorney General restraining him from instituting mandamus or forfeiture proceedings cannot be questioned, for the bill expressly prayed therefor, and one of the preliminary injunctions made perpetual was to that effect. The doubt as to whether the bill was construed as seeking such an injunction is due to the fact that no mention of this feature of the bill is made in Mr. Justice Harlan's opinion. If it was so construed, the ground upon which it was held that the plaintiff was not entitled to such relief must have been that such a proceeding was a single proceeding which the plaintiff had no equity to prevent being instituted. Though groundless, it was not an equitable wrong to plaintiff for the Attorney General to bring it, and hence not enjoinable. There is nothing in the Young Case against this holding in this particular being sound. For, though in that case the Attorney General disclaimed any intention to institute any proceedings besides the mandamus proceedings, it was possible for him to subject the plaintiff to a multiplicity of suits and he had no right to expect plaintiff to rely on his intentions. In the McGhee Case it was not possible for the Attorney General to institute any proceeding but the single proceeding in mandamus or forfeiture. There is therefore nothing in the Ayers and McGhee Cases in conflict

with the cases involving suits against state officers having to do with past, present, or threatened action on their part constituting a wrong to plaintiff. Possibly there are expressions in the opinions therein which it may be difficult to harmonize with those cases. But in so far as those expressions are in conflict therewith they will have to be ignored.

A consideration, therefore, of all the cases in the Supreme Court of the United States in which the question as to the maintainability of a suit in a federal court against officers of a state has arisen—in many of which the suit has been held maintainable, in others of. which it has been held not maintainable—leaves no room for doubt as to the maintainability of such a suit where the relief sought is against a threatened wrong such as equity will enjoin, just as much so as where it is based on a past or present wrong. The whole matter is well put by Mr. Justice Lamar in the Hopkins Case. He there said:

"But immunity from suit is a high attribute of sovereignty, a prerogative of the state itself, which cannot be availed of by public agents when sued for their own torts. The eleventh amendment was not intended to afford them freedom from liability in any case where, under color of their office, they have injured one of the state's citizens. To grant them such immunity would be to create a privileged class free from liability for wrongs inflicted or injuries threatened. Public agents must be liable to the law, unless they are to be put above the law."

Again he said: .

"The many claims of immunity from suit have therefore been uniformly denied, where the action was brought for injuries done or threatened by public officers."

And again he said.

"Neither a state nor an individual can confer upon an agent authority to commit a tort so as to excuse the perpetrator. In such cases the law of agency has no application; the wrongdoer is threatened as a principal and individually liable for damages inflicted and subject to injunction against the commission of the acts causing irreparable injury."

And in this connection it is to be distinctly noted that the maintainability of the suit in such a case to no extent depends upon whether the state will be affected by its maintenance. In all the cases where complaint was made of a threatened wrong and in which it was held that the suit was maintainable, it was so held notwithstanding the state was so affected by the granting of the relief sought that no action at all, in such particular, could be taken on its behalf. The state was also seriously affected in the suits where complaint was made of the present wrong of withholding property from plaintiff and in which the suit was held maintainable. Its officers were deprived of the possession of the property which they held for it. It was only in the cases where complaint was made of a past wrong that the state was not affected by the maintainability of the suit. It was not otherwise affected than thereby other state officers would be deterred from committing like wrongs on its behalf. In order then for a suit in a federal court against state officers seeking relief against threatened wrong not to be maintainable, it is not sufficient that the state be affected thereby, no matter to how great extent.

But though, as I think, there cannot be the slightest doubt that a suit is maintainable in a federal court against state officers seeking relief against a threatened wrong such as equity will enjoin, notwithstanding all action in that particular on behalf of the state will thereby be prevented and the state to this extent will be affected by the maintenance of the suit, for many years great uncertainty has existed as to the maintainability of such a suit. To a certain extent this uncertainty has been removed by the Young and subsequent cases, and yet it has not been entirely removed. The positions of the parties hereto is evidence of this. The defendants with much earnestness and sincerity of conviction contend that this suit is not maintainable. The plaintiff has too narrow an idea as to the maintainability of such a suit. Had it the true view, it would not have appended to the names of the defendants in the caption of its bill the title of the offices held by them, respectively, which I treat as mere descriptio personarum. According to the true view of the matter, no reference should have been made in the caption to their official capacities, thereby giving room for the impression that they are sued in such capacities. They are not so sued. They are sued in their individual capacities to enjoin them from committing a threatened wrong under cover of their official capacities. Other striking evidence of this may be noted. In the Young Case Mr. Justice Peckham said:

"It cannot be stated that the case before us is entirely free from any possible doubt, nor that intelligent men may not differ as to the correct answer to the question we are called upon to decide."

But it seems to me that a correct observation, classification, and generalization of the previous relevant cases in the Supreme Court rendered the case then before the Supreme Court entirely free from doubt and left no room for intelligent men to differ as to the question it was then called upon to decide. The effort was made in that case to settle the law on the subject for all time to come, and yet the Supreme Court has had the subject before it since in five cases, to wit, the Scully, the Atlantic Coast Line Company, the W. U. Tel. Company, the Chicago, R. I. & P. R. Co., and the Philadelphia Company Cases, and in the last case it deemed it proper to make another survey of the previous relevant cases. It has even found it necessary since then to review all the previous relevant cases in a case where the wrong with which the suit had to do was a past wrong, to wit, in the Hopkins Case, where there would seem to be very little room for difference of opinion. In the Schild Case it was held that officers could be made to respond in damages for a past infringement of a patent, but could not be enjoined from present and future infringement. That they could not be so enjoined was upheld in the Postal Supply Co. Case and the reason which Mr. Justice Holmes gave for the position really undermined the many previous cases in which it had been held that threatened action might be enjoined, notwithstanding the effect thereof was to prevent any action in that particular on behalf of the state. The course of Mr. Justice Harlan in reference to the matter indicates considerable confusion of thought in regard to the matter. Prior to the McGhee Case he had

been a radical in favor of the maintainability of suits against state officers. He had dissented from the decisions in the Jumel, Cunningham, Southern, Ayers, and Schild Cases, i. e., in all the cases prior to the McGhee Case where it had been held that the suit was not maintainable except the Christian Case. As I view it his dissent was sound in the Schild Case but unsound in the others. In the McGhee Case he said in his opinion on behalf of the court that the matter had "so frequently been the subject of consideration by the court" that "nothing of importance" remained "to be suggested on either side of the question," and that it was only necessary in each case as it arose "to ascertain whether it falls on one side or the other of the line marked out" in the former decisions. Yet nothing has done more to unsettle what had been settled before, and to create confusion in regard to the matter, than the way he handled that case and certain expressions in his opinion therein. Thereafter he became a radical against the maintainability of such suits.

In his dissent in the Young Case he claimed that his position was in substantial accord with what the court had theretofore decided— that the opinion of the majority "departed from principles previously announced by it upon full consideration"—and that he proposed "to adhere to former decisions of the court, whatever may have been once" his opinion "as to certain aspects of this general question." An indication of the confusion of thought under which he was laboring is to be found in the position that he took as to what followed from the decision therein that the suit was maintainable. He said that it followed therefrom that a suit against a state grand jury, a state judge, and a state petit jury to enjoin them from having to do with the proceedings that Young, the Attorney General, had been enjoined from instituting and prosecuting would be maintainable. But that did not follow. The state judge and juries in trying and disposing of the proceedings would commit no wrong against the plaintiff; whereas, Young, the Attorney General, in instituting and prosecuting them, would. He would thereby subject the plaintiff to a multiplicity of groundless suits all involving the same question. That Mr. Justice Harlan went to his grave thinking that his dissent in the Young Case was sound is evident from his dissent in the Hopkins Case, the last case before the court prior to his death involving the question as to the maintainability of suits against state officers or a state agent in any form.

This condition of things has led me to reflect on the probable cause of this uncertainty and confusion of thought. It occurs to me that there are two main sources thereof. One thing that has had much to do with it is a departure from one of the positions Mr. Chief Justice Marshall took as to the maintainability of a suit in the federal court where the sole defendants to the record were state officers, in his masterly opinion in the Bank of the United States Case, the pioneer case on the subject. That position was that in no contingency was such a suit against the state and forbidden by the eleventh amendment. This was so because the state, not being a party to the record, was not sued. He said:

"It may, we think, be laid down as a rule which admits of no exception that, in all cases where the jurisdiction depends on the party, it is the party named in the record. Consequently, the eleventh amendment, which restrains the jurisdiction granted by the Constitution over suits against states, is, of necessity, limited to those suits in which a state is a party on the record. The amendment has its full effect, if the Constitution be construed as it would have been construed, had the jurisdiction of the court never been extended to suits brought against a state by citizens of another state, or aliens."

Mr. Justice Swayne took the same position in the case of Davis v. Gray, supra. He said:

"In deciding who are parties to the suit, the court will not look beyond the record. Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind him as the real party in interest. A state can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation."

The departure from this position was taken by Mr. Justice Matthews in the Poindexter Case. He said:

"The question whether a suit was within the prohibition of the eleventh amendment is not always determined by reference to the nominal parties on the record. The provision is to be substantially applied in furtherance of its intention, and not to be evaded by technical and trivial subtleties."

He put the matter stronger in the Ayers Case. He said:

"It must be regarded as the settled doctrine of this court, established by its recent decisions, 'that the question whether a suit was within the prohibition of the eleventh amendment is not always determined by reference to the nominal parties on the record.'"

And further:

"This, it is true, is not in harmony with what was said by Chief Justice Marshall in Osborne v. Bank of United States."

He was led to this departure by the decision in the case of New Hampshire v. Louisiana, 108 U. S. 76, 2 Sup. Ct. 176, 27 L. Ed. 656, where it was held that the Supreme Court had no jurisdiction, by virtue of the third article of the Constitution conferring jurisdiction upon it of controversies between two or more states, of a suit by one state against another to collect an indebtedness of the latter to a citizen of the former assigned to it for the purpose of collection. The decision, however, in that case was not because the suit was not a suit between the two states, but was in fact a suit between the assignor of the indebtedness and the defendant state, but because a party plaintiff to a suit has no right to enforce the cause of action of another against the defendant thereto. He can only enforce his own cause of action. Mr. Chief Justice Waite said:

"One state cannot create a controversy with another state within the meaning of that term as used in the judicial clauses of the Constitution, by assuming the prosecution of debts owing by the other state to its own citizens."

Mr. Justice Matthews, in thus departing from this position of Mr. Chief Justice Marshall, seems to have thought that it was essential to do so in order that a suit in which relief was sought against the state might not be rendered maintainable by the trick of not making the state a party defendant to the record. But such a suit could not thereby be

made maintainable; for, though the eleventh amendment or the common-law rule against suability of a sovereign would not be against its maintenance, the rule that a suit is not maintainable in the absence of indispensable parties would. And in such a case the state would be an indispensable party. So it was that Mr. Chief Justice Marshall supplemented his position that the eleventh amendment did not apply if the state was not a defendant to the record by the further position that, when the state was not such defendant and the suit was against state officers only, the test of the maintainability of the suit was whether the state was an indispensable party to the suit. He said:

"The state not being a party on the record, and the court having jurisdiction over those who are parties on the record, the true question is, not one of jurisdiction, but whether, in the exercise of its jurisdiction, the court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties."

That the indispensableness of the state as a party is the test of the maintainability of a suit against its officers was recognized by Mr. Justice Miller, in the Cunningham Case. He said:

"Whenever it can be clearly seen that the state is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction."

Judge Marshall took care to point out that it was the fact that the state was an indispensable party to the suit which alone would render it not maintainable. It was not sufficient that the state was a proper party to the suit. The absence of a proper party to the suit, if for any reason he cannot be made such, as, for instance, he is out of the jurisdiction, or if it is a state and cannot be sued, is not in the way of the maintenance of the suit. This principle has found expression in the old 47 equity rule. In the Bank of the United States Case he said:

"The direct interest of the state in the suit, as brought, is admitted; and, had it been in the power of the bank to make it a party, perhaps, no decree ought to have been pronounced in the cause, until the state was before the court. But this was not in the power of the bank."

This was a clear recognition, as was the decision in that case, that the fact that a state will be affected by a suit against state officers is not a consideration against the maintainability of the suit. The result of the decision therein prevented the collection on behalf of the state of Ohio of the tax which its officers tried to collect from the bank and from thereby driving the bank out of the state, which was the motive behind the enactment of the unconstitutional statute imposing the tax.

[2] But it seems to me that the better test as to the maintainability of a suit in a federal court against state officers is to be found in a consideration of the relief sought therein. If the relief sought is relief against the state, it is not maintainable. Such relief may be the only relief sought as in the Cunningham and Christian Cases, or it may be sought through relief against the officers, as in the Jumel, Southern, and Smith Cases. If, however, the sole relief sought is relief against the state officers, it is maintainable. Such it is if it seeks compensation for a past wrong, recovery of possession of property wrongfully withheld, constituting a present wrong, or an injunction against a threat-

ened wrong such as equity will enjoin. This is the better test because it is the test of whether the state is an indispensable party. It is the ultimate test, and it is always best to think in ultimates.

The way in which this departure from Mr. Chief Justice Marshall's position, that a state was not sued within the eleventh amendment unless it was a defendant to the record, has contributed to the uncertainty and confusion of thought to which I have alluded, is that the position that the state can be said to be sued when not a defendant to the record within the eleventh amendment has lent color to the idea that, in order for it to be so said, it is sufficient that the state will be affected by the maintenance of the suit and not essential that the relief therein sought be against it, which we have seen is not true. And the matter has been helped along by the fact that in taking this position the Supreme Court has not made it clear that, in order for a suit to be against the state when not a party defendant to the record, it is essential that the relief therein sought be against it, and that it is not sufficient that the state may be merely affected by its maintenance. As it has now to be accepted that a suit may be a suit against a state though it is not a party defendant to the record, it should be clearly understood that in order to this end the one thing is essential and the other not sufficient.

The other source of uncertainty and confusion of thought to which I have referred is the fact that most of the cases in the Supreme Court, involving suits in a federal court to enjoin state officers from taking action which they threaten to take, have been suits where the threatened action sought to be enjoined was action to enforce an unconstitutional statute, and, in stating the law as to the maintainability of such suits in the opinions therein, it has been given a partial cast. Take, for instance, the quotation from the opinion of Mr. Justice Peckham in the Young Case heretofore made, which is taken as the kernel of his opinion therein. In this quotation he undertakes to state the law to be gathered from the various cases in the Supreme Court considered by him. He states that it is to the effect that a suit to enjoin proceedings to enforce an unconstitutional act violating the federal Constitution is maintainable. The parties hereto take it that by "unconstitutional act" he meant an unconstitutional statute. But it is by no means certain that he intended to so limit those words. He may have intended to include an unconstitutional act on the part of any state officer. Whichever he meant, as we have seen, the statement was only a partial statement of the law. The law is that a suit to enjoin the commission of any threatened wrong is maintainable. It is because a multiplicity of proceedings to enforce an unconstitutional act is a threatened wrong, and a suit to enjoin such proceedings is a suit to enjoin the commission of a threatened wrong, that such a suit is maintainable. It follows from this that a suit to enjoin any threatened wrong, no matter what may be its character, provided that it is such as equity will enjoin, is maintainable. For some reason the law was not put in this general and ultimate form. Quotations from other opinions in this partial form might be made. So stating the law was calculated to mislead, especially one whose thinking may be superficial, into supposing that such is the whole law on the subject of the maintainability of suits to enjoin threatened action.

[3] Applying the law on this subject, as I have felt constrained to hold it to be, how then is it as to the maintainability of this suit? Is. the relief sought relief against the state of Kentucky, and is the state an indispensable party to the suit? If not, and the relief sought is relief against the state officers sued, will the threatened action sought to be· enjoined, if taken, be a wrong to plaintiff, and such a wrong as equity will enjoin? It is clear that no relief is sought against the state of Kentucky. The sole relief sought is against the state officers sued. They are sought to be enjoined from taking certain action which they threaten to take. It is certain, also, that, if the assessment complained of is void on either ground relied on, the threatened action sought to be enjoined, if taken, will be a wrong to the plaintiff such as equity will enjoin. That action is the institution and prosecution of a multiplicity of groundless suits and the taking of steps which, if taken, will result therein. This action, if taken, will be a wrong to plaintiff and such as equity will enjoin. It may sound strange to the defendants that in taking such action they will commit a wrong against plaintiff; but, if the claim that the assessment complained of is void on either ground relied on is correct, such is the legal conception of their action.

I must not leave this feature of the case without taking notice of the cases of Coulter v. Weir, 127 Fed. 897, 62 C. C. A. 429, and Coulter v. L. & N. R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615. Each of these cases was an appeal from a decree. entered by me, one to the Sixth Circuit Court of Appeals, and the other to the Supreme Court.. Each was a suit complaining of an assessment·made by the same board that made the assessment complained of herein and under the same statute. That complained of in the first case was against the Adams Express Company, and in the second one against the plaintiff herein. In each case the decree entered was in favor of the plaintiff and, in each, on the appeal the decree was reversed, in the first case only in part. In each case it was held that I had erred in upholding a suit against the state in violation of the eleventh amendment. In view of this experience it is quite important that I should not fall into the same error again. And this necessitates a somewhat careful consideration of both those cases.

In the Weir or Adams Express Company Case, the person then Auditor of the State was the sole defendant. The relief decreed by me was that the defendant be enjoined from apportioning or certifying the assessment complained of in excess of a certain amount for local taxation and from collecting any state taxes thereon, those on the amount thereof not complained of having been paid, and that the assessment in excess thereof be set aside and held for naught. The portion of the decree affirmed was in so far as it enjoined the defendant from apportioning or certifying the excess portion of the assessment for local taxation. It was held that in so far the suit was maintainable and the plaintiff entitled to relief. Judge Lurton said:

"This suit is clearly maintainable so far as it seeks to enjoin the defendant from certifying the assessment complained of to the county court clerks. The suit to that extent is a suit against Coulter as an individual, and the object is to restrain him from certifying the assessments made by the state board, which he claims he is required to do by the law of the state, but which the

complainants say is not a valid authority. Coulter must therefore justify himself by showing, if he can, that the authority under which he claims to act is sufficient."

He cited in support of this decision the prior decision of that court in the case of Taylor v. L. & N. R. Co., 88 Fed. 350, 31 C. C. A. 537, and the decision of the Supreme Court of the United States in the case of Stone, Auditor, v. Farmers' Bank, 174 U. S. 409, 19. Sup. Ct. 880, 43 L. Ed. 1027. The portion of the decree reversed was in so far as it related to state taxes, i. e., set aside and held for naught the assessment in excess of a certain sum and enjoined the defendant from collecting state taxes on such excess. It was held that in so far as the decree set aside and annulled the assessment it was relief against the state of Kentucky, and hence erroneous. Judge Lurton said:

"The court in this exceeded its jurisdiction, for jurisdiction over the defendant did not give it jurisdiction over the state of Kentucky, as the decree seems to assume."

Undoubtedly in so far the judgment was erroneous, and for the reason if none other, it was not relief against the defendant. This feature of the decree escaped my attention, and I cannot say now that, had I noticed it, the result would have been different. The ground upon which the decree was held to be erroneous in so far as it enjoined the defendant from collecting any taxes on the excess was that the defendant had nothing to do with collecting state taxes. Judge Lurton said:

"Counsel representing the appellee have not pointed out any provision of law under which the defendant, as Auditor, had any power or authority to coerce the payment of the tax so assessed, and we have searched in vain for any remedy against recalcitrant taxpayers of such a franchise tax, so far as same is due the state, other than those found in sections 4091 and 113, Kentucky Statutes 1903."

He expressly recognized that, if the defendant had anything to do with the collection of state taxes, the suit was maintainable against him to enjoin him from attempting to collect them, the same as it was maintainable against him to enjoin him from apportioning or certifying the assessment for local taxation, which there was no question it was his function to do. He said:

"If the defendant had been about to take some step under color of the law tending to complete the assessment, or if he had been authorized to seize property and was about to do so, then he was, assuming the case to be with the complainant on the merits, about to commit a trespass for which he would be individually liable, and in a proper case equity might enjoin his proposed action upon the ground of his want of legal authority. But this is not the case made in respect to the tax due the state, and the bill, so far as it sought relief against the state tax, must be dismissed without regard to the merits."

There are provisions in the statutes of Kentucky making it the duty of the Auditor to enter in account as a demand payable at the treasury such state taxes, to report to the Attorney General a delinquency arising from a failure to pay them, and to cause proceedings to be instituted because of the failure, to which the court's attention was not called and which it did not find in its research. They are sections

144, 145, and 152, Kentucky Statutes. Had the court known of these provisions, it would have upheld the decree in so far as it enjoined the defendant from taking steps to collect state taxes as well as in so far as it enjoined him from apportioning or certifying the assessment for local taxation.

Here no relief against the assessment is sought. It is not sought to have it set aside and held for naught. And the Auditor is not the sole defendant. The Attorney General and prosecuting officers having to do with the institution and prosecution of proceedings against plaintiff because of its delinquency in payment of state taxes are defendants also, and it is also unquestionable that the institution of a multiplicity of groundless suits involving the same question is such a wrong as equity will enjoin. So the decision in this case is an authority in support of the maintainability of this suit as to both state and local taxes, instead of being against its maintainability to any extent. In the Louisville & Nashville Railroad Company Case the same position was taken as in the Weir or Adams Express Company Case. It was held that the suit was maintainable in so far as it sought to enjoin the apportionment and certification for local taxes, but not in so far as it sought to enjoin the collection of state taxes. The latter holding was based on the Weir or Adams Express Company Case. Mr. Justice Holmes said:

"We need not stop to show that so much of the bill as seeks an injunction against collecting the state tax, and the portion of the decree which orders a receipt to be executed on the part of the state, cannot be maintained. See Coulter v. Weir, 127 Fed. 897, 906, 912 [62 C. C. A. 429]. On the other hand, in a proper case, a bill may be brought to restrain apportionment and certification to the counties. Fargo v. Hart, 193 U. S. 490, 495, 503 [24 Sup. Ct. 498, 48 L. Ed. 761]."

The suit was against not only the Auditor, but the members of the Board of Valuation and Assessment. Undoubtedly the decree in so far as it ordered a receipt to be executed on the part of the state was erroneous. I do not recall that I saw the decree after handing down my opinion in the case, and I cannot say that it would have made any difference had I seen it. My opinion in the case, reported in 131 Fed. 282, however, shows that as I viewed the matter the sole relief sought was to enjoin the apportionment and certification of the assessment for local taxation. It is certain that there is nothing in this decision against the maintainability of this suit in toto. So far as the decision as to state taxes was concerned, it took for granted what had been held in the Weir or Adams Express Company Case, that the Auditor had nothing to do with collecting state taxes, and the Attorney General and other prosecuting officers were not defendants, and no injunction was sought against institution and prosecution of proceedings for delinquency in payment of state taxes. There is therefore nothing in this decision in support of the contention that this suit is not maintainable because it is a suit against the state.

Finally, it is to be noted that, if this suit had been brought in the state court, instead of this court, it would have been held maintainable. The Court of Appeals has frequently sustained suits in the state court against state officers in which complaint was made of assess-

ment made by the Board of Valuation and Assessment under the statute in question here, and relief was sought against state as well as local taxes. The following are cases of this sort, to wit: Coulter v. Louisville Bridge Company, 114 Ky. 42, 70 S. W. 29; Ætna Life Ins. Co. v. Coulter, 115 Ky. 787, 74 S. W. 1050; Fidelity & Casualty Co. v. Coulter, 115 Ky. 805, 74 S. W. 1053; Hager v. American Surety Co., 121 Ky. 791, 90 S. W. 550; James v. Kentucky Refining Co., 132 Ky. 353, 113 S. W. 468; James v. U. S. Fidelity & Guaranty Co., 133 Ky. 299, 117 S. W. 406; James v. American Surety Co., 133 Ky. 313, 117 S. W. 411. The suits in the Ætna Life Insurance Company, Fidelity & Casualty Company, United States Fidelity & Guaranty Company, and the last of the two American Surety Company cases were suits against the members of the Board of Valuation and Assessment to enjoin them from making an assessment. The suits in the Louisville Bridge Company and Kentucky Refining Company Cases were suits against the Auditor to enjoin him from collecting the state taxes due on assessments made by the Board of Valuation and Assessment. And the first American Surety Company Case was a suit against the members of the Board of Valuation and Assessment and the Auditor, brought, after a final assessment had been made by the board, to enjoin the members of the board from making the assessment and the Auditor from collecting the state taxes due on the assessment. In each one of these seven cases, except the Kentucky Refining Company Case, the plaintiff was held entitled to judgment, and in the Kentucky Refining Company Case it was denied judgment on the merits only. In no one of them was it intimated that the members of the board or the Auditor were not suable. If this suit is not maintainable because it is a suit against the state, then no one of those suits were maintainable on the same ground. For though the eleventh amendment has no application to suits in the state court, the common-law rule that a sovereign is not suable, of which that amendment was an embodiment, has, and is just as effective against the maintenance of a suit against the state as it is, and there was no statute permitting such suits to be brought. And the Louisville Bridge Company, first American Surety Company, and Kentucky Refining Company Cases are authorities against the position taken by Judge Lurton in the Weir or Adams Express Company Case that I had erred in holding that the Auditor had anything to do with collecting state taxes which he could be enjoined from doing. In view then of all that I have said, I think that I am warranted in holding that defendant's preliminary contention is not sound and in being confident that my position will be able to stand against just criticism.

[4] 3. This brings me to the merits of the case, to wit, the claim of plaintiff that the assessment is void. I will consider first the claim that it is void because the board did not follow the statute. As I make it, there are three particulars in which it is claimed that the board did not so do. As stated, plaintiff's property is a physical and organic unit covering 13 states. That which was assessable by the board was not that part of this unit which is in this state but that part of the intangible part thereof located therein, which I designate as its

franchise therein. The method by which it valued and assessed it was this: It apportioned to this state a part of the total value of the whole unit and then deducted therefrom the assessed value of that part of its tangible property in this state, assessed by the Railroad Commission, another body, whose function it is to assess it. The balance it fixed as the value of that part of plaintiff's franchise in this state and is the assessment complained of. The apportionment of a part of the total value to this state was not made on a mileage basis. Roughly speaking, the Kentucky mileage is in round numbers 25 per cent. of the total mileage. It apportioned, according to the presentation before me, 35 per cent. thereof, or 10 per cent. more than the mileage proportion. It obtained this percentage by averaging the gross receipts proportion and the net income proportion, as it determined them to be, respectively, with the mileage proportion. The plaintiff claims· that this method was not in accordance with the statute. Its claim is that the board before apportioning to this state any part of the total value should have deducted therefrom the value of plaintiff's tangible property everywhere, i. e., in this state and elsewhere, then apportioned to this state a part of this balance, and that it should have made this apportionment on a mileage basis. There were therefore, according to plaintiff, two particulars in which the board did not follow the statute in the method which it pursued in making the assessment. One was in not first deducting from the total value the value of all the tangible property. And the other was in not apportioning what was apportioned to this state on a mileage basis. The other particular in which it is claimed the board did not follow the statute has to do with the hearing thereby provided.

· To fully appreciate these claims of plaintiff and to dispose of them correctly, a general survey of the statutory provisions under which the board acted will be helpful. They are, as heretofore stated, sections 4077 to 4081, inclusive, and 4083, Kentucky Statutes. Such a survey will bring out a number of imperfections therein and show that it is a rather crude piece of legislation. It originated at the first session of the Legislature held after the adoption of the present Constitution. Certain sections of that Constitution had provided, with a note of emphasis, that taxes should be uniform on all property in the state; that all property not thereby specifically exempted should be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale; that all property, whether owned by natural persons or corporations, should be taxed in proportion to its value; and that all corporate property should pay the same rate of taxation paid by individual property. In compliance with these provisions, an act entitled "An act in relation to revenue and taxation" was passed at that session of the Legislature and became law November 11, 1892. The first five and the seventh sections of article 3 thereof are, with the exception of certain changes made by subsequent amendments, to some of which reference will be made, the same as the sections of the Kentucky Statutes above referred to. Section 4083 relates to the matter of the hearing and will be passed by for the time being.

Section 4077 provided for the payment annually by 18 enumerated

corporations, companies, or associations, of which "every railroad company or corporation" is the first named, and "every like company, corporation or association, also every other corporation, company or association, having or exercising any special or exclusive privilege or franchise not allowed by law, to natural persons, or performing any public service," of a tax on its franchise, to the state and to the subordinate jurisdiction in which it may be exercised, in addition to the other taxes imposed on it by law, and for the fixing and apportionment to the subordinate jurisdiction of the value of such franchise by the Auditor, Treasurer, and Secretary of State, who were constituted a Board of Valuation and Assessment for that purpose.

The Court of Appeals of Kentucky has held the following companies, not amongst those enumerated, to be covered by the general language used, to wit, race track, tank car, and refrigerator car companies. Latonia A. & S. Association v. Donnelly, 106 Ky. 325, 50 S. W. 251; Louisville Tank Line Co. v. Commonwealth, 123 Ky. 81, 93 S. W. 635; Morrell Refrigerator Car Co. v. Commonwealth, 128 Ky. 447, 108 S. W. 926.

It has held the following companies not to be covered thereby, to wit, ordinary business corporations, insurance companies, and title companies. Louisville Tobacco Warehouse Co. v. Commonwealth, 106 Ky. 165, 49 S. W. 1069, 57 L. R. A. 33; Ætna Life Insurance Co. v. Coulter, 115 Ky. 787, 74 S. W. 1050; Fidelity & Casualty Co. v. Coulter, 115 Ky. 805, 74 S. W. 1053; Hager v. Louisville Title Co. (Ky.) 85 S. W. 182.

As to the companies covered by the section, those enumerated and those held by the Court of Appeals to be within the general language used, it is to be noted that all of them except one conduct and operate their business along fixed and definite lines. The one that does not so operate and conduct its business is a guaranty or security company. The lines of a number of those who so operate and conduct their business are limited to this state, and most of these usually, if not always, to a single subordinate jurisdiction therein. They are gas, water, street railroad, electric power, turnpike, and race track companies. The lines of most of them cover other states as well as this state. They are a railroad, ferry, bridge, express, telegraph, press dispatch, telephone, palace car, dining car, sleeping car, chair car, tank car, and refrigerator car companies. Of these a ferry company and a bridge company are limited to only one other state. The properties of a railroad company, bridge, telegraph, and telephone companies constitute physical and organic units; those of the other companies organic units only. These companies may be placed in three classes, to wit, companies which operate and conduct their business wholly in this state, companies which operate and conduct their business partly in this state and partly elsewhere, and companies which operate and conduct their business wholly elsewhere. So far as the first two classes are concerned, it is immaterial where they were organized. It is sufficient that they wholly or partly operate and conduct their business in this state. So far as the last class is concerned, it is essential that they be organized in this state; for, as they operate and

conduct their business wholly elsewhere, there is no other basis of jurisdiction. Each of these three classes of companies may be subdivided into companies which operate and conduct their business along definite and fixed lines and those which do not. But it is not material to note this except in case of the second class, i. e., companies which operate and conduct their business partly in this state and partly elsewhere.

Section 4078 provides for all the companies covered by section 4077 making and delivering to the Auditor a statement as to certain enumerated facts essential to enable the board to fix the value of the franchise which it is required to assess. The facts as to which they are required to make statement are as follows, to wit: Name and principal place of business; kind of business; amount of capital stock, preferred and common; number of shares of each amount of stock paid up, par and real value thereof; highest price at which such stock was sold at a bona fide sale within 12 months next before the 30th of June of the year in which the statement is made; amount of surplus funds and undivided profits, and all other assets; total amount of indebtedness as principal; amount of gross or net earnings or income, including interest on investments and incomes from all other sources for 12 months next preceding the 30th of June of the year in which the statement is made; amount and kind of tangible property in this state, and where situated, assessed, or liable to assessment in this state; and fair cash value thereof estimated at price it would bring at a fair voluntary sale. It provides further that they shall make a statement as "to such other facts as the Auditor may require."

Section 4079 is twofold in character. It consists of three sentences. The last sentence is divided into two parts by the word "provided," which seems to have been used without significance. The first two sentences and the first part of the last sentence relate to the statement which is the subject-matter of section 4078. Each of the first two sentences provide for its covering additional facts. The first sentence is in these words:

"Where the line or lines of any such corporation, company or association extend beyond the limits of the state or county, the statement shall, in addition to the other facts heretofore required, show the length of entire lines operated, owned, leased or controlled in this state, and in each county, incorporated city, town or taxing district, and the entire line operated, controlled, leased or owned elsewhere."

This sentence has application to the first two classes of companies of the three into which I have divided the companies covered by section 4077, to wit, those which operate and conduct their business wholly in this state and those which so do partly in this state and partly elsewhere. It does not have application to all the companies in those two classes. It has application to those only of the first class which operate and conduct their business along definite and fixed lines, where the lines extend beyond the limits of one county and to those only of the second class which so do along such lines. It requires the companies to which it has application to make statement as to the additional facts therein referred to.

The second sentence is in these words, to wit:

"If the corporation, company or association be organized under the laws of any other state or government or organized and incorporated in this state, but operating and conducting its business in other states as well as in this state, the statement shall show the following facts in addition to the facts hereinbefore required: the gross and net income or earnings received in this state and out of this state, on business done in this state, * * * and elsewhere during the twelve months next before the thirtieth day of June of the year in which this assessment is required to be made."

This sentence, too, like the first, requires the companies to which it has application to make statement as to certain additional facts. Literally it may be said that it has application to all companies of the second class, i. e., which operate and conduct their business in this state and elsewhere. Literally also the place of organization has something to do with distinguishing the companies to which this statement applies. But, as it covers companies organized both in this state and elsewhere, i. e., all possible places of organization, it is apparent that so much of the sentence is without significance and mere surplusage. And though the letter of the sentence makes it applicable to all companies of the second class, it is clear that it has application to only such of those companies as do not operate and conduct their business along definite and fixed lines. The first sentence of the section provides as to what additional facts such of those companies as so do along such lines shall make statement; and, as we proceed, an additional consideration will be noted which makes it conclusive that it was not intended that it should have application to such of those companies as operate and conduct their business along definite and fixed lines.

The first part of the third sentence of section 4079 permits the board to excuse a statement as to any of the facts required, where it is impossible to make a correct statement as to it, or it will not afford valuable information in determining the value of the franchise to be taxed.

The last part of the third sentence of section 4079, section 4080, and section 4081 are alike, in that each has to do with prescribing a method or methods for fixing the value of the franchise of companies covered by section 4077 to be followed by the board. In so far as the methods thus prescribed apply, the board is limited to them. It cannot do otherwise than follow them. Together they prescribe four methods—section 4079 one, section 4080 one, and section 4081 two. Literally section 4080 prescribes two, but they are alternative methods applicable to the same companies; but the Court of Appeals, in the case of James v. American Surety Company, 133 Ky. 313, 117 S. W. 411, has held that they prescribe but one method. Originally section 4081 prescribed but one method. The other or fourth and last method was prescribed March 15, 1906 (Laws 1906, c. 22), when the whole act on the subject of revenue and taxation was re-enacted with certain changes. Theretofore no method had been prescribed for assessing the franchise of companies of the third class, covered by section 4077, to wit, companies which operate and conduct their business wholly elsewhere, but have been organized in this state. The method so prescribed is applicable to those companies, and it is not important to set

forth in detail that method. Our attention will be limited to the first, second, and third methods, prescribed respectively in the last part of the third sentence of section 4079, section 4080, and section 4081. The last part of the third sentence of section 4079 is the same as it was when originally enacted in 1892 (Laws 1891–92–93, c. 103). It is in these words:

"That said board, from said statement, and from such other evidence as it may have, if such corporation, company or association be organized under the laws of this state, shall fix the value of the capital stock of the corporation, company or association, as provided in the next succeeding section, and from the amount thus fixed shall deduct the assessed value of all tangible property assessed in this state, or in the counties where situated. The remainder thus found shall be the value of its corporate franchise subject to taxation as aforesaid."

[11] Literally the application of the method so prescribed is not determined by the classification I have made of the companies covered by section 4077, but by the place of organization, which is not a feature of that classification. So considered, i. e., literally, it applies only to companies organized in this state and to all companies so organized. But it cannot have application to all companies so organized because to so construe it would render it unconstitutional. The first step in the method is to fix the value of the capital stock of the company. The words "capital stock," as used in this and the other sections of the statutory provisions under consideration, have been construed to mean the entire property of the company, tangible and intangible, and when used in the course of this opinion that is the sense in which they are used. In case then of a company organized in this state, but owning property elsewhere, this property would be included in fixing the value of the capital stock, and, as the next and only other step is to deduct the assessed value of the tangible property in this state, the balance to be the value of the franchise, the assessment thereof would include the property elsewhere. Such an assessment would deprive the company of its property without due process of law and hence would be unconstitutional. The Court of Appeals of Kentucky upheld an assessment of such a company, where this method had been applied, in the case of Louisville & Jeffersonville Ferry Company v. Com., 108 Ky. 717, 57 S. W. 624, 626. The company there was a Kentucky corporation operating a ferry between Kentucky and Indiana and owning a ferry franchise in both states. The ferry franchise in Indiana was included in the assessment. On appeal to the Supreme Court of the United States, it held that the assessment was invalid and reversed the judgment of the lower court. Louisville & Jeffersonville Ferry Co. v. Com., 188 U. S. 385, 23 Sup. Ct. 463, 47 L. Ed. 513. The letter of this portion of section 4079 would include all companies of the third class, i. e., which operate and conduct their business wholly elsewhere, but are organized in this state, like the Southern Pacific Railway Company. If, then, this method is limited to companies organized in this state, to render it constitutional, it must be limited further to such of those companies as operate and conduct their business and have their property wholly in this state, i. e., to all companies of the first class organized in this state. Under this construction it has no

application to companies organized elsewhere who also operate and conduct their business and have their property wholly in this state, and, as we shall see, the other two methods have no application to them, no method has been prescribed for assessing their franchise. . And either this position will have to be taken, or the words as to organization in this state will have to be disregarded, and so much of section 4079 construed to have application to all companies of the first class, i. e., which operate and conduct their business and have their property wholly in this state.

Section 4080 prescribed the second method. As originally enacted it was as follows, to wit:

"If the corporation, company or association be organized under the laws of any other state or government, except as provided in the next section, the board shall fix the value of the capital stock as hereinbefore provided and will determine from the amount of the gross receipts of such corporation, company or association in this state and elsewhere the proportion which the gross receipts in this state, within twelve months next before the fifteenth of September of the year in which the assessment was made, bears to the entire gross receipts of the company, the same proportion of the value of the entire capital stock, less the assessed value of the tangible property assessed, or liable to assessment, in this state, shall be the correst value of the corporate franchise of such corporation, company or association for taxation in this state."

It was amended by the revision act of March 15, 1906, hereinbefore referred to, and, as amended and as it now is, it is as follows, to wit:

"If the corporation, company or association be organized under the laws of any other state or government, except as provided in the next section, the board shall fix the capital stock in this state by capitalizing the net income derived in this state, or it shall fix the capital stock as hereinbefore provided, and will determine from the amount of the gross receipts of such corporation, company or association in this state and elsewhere, the proportion which the gross receipts of this state, within the twelve months next before the thirtieth day of June of the year in which the assessments were made, bears to the entire gross receipts of the company, the same proportion of the value of the entire capital stock or the capitalizing of the net earnings in this state, less the assessed value of the tangible property assessed, or liable to assessment, in this state, shall be the correct value of the corporate franchise of such corporation, company or association for taxation in this state."

This section as originally and as amended is like so much of section 4079 as prescribes the first method in that according to its letter the place of organization has to do with determining the companies to which it is applicable. It, however, is not the sole factor in so determining. The character of the method prescribed shows that it has application only to companies of the second class, i. e., companies which operate and conduct their business partly in this state and partly elsewhere, and, in view of the third method prescribed by section 4081, it must be held to have application to such companies only as do not so do along definite and fixed lines. If then the place of organization is a factor in determining the companies to which it has application, no method has been prescribed for assessing the franchise of companies of the second class which do not operate and conduct their business along definite and fixed lines and which have been organized in this state. That the intention was that this method should have ap-

plication to companies organized in this state as well as those organized elsewhere is to be inferred from the fact that the second sentence of section 4079, which provides for the statement to be filed by the companies to which it applies, containing certain facts in addition to those set forth in section 4078, and which information is essential to enable the second method to be applied and was enacted for that purpose, is not limited to companies organized elsewhere than in this state, but covers those organized in this state as well as those organized elsewhere. This second method then should be construed as applicable to all companies of the second class who do not operate and conduct their business along definite and fixed lines, without reference to whether they were organized elsewhere or in this state or it has to be accepted that no method has been prescribed for assessing the franchise of such of those companies as have been organized in this state.

As originally enacted, the section treated the property of the companies to which it had application as a unit and provided for an apportionment of a part thereof to this state on a gross receipts basis, i. e., of the same proportion of the value of the capital stock which the gross receipts in this state is of the whole gross receipts. In the case of Hager v. American Surety Co., 121 Ky. 791, 90 S. W. 550, it was held that the board in assessing the franchise of a company to which section 4080 applied was restricted to this method and had no right to treat the part of the franchise in this state as an independent whole in itself and fix its value by a capitalization of the net earnings in this state. This was the occasion of the change in section 4080 made by the revision act of March 15, 1906. According to the section as changed, what was done was to prescribe an additional method and to give the board the right to choose between them. This at least was the letter of the change. And the alternative method which it prescribed was to treat the part of the franchise in this state as an independent whole in itself and fix its value by a capitalization of the net earnings therein. The Court of Appeals, however, as heretofore stated, in the Kentucky Refining Company Case, held that the Legislature did not so intend, but intended that both methods should be used at the same time and that to make the letter conform to such intent the word "and" should be substituted for the word "or." The two methods are opposites. By the original method the part was to be treated as a part of a larger whole, and by the new method it was to be treated as an independent whole in itself. According to this construction, therefore, we have what may be characterized as an enforced "harmony of opposites." The decision is bottomed on the idea that the Legislature in empowering a tribunal to assess property must prescribe the method by which it is to value it. Of course, if this is so, it has no power to leave to that body the discretion of making a choice between two alternative methods. But I submit that this idea is not sound. The Legislature does not have to prescribe the method by which such a tribunal is to value the property which it is its duty to assess. It can leave to it the matter of adopting a reasonable or suitable method. The authorities relied on as supporting the position do

not, in my opinion, do so. It is against the position that the statute does not, as we shall see, prescribe the method of valuing the capital stock, the first step in each of the three methods, and it has been recognized by the Court of Appeals from the beginning of this legislation that the board has the right to choose between two methods of so valuing, i. e., the stock and bond and the capitalization methods. The later decision in the case of Southern Pacific Ry. Co. v. Commonwealth, 134 Ky. 410, 120 S. W. 309, is against it. It was there held as to a company of the third class, i. e., organized in this state, but operating and conducting its business wholly elsewhere prior to March 15, 1906, when no method had been prescribed for assessing the franchise in this state of such a company, that the board had the power to assess it and to adopt a reasonable and suitable method for so doing. There was therefore no reason for holding that the Legislature did not mean what it said and to leave it to the board to adopt whichever method was most advantageous to the state.

Section 4081 prescribes the third method with which we have to do in this case. As originally enacted, it is in these words, to wit:

"If the corporation organized under the laws of this state or some other state or government be a railroad, telegraph, telephone, express, sleeping, dining, palace or chair car company, the lines of which extend beyond the limits of this state, the said board will fix the value of the capital stock as hereinbefore provided, and that proportion of the value of the capital stock, which the length of the lines operated, owned, leased or controlled in this state bears to the lines owned, leased or controlled in this state and elsewhere, shall be the value of the corporate franchise of such corporation liable for taxation in this state; and such corporate franchise shall be liable for taxation in each county, incorporated city, town or district through, or into which, such lines pass or are operated, in the same proportion that the length of the line in such county, city, town or district bears to the whole length of lines in the state, less the value of any tangible property assessed or liable to assessment in any such county, city, town or taxing district."

The section has been amended twice since its original enactment. The first amendment was made at the same session of the Legislature, near its close, it being a long one, i. e., June 9, 1893 (Laws 1891–92–93, c. 217). It consisted simply in inserting the words "considered in fixing" between the words "shall be" and "the value of the corporate franchise," so that it provided, instead of as originally, that the part apportioned to this state should be the value of the franchise in this state, that it should be considered in fixing such value. The other amendment was by the revision act of March 15, 1906. It omitted the concluding clause, to wit, "less the value of any tangible property assessed, or liable to assessment, in any such county, city, town or taxing district," and added two other clauses. One was the words "or a corporation performing any other public service" inserted after the words "chair car company," the last of the eight companies enumerated therein, so that it would not be limited thereto. The other prescribed the fourth method of assessment hereinbefore referred to applicable to companies organized under the laws of this state which operate and conduct their business along definite and fixed lines entirely elsewhere. As thus changed, and as it was at the time when the assessment complained of was made, the section was as follows, to wit:

"If the corporation organized under the laws of this state, or some other state or government be a railroad, telegraph, telephone, express, sleeping, dining, palace or chair car company or a corporation performing any other public service, the lines of which extend beyond the limits of the state, the said board will fix the value of the capital stock as hereinbefore provided, and that proportion of the value of the capital stock which the length of the lines operated, owned, leased, or controlled in this state, bears to the total length of the lines owned, leased or controlled in this state and elsewhere, shall be considered in fixing the value of the corporate franchise of such corporation liable for taxation in this state; and such corporate franchise shall be liable to taxation in each county, incorporated city, town or district through or into which such lines pass, or are operated, in the same proportion that the length of the line in such county, city, town or district bears to the whole length of lines in this state; but if any such railroad or other corporation organized under the laws of this state have all of its lines outside of this state, the said board shall fix the value of its entire capital stock as hereinbefore provided, and apportioned to this state for taxation therein the proper proportion and not less than one per cent. of its said capital stock, and the amount so apportioned shall be the value of its intangible property, including its corporate franchise, stocks, bonds, securities and choses in action, subject to taxation in this state and in the county, city, town and district where its principal place of business in this state may be located."

In determining the companies to which this method has application here, as in the case of the other two methods, apparently the place of their organization is a factor. But as here the language used covers both this state and elsewhere as places of organization, there can be no question that, however it may be as to the other two methods, the place of organization is not a determining factor as to the application of the third method. As originally enacted, it applied to such of the companies of the second class as were enumerated, being eight in number, which companies operate and conduct their business both in this state and elsewhere along definite and fixed lines. By the amendment of March 15, 1906, the section was changed so as to make the third method applicable to all such companies as performed any other public service than that performed by the eight enumerated companies.

It is clear then that down to the revision act of March 15, 1906, no method was prescribed for assessing the franchise in this state of certain of the companies covered by section 4077. This was the case of all companies of the third class, i. e., companies organized in this state and operating and conducting their business wholly elsewhere. It was the case as to all companies of the second class, i. e., companies operating and conducting their business partly in this state and partly elsewhere along definite and fixed lines not included by the eight companies enumerated in section 4081. This was the case as to all bridge and ferry companies so operating and conducting their business. And it is now the case as to all such companies not included by those eight companies or performing any other public service. It is now and always has been the case as to companies of the first class, that is, companies which operate and conduct their business wholly in this state but organized elsewhere, if that portion of section 4079 prescribing the first method limits it to such companies as have been organized in this state, and, as to companies of the second class, i. e., companies which operate and conduct their business partly in this state and part-

ly elsewhere, but not along definite and fixed lines, but organized in this state, if section 4080 prescribing the second method limits it to such companies as have been organized elsewhere. The Court of Appeals has had to deal with the question as to how companies covered by section 4077, as to which no method of assessment was so prescribed, should be assessed. It had to deal with it in the Southern Pacific Railroad Company Case, hereinbefore referred to, and I have indicated how it dealt with the question there. The case was decided after March 15, 1906, when the act prescribing a method for such cases became the law, but it involved years prior thereto. That court had to deal with it in the case of Morrell Refrigerator Car Co. v. Commonwealth, 128 Ky. 447, 108 S. W. 926. The company there involved was a refrigerator car company which operated and conducted its business partly in this state and partly elsewhere along definite and fixed lines, but which was not one of the eight companies enumerated in section 4081 and was not regarded as performing a public service. It was not dealt with as it was in the subsequent Southern Pacific Railroad Co. Case, but section 4081 was construed to apply not only to the companies covered by its language, but all companies like those enumerated, and hence that that method was applicable to it. The earlier case of Louisville Tank Line Co. v. Commonwealth, 123 Ky. 81, 93 S. W. 635, involved the question; but it does not seem to have been raised there.

The true view of the matter seems to me to be this: Section 4077 expressly provides that all the companies covered by it shall pay a franchise tax and empowers the board to make the assessment. The fact that no method has been prescribed for making the assessment of any company does not relieve it from assessment and from the tax. There is simply no method of assessment prescribed. This leaves the matter so that the board can adopt a reasonable method. And it should be taken that the Legislature so intended. And a reasonable method is one similar to that prescribed in analogous cases, if there are such, and, if not, such as is reasonable under the circumstances. A similar line of reasoning was taken by me in the field of federal jurisdiction in the case of Kentucky Coal Lands Co. v. Mineral Development Co. (C. C.) 191 Fed. 899. The first sentence of the first section of the jurisdictional acts of 1887 and 1888 (Acts March 3, 1887, c. 373, 24 Stat. 552 and Act Aug. 13, 1888, c. 866, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508]) confers essential jurisdiction on the Circuit Courts of the United States in certain cases. The middle clause of the second section thereof—the venue clause—distributes that jurisdiction amongst those courts. It does not distribute all of it. It leaves a portion thereof undistributed, such as suits against aliens and suits of a local nature. I there pointed out that the fact that a portion of such jurisdiction so conferred was not distributed did not deprive the Circuit Courts of jurisdiction thereof. The sole effect of its not being distributed was that it must be treated as distributed along reasonable lines.

If then this position is sound and the first method of assessment is to be confined to companies organized under the laws of this state

in accordance with the letter of section 4079, so that no method is prescribed for assessing companies organized under the laws of other states which operate and conduct their business and have their property wholly in this state, it should be taken that the board has the right to adopt a reasonable method and a reasonable method is that prescribed in section 4079, as it is an analogous case. And if the second method is to be restricted to companies organized under the laws. of other states in accordance with the letter of section 4080, so that no method is prescribed for assessing companies which operate and conduct their business partly in this state and partly out of it, but not on definite and fixed lines, the same course is to be pursued.

So much then as to the methods of assessment prescribed, their applicability, and the course to be pursued where no applicable method has been prescribed. It is now in order to consider the methods themselves.

The first step in the first, second, and third methods is exactly the same. It is to fix the value of the capital stock of the company. It is not important to deal with the method of fixing such value. It is sufficient to note that the statute prescribes none. It is true that section 4079 says that the board shall fix it "as provided in the next succeeding section." But the next succeeding· section, to wit, section 4080, provides that the board, if it adopts the third method, shall fix it "as hereinbefore provided." ˙ These two clauses cancel each other˙ and leave no method prescribed. So section 4081 says that it shall fix the value of capital stock "as hereinbefore provided." But as there is no prior provision on this subject, this clause is also without meaning. The board therefore, in taking this first step in these three methods, is left· to adopt a reasonable method of fixing such value. After the taking of this first step, the three methods part company. According to the first method, the next step is to deduct ˙from the valuation so fixed the assessed value of the entire tangible property which is all in this state. The provision then is that the remainder thus found shall be the value of the company's franchise. This method, therefore, consists of but two steps, fixing the value of the entire property and deducting the assessed value of the entire tangible property. By it the board does not directly fix the value of the franchise. That ·results automatically from the taking of these two steps.

The several steps of the original second and the third methods are alike, in that neither consists of a deduction of tangible property., like the second step in the first method, but of an apportionment of the value of the entire property. They differ from each other in the manner of apportionment which is prescribed. The apportionment in the original second method is on a gross receipts basis, and that in the third method on a mileage basis. In the nature of things the apportionment in the original second method cannot be on a mileage basis, because the companies to which it is applicable do not operate and conduct their business on definite and fixed lines. According to it the ratio of ·the gross receipts in this state to the total receipts determines what part of the total value shall be apportioned to this state and that absolutely so.

The third and last step in the original second method is to deduct

from the part of the total value thus apportioned to this state the assessed value of the tangible property in this state. The balance is to be taken as the value of the franchise therein. This method, therefore, consists of three distinct steps—valuation of the entire property in and out of this state, apportionment of a part of such valuation to this state on a gross receipts basis, and a deduction from such part of the assessed value of the tangible property in this state. By it, too, the value of the franchise in this state is not fixed directly by the board. It results automatically from the taking of these three steps. The act of March 15, 1906, treating it as prescribing an alternative method for fixing the value of the franchise of such companies in this state, made a radical departure from the original method applicable to such companies and introduced an entirely new thought into the methods of fixing the value of the franchise in this state of companies which operate and conduct their business partly in and partly out of the state. The old thought was that it could only be done by the apportioning a part of the total value of the franchise of such companies to this state. The new thought so introduced was to disregard the whole and treat the part in Kentucky independently thereof, as if it were the whole. The alternative method provided by the act of March 15, 1906, applicable to companies covered by section 4080, therefore, included no valuation of the whole and apportioning of a part thereof to this state. It called for two steps only. The first was a valuation of the part of the whole in this state, as if it were the whole, and the second was a deduction therefrom of the assessed value of the tangible property in this state. It had a novel feature further, in that a method of assessing the value of such part was prescribed, to wit, the capitalization of the net earnings in this state. Here, too, the value of the franchise in this state is not fixed directly by the board, but results automatically from the taking of these two steps. It is substantially like the first method. Each consists of two steps. In each the first step consists in the valuation of the entire property in Kentucky, and the second in deducting the assessed value of the tangible property in this state. They differ only in one particular. In the first method the board is not limited as to how it shall value the entire property in this state, whereas in this alternative method so prescribed it is limited to a capitalization of the net earnings in this state. I will not undertake to describe in detail the process under the construction of section 4080 as amended in the Kentucky Refining Company Case. I find it difficult to do so and it is not important. This completes our general survey of sections 4077 to 4081, inclusive, and of any detailed reference to sections 4077 to 4080.

We come now to a further detailed consideration of section 4081, in so far as it relates to the third method, which is the one involved here, as plaintiff is a railroad company, whose line extends beyond the limits of this state, and hence is one of the eight companies enumerated therein to which that method is applicable, with a view of determining whether plaintiff's contention in regard to that method and as to the two particulars in which the board failed to follow it is sound. And first as to its contention that the second step in the meth-

od is a deduction of the value of the entire tangible property both in and out of this state: This should be first viewed, as it would have to be under the section as it was originally before the changes introduced by the amendment of June 9, 1893, and the re-enactment of March 15, 1906, and then the effect of those changes should be considered. As already stated, the first step then, as now, consisted of the fixing of the value of the capital stock. As to this there is no dispute. According to plaintiff's contention, this step is followed by two others, the taking of which results automatically in fixing the value of its franchise in this state. The second step consists of a deduction, to wit, of the value of the entire tangible property, both in and out of this state, and the third and last step of an apportionment to this state of a part of the remainder left after making the deduction and that on a strictly mileage basis. But if such are the second and third steps of the third method, they are to be found elsewhere than in the letter of section 4081. The letter thereof provides for no such steps. The second step which its letter calls for is not a deduction but an apportionment. The apportionment which it calls for is of a part of the total value on a mileage basis. And this is the only other step which it calls for. It then provides that the part so apportioned to this state shall be the value of the franchise in this state and that it shall be liable to taxation in the several subordinate jurisdictions in which it is located on a mileage basis less the tangible property therein. It is in this connection only that any reference is made to a deduction of the tangible property, and here it has reference solely to the tangible property in this state. It is evident that the provision as to a deduction was misplaced. According to the letter of the section, the part of the total value apportioned to this state on a mileage basis was the value of the franchise in this state. But as the total value included both tangible and intangible property, the part so apportioned to this state would be not merely the value of the intangible property, but both the tangible and intangible property therein. If such apportionment were to be taken as the value of the intangible property in this state, then the companies to which the method was applied would have to pay a double tax to the state on its tangible property—on it as such and on it as included in this apportionment. But the Legislature could not have so intended. The section was so worded that they would not have to pay a double tax thereon to the subordinate jurisdictions, and it was as little intended that it should pay a double tax thereon to the state. Had the provision as to deduction been inserted, instead of at the close of the section, just after the provision as to the apportionment of a part of the total valuation to this state, and the requirement been that it should be made from the part so apportioned and that the balance should be apportioned amongst the subordinate jurisdictions, then there would have been nothing in the letter of the section favoring payment of double taxes on the tangible property in this state. It should therefore be taken that the intent was that the deduction should be made from the part apportioned to the state and not from the parts apportioned to the subordinate jurisdictions.

By this time one has become used to imperfections in this legisla-

tion. We have found that it uses the word "provided" without significance; that the application of the first method has to be limited to companies which operate and conduct their business and have their property wholly in this state to render it constitutional; that it thinks that the place of organization of the companies is of significance in determining the application of the three methods which it provides, when it is not; and that it thinks that it has provided a method of valuing the capital stock and that it has prescribed a method for assessing the franchise of all companies covered by section 4077, when it has done neither. He is not, therefore, surprised when he comes across such an imperfection here. In the case of Southern Ry. Co. v. Coulter, 113 Ky. 657, 68 S. W. 873, the railroad companies of the state were willing to concede that the assessed value of the tangible property in this state should be deducted from the part apportioned thereto, before an apportionment amongst the subordinate jurisdictions, and claimed that by virtue of the provisions as to deducting same after such apportionment from the parts so apportioned that they were entitled to have same deducted again. Thereby they would get a double deduction, and in this way get back the taxes which they were bound to pay on their tangible property as such. But the Court of Appeals could not see it that way.

There is therefore absolutely nothing in section 4081 that allows of a deduction of the valuation of the tangible property both in this state and out of it from the valuation of both tangible and intangible property everywhere and then an apportionment of a part of the balance to this state on a mileage or any other basis. The thought of the section must be taken to be that a part of the valuation of the entire property is first to be apportioned to this state, and that then the assessed value of the tangible property therein is to be deducted therefrom. And to this conforms the thought of the companion sections. In none of the sections relating to the assessment of the franchises of companies covered by section 4077 is there the remotest reference to the deduction in any contingency of the value of the entire tangible property. In so far as any provision is made for a deduction, it is always a deduction of the assessed value of the tangible property in this state. There are two other provisions for a deduction besides that contained in section 4081, which it seems to me was misplaced. One is in section 4079 as a step in the first method thereby prescribed. And the other is in section 4080 as a step in the second method thereby prescribed. And in each case the deduction called for is the assessed value of the tangible property in this state. That may be said to be expected in connection with the first and alternative methods prescribed by the amendment of March 15, 1906, to section 4080 because in each of them the valuation from which the deduction is to be made is the valuation of the entire property in this state. But such is not the case as to the original second method. There, as in the case of the third method involved here, there is a valuation of the entire property in and out of the state and an apportionment to this state on a gross receipt basis, and the requirement is not that the value of the tangible property both in and out of the state shall be first deducted,

and then an apportionment made, but that an apportionment shall be first made and then the assessed value of the property in this state shall be deducted. It is expressly provided that such shall be the method of procedure without any ambiguity. The statement provided for by section 4078 to be considered by the board in making the assessment calls for information as to the value of the tangible property, but it is limited to the assessed value of the tangible property in this state. There is not a word in the provisions in regard to this statement about any information being furnished as to the value of property elsewhere.

Thus far I have dealt with section 4081 as if it were now as it was when originally enacted. Do the changes subsequently made in it to any extent support plaintiff's contention? The change made by the amendment of June 9, 1893, has no bearing on the question now under consideration. It has bearing on the other part of plaintiff's contention, to wit, that the section requires the apportionment to the state to be on a mileage basis absolutely. When I come to take up that part of its contention, the effect of this change will be considered. By the change made by the act of March 15, 1906, the clause at the end of the section, relating to a deduction of the tangible property in each subordinate jurisdiction from the apportionment thereto, was omitted, and the section as it now stands contains no express provision for a deduction of the value of the tangible property at any stage of the process of assessment. As heretofore stated, the clause was improper at that place and had been the basis of a claim of a right to a double deduction of the assessed value of the tangible property. It was no doubt omitted for this reason. That it was not at the same time expressly provided that the assessed value of the tangible property in this state should be deducted from the part of the total value apportioned thereto can be accounted for on no other ground than that it was thought to be clear that it was the thought of the section that such deduction should be made.

It seems to me, therefore, that the idea that the statute, under which the board acted in making the assessment complained of, requires first a deduction of the total value of the entire tangible property from the total value of the entire property and then an apportionment, is utterly without warrant in the provisions thereof, and that there can be no doubt that what it contemplates is first an apportionment and then a deduction; the deduction to be of the assessed value of the tangible property in this state. In other words, the thought of the statute is first apportionment and then deduction, and not first deduction and then apportionment; and that the deduction is of the assessed value of the tangible property in this state, and not of the value assessed or otherwise, of the entire tangible property in and out of the state. There is but one possible ground, then, on which plaintiff's contention in this particular can be upheld, and that is that it is essential to construe the section as providing first for a deduction of total value of entire tangible property from total value of entire property, and then an apportionment of a part of the balance to this state in order to keep it within constitutional limits. I have found it necessary to limit

that portion of section 4079 prescribing the first method to companies which operate and conduct their business and have their entire property in this state in order to so keep it. And it may be necessary to so reshape section 4081 in order to keep it within constitutional limits. How is it as to this?

To answer the question we must equip ourselves with the thought of the Supreme Court of the United States on the matter of assessing for taxation in any given state the part of a unit covering several states in such state, as a part thereof. As heretofore indicated, such unit may be a physical and organic unit, as in case of the property of a railroad, telegraph, or telephone company, or merely an organic unit, as in case of an express company. The rules applicable to the assessment of such a part thereof, as a part, are precisely the same in both cases. That such part thereof can be valued as part of the whole, or, in other words, that it is not essential that it be valued without reference to the whole, as if it were itself the whole, is well settled. Such an assessment does not involve the assessment in the state of property lying outside of it. It is taken for granted that such part of such unit is always of more value regarded as a part than as itself an independent whole, and that therefore the state gains by so doing; and it is thought to be fair for the state to avail itself of such enhancement in value, for, as the parts in other states contribute to its value, so it contributes to their value. It is equally well settled that ordinarily, i. e., in the absence of special circumstances, such part thereof can and should be valued on a mileage basis, i. e., at such a proportion of the value of the whole unit as the mileage in the state bears to the total mileage. It is an exceptional case where the part is not to be so valued. In any given case nothing else appearing than the value of the whole and the proportionate mileage of the part the value of the part is to be taken as the same proportion of the value of the whole. In starting out then to value the part, the presumption is that such is its value, and such presumption is to be maintained until it is rebutted by the special circumstances or exceptional character of the particular case. In the case of State Railroad Tax Cases, 92 U. S. 608, 23 L. Ed. 663, where the apportionment involved was between subordinate jurisdictions in the same state, Mr. Justice Miller said:

"It may well be doubted whether any better mode of determining the value of that portion of the track within any one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole."

In the case of Pittsburg, C., C. & St. L. R. R. Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031, Mr. Justice Brewer said:

"It is ordinarily true that, when a railroad consists of a single continuous line, the value of one part is fairly estimated by taking that part of the value of the entire road which is measured by the proportion of the length of the particular part to that of the whole road. This mode of division has been recognized by this court several times as eminently fair."

And again in the case of Cleveland, C., C. & St. L. R. R. Co. v. Backus, 154 U. S. 439, 14 Sup. Ct. 1122, 38 L. Ed. 1041, he said that one of the questions therein was:

"If an assessing board, seeking to assess for purposes of taxation a part of a road within a state, the other part of which is in an adjoining state, ascertains the value of the whole line as a single property and then determines the value of that within the state, upon the mileage basis, is that a valuation of property outside of the state, and must the assessing board, in order to keep within the limits of state jurisdiction, treat the part of the road within the state as an independent line, disconnected from the part without, and place upon that property only the value which can be given to it if operated separately from the balance of the road?"

In answer to this question, he said:

"It is assumed that no special circumstances exist to distinguish between the conditions in the two states, such as terminal facilities of enormous value in one and not in another. With this assumption the first question must be answered in the negative. The true value of a line of railroad is something more than an aggregate of the values of separate parts of it, operated separately. It is the aggregate of those values plus that arising from a connected operation of the whole, and each part of the road contributes not merely the value arising from its independent operation, but its mileage proportion of that flowing from a continuous and connected operation of the whole. This is no denial of the mathematical proposition that the whole is equal to the sum of all its parts, because there is a value created by and resulting from the combined operation of all its parts as one continuous line. There is something which does not exist, and cannot exist, until the combination is formed."

Then in the case of Fargo v. Hart, 193 U. S. 490, 24 Sup. Ct. 498, 48 L. Ed. 761, Mr. Justice Holmes said:

"And when that property is part of a system and has its actual uses only in connection with other parts of the system, that fact may be considered by the state in taxing, even though the other parts of the system are outside of the state. The sleepers and rails of a railroad company, or the posts and wires of a telegraph company, are worth more than the prepared wood and the bars of steel or coils of wire, from their organic connection with other rails or wires and the rest of the apparatus of a working whole. This being clear, it is held reasonable and constitutional to get the worth of such a line, in the absence of anything more special, by a mileage proportion."

These learned judges, therefore, characterize the method of determining the value of the part on a mileage basis as "reasonable and constitutional" and "eminently fair," and say that it may well be doubted whether any better mode has been devised. But they recognize that this is true "ordinarily" only, or in the absence of "special circumstances," or "anything more special." A special circumstance recognized by Mr. Justice Brewer in one of the quotations heretofore made was the existence of "terminal facilities of enormous value out of the state and not in it." Mr. Justice Holmes also recognized this as a special circumstance affecting the reasonableness of an apportionment on a mileage basis in the Fargo Case. He there said:

"So long as it fairly may be assumed that the different parts of a line are about equal in value, a division by mileage is justifiable. But it is recognized in the cases that if, for instance, a railroad company had terminals in one state equal in value to all the rest of the line through another, the latter state could not make use of the unity of the road to equalize the value of every mile. That would be taxing property outside of the state under a pretense."

In the Pittsburg, C., C. & St. L. R. R. Co. Case, Mr. Justice Brewer recognized another special circumstance affecting the rule in connec-

tion with the existence of terminal facilities of enormous value, to wit, the requirement in another state for sole use therein of an "extra amount of rolling stock." He said there:

"It is true, there may be exceptional cases, and the testimony offered in the trial of this case in the Circuit Court tends to show that this plaintiff's road is one of such exceptional cases, as, for instance, where the terminal facilities in some large city are of enormous value, and so give to a mile or two in such city a value out of proportion to any similar distance elsewhere along the line of the road, or where in certain localities the company is engaged in a particular kind of business requiring for sole use in such localities an extra amount of rolling stock."

The special circumstances so recognized consist of more tangible property outside of the state than in it. I find no other special circumstance referred to as affecting the application of the rule of valuing on a mileage basis. In the Delaware Railroad Tax Case, 18 Wall. 206, 21 L. Ed. 888, it was held that, if the tax there involved had been on the property of the company, an assessment on the mileage basis would have been invalid because it would be a tax on property outside of the state. Mr. Justice Field there said:

"Assuming that the tax is upon the property of the corporation, if the ratio of the value of the property in Delaware to the value of the whole property of the company be less than that which the length of the road in Delaware bears to its entire length, and such is admitted to be the fact, a tax imposed upon the property in Delaware according to the ratio of the length of its road to the length of the whole road must necessarily fall upon property out of the state. The length of the whole road is in round numbers 100 miles; the length in Delaware is 24 miles. The tax upon the property estimated according to this ratio would be in Delaware $24/100$ or $6/25$ of the amount of the tax upon the whole property. But the value of the property in Delaware is not $6/25$ of the value of the whole property, but much less than this proportion would require."

It did not appear wherein the property outside of Delaware was proportionately worth more than that inside thereof. In the Fargo Case the assessment against the American Express Company on a mileage basis was held invalid as including property outside of the state of Indiana, not because proportionately a greater portion of the unit was outside of that state, but because it included property outside of the state, to wit, stocks and bonds in New York, which were not used in the business, and which therefore were no part of the unit.

In the case of W. U. Telegraph Co. v. Massachusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, apparently a special circumstance outside of the state of Massachusetts making against an assessment therein on the mileage basis, to wit, the ownership of $3,000,000 of real estate, with the ownership of none therein, was held to be offset by a special circumstance within the state, to wit, the existence proportionately of greater intangible property therein so that an assessment on a mileage basis was held to be valid notwithstanding the special circumstance outside of the state. Mr. Justice Miller said:

"It is very clear to us, when we consider the limited territorial extent of Massachusetts, and the proportion of the length of the lines of this company in that state to its business done therein, with its great population and business activity, that the rule adopted to ascertain the amount of the value of the capital engaged in that business within its boundaries, on which the tax

should be assessed, is not unfavorable to the corporation, and that the details of the method by which this was determined have not exceeded the fair range of legislative discretion. We do not think that it follows necessarily, or as a fair argument from the facts stated in the case, that there was injustice in the assessment for taxation."

It is to be noted in this connection that it would seem that, in assessing the part of such a unit within the state as a part thereof, the determination by the board of how much of the unit is within the state is not such a determination as that it is conclusive unless overthrown by fraud or mistake. In the Pittsburg, C., C. & St. L. R. R. Co. Case, Mr. Justice Brewer said:

"Whenever a question of fact is thus submitted to the determination of a special tribunal, its decision creates something more than a mere presumption of fact, and if such determination comes into inquiry before the courts it cannot be overthrown by evidence going only to show that the fact was otherwise than as so found and determined. Here the question determined by the state board was the value of certain property. That determination cannot be overthrown by the testimony of two or three witnesses that the valuation was other than that fixed by the board."

But in the Fargo Case, Mr. Justice Holmes said:

"In Pittsburg, C., C. & St. L. R. R. Co. v. Backus, there was reason to suspect an infraction of constitutional rights, but the Secretary of State testified that there was no assessment of property outside of the state, * * * and therefore the court could not say that there was more than a possible overvaluation by the board. Of, course, if the board did not go beyond its jurisdiction, its decision was final. But the court recognized that if the facts charged had appeared the case would have been different. In the express companies' cases previously decided, it was pointed out that there was nothing to show that the line might not fairly be assumed to be of substantially the same value throughout. But it was intimated on the pages just cited that, if the company should prove the fact to be otherwise, a different rule would apply, and the statutes were construed not to prevent such a difference from being taken into account."

And again he said:

"This cannot be treated as a case of mere overvaluation, but is an assessment made on unconstitutional principles."

In view then of this thought of the Supreme Court on the subject of assessing for taxation the part of such property unit located in this state, is it essential to reshape section 4081, in so far as it relates to the third method, or the one applicable here, so as to make it require that there should be first a deduction from the total value of the value of of the total tangible property and then an apportionment in order that it may be constitutional?

I think not. If there is no special circumstance rendering the part elsewhere proportionately of more value than that in this state, there certainly is not. In such a case it is to be taken that the part of the capital stock in this state is proportionately of the same value as the part elsewhere. This is true also of its separate parts, to wit, tangible property and intangible property. The value of the tangible property can first be deducted from that of the capital stock, which would leave the value of the intangible property, and then a part thereof can be apportioned to this state on the mileage basis. But it can just as well,

and even better, be done in this way: A part of the capital stock can be first apportioned to this state on the mileage basis, and then the value of the tangible property in this state can be deducted therefrom. This would give exactly the same result as before. If there is a special circumstance rendering the tangible part of the part elsewhere proportionately of more value than that in this state, in order to keep from taxing such excess value elsewhere it is still not essential that it be first deducted and that then there be an apportionment. It can be handled by deducting from the value of the part of the capital stock apportioned to this state, in addition to the assessed value of the tangible property in this state, the mileage proportion of such excess value included in the apportionment of a part of the capital stock thereto. Of course, the simpler way is first to deduct the whole of such excess value, then to apportion the remainder on a mileage basis, and then to deduct the assessed value of the tangible property in this state. The result is the same either way. I am only concerned to show that, in order to keep from taxing in this state such excess value elsewhere, it is not essential that it be first deducted and that then the remainder be apportioned. It can be handled as successfully the other way. It is clear therefore that, to keep the third method prescribed by section 4081 within constitutional limits, it was not essential that it should have provided that the value of the entire tangible property should first be deducted from the capital stock before an apportionment. It was sufficient that it provided for an apportionment of a part of the capital stock to this state on a mileage basis, with a deduction of the assessed value of the tangible part therein, and permitted a deduction on account of any such excess value in either of the two ways suggested.

But it is urged by plaintiff that both the Court of Appeals of Kentucky and the Sixth Circuit Court of Appeals have held that the proper course is first to deduct the value of the entire tangible property and then to apportion the balance. Of course, if this is so, and the holding by either court is not a mere dictum, I am bound by it. The cases relied on are the following, to wit: Commonwealth v. Covington & Cincinnati Bridge Co., 114 Ky. 343, 70 S. W. 849, and Coulter v. Weir, supra.

To understand the Covington & Cincinnati Bridge Company Case it is essential to take notice of the case of Henderson Bridge Co. v. Commonwealth, 99 Ky. 623, 31 S. W. 486, 29 L. R. A. 73, the first case to arise under the statutory provisions under consideration. The companies, the assessment of whose tangible properties in this state were involved in these two cases, were bridge companies operating and conducting bridges across the Ohio river, one between this state and Indiana and the other between it and Ohio. As we have seen, the statute, as it then stood, provided no method for assessing the franchise of such companies in this state. Those companies did not operate and conduct their business and have their property wholly in this state, and hence the first method prescribed by section 4079 did not apply to them. Though they operated and conducted their business both in and out of this state, they did so along definite and fixed lines. Hence the original second method prescribed by section 4080 did not apply to

them. And though they operated and conducted their business along definite and fixed lines, the third method prescribed by section 4081 did not apply to them, because bridge companies were not one of the eight companies to whom that method was then limited. But the board having power to assess their intangible property in this state under section 4077, and no specific method being prescribed for such a case, the board had a right to adopt a reasonable method, and a reasonable method was that prescribed by section 4081 applying to other companies like it, which operated and conducted their business both in and out of the state and that along definite and fixed lines. The Henderson Bridge Company Case was a suit by the commonwealth against the company to recover the tax due it on an assessment made by the board. The method which it had used was first to value the whole property, then to deduct the assessed value of Indiana tangible, then to apportion to Kentucky a part of the balance on the mileage basis, and then to deduct therefrom the assessed value of the Kentucky tangible; the balance being taken as the value of the intangible in Kentucky. The method erred in favor of the company, in that it first deducted the assessed value of the Indiana tangible. Thereby Kentucky shared with Indiana its tangible without Indiana sharing in turn its tangible with Kentucky. There should have been no deduction of the Indiana tangible. That this was erroneous was noted by Judge Hobson in the Covington & Cincinnati Bridge Company Case. That company was contending for the same method in its case. In response to this contention, he said:

"But that suit, and all those following it, were actions by the commonwealth to recover taxes based on the assessment made by the board. The state was not complaining of the assessment; on the contrary, it was endeavoring to enforce it. It had no right of action except upon the assessment, and no question, therefore, could be presented by the state as to the propriety of the assessment which it sought to enforce."

On the other hand, the commonwealth, appellant therein, contended that the proper method was first to value the whole, then to apportion a part thereof to this state on the mileage basis, and then to deduct from such part the assessed value of the tangible in this state, the method which I have held is the one prescribed by section 4081 and applicable here, and in answer to this contention Judge Hobson said:

"We therefore conclude that the basis urged by appellant is the proper one for the assessment of the property."

So far certainly there is nothing favoring plaintiff's contention. On the contrary, it is directly against it. But this is not all of the case. Judge Hobson had this to say in his opinion as to first deducting the value of the total tangible and then apportioning a part of the balance to Kentucky on a mileage basis, to wit:

"If we subtract from the total value of all the property of appellee the value of its tangible property, the balance represents necessarily its intangible property; and, as the Constitution requires all property within the taxing district to bear its equal part of the public burden, this intangible property, so far as it is within the state, must be taxed as other property. While it does not necessarily follow that all parts of a bridge are of equal value, still the fact remains that its whole value is due to its entirety, and that one part of

the bridge is practically of no value, at least as a bridge, without the other. Prima facie, it should be presumed, where part of a bridge lies in Kentucky and part in another state, that the value of the structure in the two states is in proportion to the length of the bridge in each, for the value of the property depends upon its use as a bridge, and the franchise, it seems to us, must necessarily be apportioned the same way. If it should be shown that the property in the other states was of greater value per foot than the property in Kentucky, our officers are not concluded by the action of the officers of the other state, but could for themselves fix the value of the entire tangbile property of the bridge, and deduct this from the total value, which was in this case $1,330,000. But, there being no showing that there was any discrepancy in value between the Kentucky end of the bridge and the Ohio end, it should be assumed, in the absence of proof, that the value of the property in Kentucky was in proportion to the length of the bridge in Kentucky."

In saying what he thus said, Judge Hobson was not indicating the "proper way" of making the assessment under the statute. He said this, arguendo, i. e., in support of what he conceived to be the "proper way." For what he thus said is followed immediately by the statement heretofore quoted to this effect:

"We therefore conclude that the basis urged by appellant is the proper one for the assessment."

It followed therefrom that such was the "proper way," because it was based on the presumption that all parts of the bridge were of equal value and so of the franchise, and the result of such way was exactly the same as if the value of the whole tangible had been first deducted and then the balance apportioned.

But when we come to the Weir Case it must be conceded that it contains an express holding in accordance with plaintiff's contention. The holding is based on what Judge Lurton took to be the holding of the Supreme Court in the case of Adams Express Co. v. Kentucky, 166 U. S. 171, 17 Sup. Ct. 527, 41 L. Ed. 960. In the Weir Case Judge Lurton thus expressed himself:

"We therefore read the act, as the Supreme Court seems to have read it in Adams Express Company v. Kentucky, as requiring the deduction of tangible property from the gross value of all corporate assets, whether such tangible property be within or without the state."

But did the Supreme Court so read the act in that case? Judge Lurton only says that "it seems to have so read it" as if he were not sure of his ground as to this. In that case Mr. Chief Justice Fuller said:

"But taking the whole act together, and in view of the provisions of sections 4078–4081, we agree with the Circuit Court that it is evident that the word 'franchise' was not employed in a technical sense, and that the legislative intention is plain that the entire property, tangible and intangible, of all * * * corporations, * * * possessing no franchise, should be valued as an entirety, the value of the tangible to be deducted, and the value of the intangible property thus ascertained be taxed under these provisions; and as to railroad, telegraph, telephone, express, sleeping car, etc., companies whose lines extend beyond the limits of the state, that their intangible property should be assessed on the basis of the mileage of their lines within and without the state."

Undoubtedly this has the seeming which Judge Lurton attributed to it. But the case involved no question of method and hence did not

call for accuracy of statement regarding the matter. In the first clause of the quotation, the first, original second, and third methods, which were then the only methods prescribed, are treated as if they were exactly alike, and hence one description is made to fit them all. What is said is true of the first method but not of the other two. As to the then second method, covered by section 4080, it is expressly provided that, after valuing the entire property, tangible and intangible, a part shall be apportioned to this state on the gross receipts basis, and that then for the first time there shall be a deduction, and that of the assessed value of the tangible property in this state. What is thus said, therefore, is an inaccurate obiter dictum. So was Judge Lurton's holding. There was no question of method involved in the Weir Case. It involved the same question that was involved in the Fargo Case, and that is whether stocks and bonds in New York owned by the Adams Express Company and not used in its business could be treated as a part of its property unit, a part of which was in this state and assessable here. There is therefore nothing in either of the cases relied on against the position I feel constrained to take on the matter now under consideration. And on the contrary the decision in the Covington & Cincinnati Bridge Company Case supports it. This position of plaintiff, therefore, is not sound.

4. The other particular in which plaintiff claims that the board did not follow the statute in the method which it adopted was in allotting to this state more than the mileage proportion of its capital stock as the value of the part therein and in fixing the remainder left after deducting from such allotment the assessed value of the tangible property in this state as the value of its franchise therein. As heretofore stated, the proportion of Kentucky mileage to total mileage is 25 per cent. in round numbers. The board allotted to this state 35 per cent. of the value of plaintiff's capital stock, as the value of the part thereof in this state. It obtained this proportion by averaging the gross receipts proportion, which it determined to be 39 per cent., and the net income proportion, which it determined to be 41 per cent., with the mileage proportion. The plaintiff's position is that the statute requires the board absolutely, i. e., in all cases, to allot to this state the mileage proportion of the value of the capital stock as the value of the part thereof therein, and to fix the remainder left after deducting from such allotment the assessed value of the tangible property in this state as the value of its franchise therein. I think it clear that here, also, plaintiff's position as to the requirement of the statute is wrong. The board is not required absolutely, i. e., in all cases, to so do. To construe the statute as so requiring would render it unconstitutional. If it so requires, then, in a case where that part of the capital stock of such a company elsewhere is, by reason of some special circumstance, proportionately of more value than the part in this state, the board is required to include in its assessment the mileage proportion of such excess value elsewhere, no part of which is subject to taxation in this state. Such was the character of the statute as originally enacted, i. e., before the amendment of June 9, 1893. And I think that it is to be accepted that the object of the amendment in providing that the board

should consider the mileage proportion of the value of the capital stock in fixing the value of the franchise instead of that it should take it absolutely as the value of the part of the capital stock in this state and fix it, less the assessed value of the tangible property, as the value of the franchise, was to make it so that, in such a case, the statute would not require the board to include in its assessment any part of the excess value elsewhere.

The plaintiff has it that the object of the amendment was' to make it so that the board might deduct the assessed value of the tangible property in this state before apportioning the part apportioned to this state on a mileage basis, amongst the subordinate jurisdictions. But the section as originally enacted permitted it to make such deduction, as I have already held; the deducting clause being simply misplaced, i. e., after the apportionment to subordinate jurisdictions instead of before. Such, then, could not have been the object of the amendment. Its object, in part at least, was as I have stated it to have been. Under the statute as so amended, the board can avoid including in its assessment any part of the excess value elsewhere in either of two ways. It can either first deduct the whole of such excess value, after fixing the value of the capital stock, and then take the mileage proportion of the remainder as the value of the part thereof in this state, or it can apportion to this state the mileage proportion of the value of the capital stock and then deduct the mileage proportion of such excess value therefrom. And as the statute calls for an apportionment to this state of the mileage proportion of the value of the capital stock as the next step after fixing the value thereof—it so calls therefor in providing that it shall consider such mileage proportion—it would seem that it contemplates that the deduction shall be made in this last way. But as the result is exactly the same each way, it is immaterial which way is adopted.

The statute of Indiana involved in the Pittsburg, C., C. & St. L. R. Co. Case and the Cleveland, C., C. & St. L. R. Co. Case was substantially the same as section 4081 after the amendment. In the first of these causes Mr. Justice Brewer said:

"When a road runs through two states it is, as seen, helpful in determining the value of that part within one state to know the value of the road as a whole. It is not stated in this statute that when the value of a road running in two states is ascertained the value of that within the state of Indiana shall be determined absolutely by dividing the gross value upon a mileage basis, but only that the total amount of stock and indebtedness shall be presented for consideration by the state board."

And again, after referring to the testimony introduced on the trial of the case as to the special circumstances rendering that case an exceptional one, in the quotation heretofore made from the opinion, he said:

"If testimony to this effect was presented by the company to the state board, it must be assumed, in the absence of anything to the contrary, that such board, in making the assessment of track and rolling stock within the state, took into account the peculiar and large value of such facilities and such extra rolling stock. But whether in any particular case such matters are taken into consideration by the assessing board does not make against the

validity of the law, because it does not require that the valuation of the property within the state shall be absolutely determined upon a mileage basis."

And again he said:

"The certificate of the state board does not show that it reached its determination of the value of the property in Indiana by first assessing the total value of the company's property, and then dividing it on the mileage basis. It simply shows that it considered the matters which by the statute were required to be presented to it by the railroad company, as well as all other matters which in its judgment bore upon the question of value, and from such consideration reached the result announced, to wit, the value of that part of the company's road in the state of Indiana. Evidence that there were peculiar matters which gave to portions of the road outside of Indiana an enormous value as compared with the general line of the road does not prove that the board did not take those peculiar matters into consideration. On the contrary, the reasonable presumption is that, if its attention was called by the company to those facts, it did take them into consideration in connection with the information derived from the total amount of stock and indebtedness of the company. Indeed, its certificate is affirmatively that it took into consideration 'all other matters appertaining thereto that would assist the board in arriving at a true cash value' of the parts of the road within the state of Indiana. That the aggregate value of the entire property of the company was evidence properly receivable and bearing upon the question of value of that part in Indiana is a proposition which, as we have heretofore said, is clearly established both on reason and authority. * * * Is testimony that the value placed by the board was excessive, together with testimony that portions of the road outside of the state were of largely greater value than any similar length of road within the state, unaccompanied with evidence that the board reached the valuation by simply dividing the total value of the company's property on a mileage basis, or that it failed to take into consideration the fact of such excessive value of portions outside of the state, sufficient to impeach its determination? This question must be answered in the negative."

The later case of W. U. Telegraph Co. v. Taggart, 163 U. S. 1, 16 Sup. Ct. 1054, 41 L. Ed. 49, involved an amendment to the statute involved in those two cases, providing for the taxation of telegraph and other companies. It expressly provided for an apportionment of the gross value on a mileage basis and said nothing whatever as to taking same into consideration. But the state Supreme Court, and the Supreme Court of the United States following it, held that it should be construed in connection with the original act and that, so construing it, such was its meaning. Mr. Justice Gray there said:

"This court, at the last term, in several cases affirming judgments of the Supreme Court of Indiana, held that the statute of 1891 did not, in the case of a railroad partly in that state, and partly in another, require that the value of the part in Indiana should be determined absolutely by dividing the whole value upon a mileage basis; but only that the total amount of stock and indebtedness should be taken into consideration in ascertaining the value."

He quoted with approval from the opinion in the state Supreme Court the following portions thereof, to wit:

"The act, it is true, provides a method of valuation, the mileage method, as a basis for the taxation of certain property within the state of Indiana. But this is simply a means for determining the true cash value of the property within the state; and if in the case of appellant's property, or in any other case, it is shown to the board, or is discovered by them, that still further deductions should be made, on account of larger proportionate values outside of the state, or for any other reason, then the board must make such deductions, so that, finally, only the property within the state of Indiana shall be assessed, and that at its true cash value."

And again:

"Construing the acts of 1891 and 1893 together, it will therefore be presumed, in the absence of evidence to the contrary, that the state board has deducted from the total valuation of all interstate property such values, if any, of extrastate property, as will leave the remaining property, within and without the state, as near as may be of equal proportional value. * * * The act of 1893 provides, generally, for a mode of assessing the true cash value of that part of interstate telegraph and other property which is within the state of Indiana, to wit, the mileage method. But should there be particular cases where that method must be modified in order to reach the necessary result, namely, the true cash value of such part of the property as is within the jurisdiction of the state, the law of 1893 itself supplies the means of doing so."

He then said:

"The statute of Indiana of 1893 regarding telegraph companies, therefore, as construed and applied by the Supreme Court of the state, like the statute of 1891 regarding railroad companies, while it takes, as the basis of valuation of the company's property within the state, the proportion of the value of its whole capital stock which the length of its lines within the state bears to the whole length of all its lines, makes it the duty of the state board of tax commissioners, to make such deductions, on account of a greater proportional value of the company's property outside of the state, or for any other reason, as to assess its property within the state at its true cash value only."

If then such was the object in part of the amendment, it would seem that it was its object also to make it so that, in a case where that part of the capital stock of such a company in this state is proportionately of more value than the part elsewhere, by reason of some special circumstance, the statute would require the board to include in its assessment the whole of the excess value in this state. The inclusion of the whole of the excess value in this state can be brought about in either of two ways also. The mileage proportion in this state of the capital stock would include that proportion of such excess value. The mileage proportion elsewhere of such excess value could then be added thereto. This would make the assessment include the whole of the excess value. Or the whole of the excess value in this state can first be deducted from the value of the capital stock, then a part of the remainder can be apportioned to this state on the mileage basis, and then the whole of such excess value can be added thereto. The result obtained in this way will be exactly the same as that obtained in the other, and it is therefore immaterial which of the two ways is adopted.

Of course, in order to make a deduction or addition on account of such excess value, as the case may be, the amount thereof has to be determined. If the excess is in the tangible property, it has to be determined wherein it lies, i. e., whether in terminal facilities, rolling stock, or in something else, and what the extent of it is, and then the value thereof has to be determined. Cost of construction or acquisition and extent of deterioration are no doubt considerations relevant to such determination. No other way of determining the amount of such excess value, in such a case, occurs to me. Of course, under our complicated system of assessing interstate railroad companies, in such a case, if the excess is in this state, it is in fact first assessed by the Railroad Commission. But, if I mistake not, the Board of Valuation and Assessment, inasmuch as it deducts the assessed value of the tan-

gible property in this state from the value of the part of the capital stock therein, would have to take it into consideration to keep from deducting it from the franchise. So, there occurs to me but one way of determining the amount of the excess value if it is in the intangible property. That is to determine the Kentucky gross receipts and the elsewhere gross receipts, and then to compare them. It is from such a comparison that it is to be determined whether there is any such excess value, where it is, and its amount. It seems to me that it is in such comparison, rather than in a comparison of the respective net incomes, that the truth is to be found, though as to this I may be mistaken. I cannot see anything to be gained by considering both comparative gross receipts and comparative net incomes and averaging them. Such procedure does not seem to me to have relation to the truth of things. The proper division of the gross receipts between this state and elsewhere in order to the comparison of their respective parts calls for much thought, but the necessities of this case do not require that I should give expression to any opinion which I may have in regard thereto.

My conclusion, therefore, is that the statute does not require the board to absolutely, i. e., in all cases, allot the mileage proportion of the value of the capital stock to this state as the value of that part thereof therein and to fix the remainder left, after deducting therefrom the assessed value of the tangible property in this state, as the value of the franchise therein. It is elastic enough to permit of a deduction from or addition to such mileage proportion in case there is excess value elsewhere or in this state, on account of it, so as to keep from taxing any part thereof in this state, if it is elsewhere, and to tax the whole of it, if it is within this state.

If this view of the statute is correct, it follows that the board did not depart therefrom in that it allotted to this state more than the mileage proportion of plaintiff's capital stock and fixed the remainder left, after deducting therefrom the assessed value of its tangible property in this state, as the value of its franchise therein, unless the part of the plaintiff's capital stock in this state was proportionately of the same value as the part elsewhere or proportionately less than the value thereof. It is defendant's claim that the part of plaintiff's capital stock in this state is proportionately of more value than the part elsewhere, and I propose to dispose of this case on the assumption that this claim is correct.

[5] 5. If then the board departed from the statute in the method which it pursued, it so did in some particular not indicated by plaintiff and not thus far considered. But I feel constrained to hold that it did depart therefrom, in that it did not care for the excess value in this state in the way in which I have indicated that it could have cared for it. If I am correct in the view that such is the only way in which to care for it, of course, the statute contemplates that it shall be so cared for and in no other way. The way in which the board attempted to care for it was by changing what defendants term the apportioning unit. It changed it from the mileage proportion to the average of the three proportions, to wit, the mileage proportion, the

gross receipts proportion, and the net income proportion. The only proportions available other than the mileage proportion are the gross receipts proportion, the net income proportion, the average of the two, the average of either and the mileage proportion, and the average of the three proportions. But neither the gross receipts proportion, nor the net income proportion, nor the average of the two will do, for neither has any true relation to the apportionment of the tangible property. So far as either has any relation to the apportionment of the capital stock, it is to the intangible part thereof, and of the three it is only the gross receipts proportion or the net income proportion that can be said to have such relation thereto, of which two it seems to me the gross receipts proportion is to be preferred. Even as to intangible property no instance of an apportionment of such property on a gross receipts basis has come to my notice.

The case of Erie R. Co. v. Pennsylvania, 21 Wall. 492, 22 L. Ed. 595, involved a tax on the gross receipts in Pennsylvania of an interstate railroad company, which was upheld. There the apportionment of the gross receipts was on a mileage basis. The statute itself contained no provision for an apportionment. It merely provided for a tax on the gross receipts in the state of all railroad companies operating therein, and the assessing board determined the amount of the gross receipts in the state of the company there involved by so apportioning them. The case indicates how little an assessing board is dependent on legislation to provide the method by which it shall value the property subject to its assessment. If then the excess value is in the tangible property alone, it is impossible by the use of the gross receipts proportion, or the net income proportion, or the average of the two, to determine its existence or its amount. And if it is in the intangible property, an apportionment of a part of the value of the capital stock on such a basis will apportion both the intangible property and the tangible property, and, whilst the apportionment of the one may be correct, that of the other, presumptively at least, will not be. Possibly there may be a certain degree of sympathy between the intangible and tangible property and such as to weaken the presumption, nothing else appearing, that the two parts of the tangible property are proportionately of the same value, but certainly not sufficient to overcome it. An indication of how little sympathy may exist between the two is to be found in the Massachusetts Western Union Telegraph Company Case. There the intangible property in that state was treated as being as much more proportionately than the part elsewhere as the part of the tangible property therein was less than the part elsewhere, so as to justify the court in upholding an apportionment of both on a mileage basis.

If then neither the use of the gross receipts proportion, nor of the net income proportion, nor of the average of the two, will yield a correct result, the use of the average of the gross receipts proportion or the net income proportion and the mileage proportion or the average of the three proportions will not do so. Possibly the use of the average of the gross receipts proportion or of the net income proportion and the mileage proportion may yield a truer result than the use of

the gross receipts proportion or of the net income proportion, by itself, will do; but it will still come short of the truth. The use of the average of the three proportions, thereby as it were doubling up on the mileage proportion, is farther away from the truth than the use of the average of either the gross receipts proportion or the net income proportion and the mileage proportion. The ideas intended to be conveyed here can be made clearer if I apply them to a supposed state of case. That case is that the value of plaintiff's capital stock is $225,000,000, made up of tangible property of the value of $175,-000,000 and intangible property of the value of $50,000,000. The mileage proportion thereof is $56,500,000. But this is not the true value of the part of plaintiff's capital stock in this state if the gross receipts proportion is 39 per cent. and the net income proportion is 41 per cent. as determined by the board. On the one basis the true value thereof is as follows, to wit: 25 per cent. of the tangible property, $43,750,-000; 39 per cent. of the intangible property, $19,500,000; total value of the part in this state, $63,250,000—or $6,750,000 in excess of the mileage proportion. On the other basis it is as follows, to wit: 25 per cent. of the tangible property, $43,750,000; 41 per cent. of the intangible property, $20,500,000; total value of the part in this state, $64,250,000—or $7,750,000 in excess of the mileage proportion. The gross receipts proportion of the value of the capital stock is $87,750,-000, or $24,500,00 in excess of the true value of the part of the capital stock in this state according to the one calculation and $23,500,000 in excess thereof according to the other.

The net income proportion of the value of the capital stock is $92,-500,000, or $29,000,000 in excess of the true value of the part of the capital stock in this state, according to the one calculation, and $28,-000,000 in excess thereof according to the other.

The average proportion of the gross receipts proportion and the mileage proportion, which is 32 per cent. of the value of the capital stock, is $72,000,000, or $8,750,000 in excess of the true value of the part of the capital stock in this state according to the one calculation and $7,750,000 according to the other.

The average proportion of the net income proportion and the mileage proportion, which is 33 per cent. of the value of the capital stock, is $74,250,000, or $11,000,000 in excess of the true value of the part of the capital stock in this state according to the one calculation and $10,000,000 according to the other.

The average proportion of the three proportions, which is 35 per cent., and which is the proportion used by the board, is $78,750,000, or $16,500,000 in excess of the true value of the part of the capital stock in this state according to the one calculation and $15,500,000 according to the other.

If then the supposed case is the true one, and the line of reasoning here followed is sound, the board has assessed as against plaintiff according to the one calculation $16,500,000, and according to the other $15,500,000, of property not in this state. Of course, the extent of the assessment of property elsewhere would be reduced if the value of the part of the tangible property in this state is proportionately more

than the value of the part thereof elsewhere, which it is not unlikely is the case. And in justice to myself it should be noted that in adopting this line of reasoning I have been without the assistance of the reflections of others. This is the first instance, so far as I am advised, in which the position has been taken that the part of such a property unit as is involved here covered by the assessment attacked is proportionately of more value than the part elsewhere, and an attempt has been made to have the assessment include the excess value. I am without any assistance from counsel, because plaintiff's counsel claim that the allotment should have been limited to the mileage proportion, and defendant's that it was right to use the average proportion of the three in making it, both of whom I have been constrained to hold are in error.

The use of the average proportion of the three is excluded by the statute itself. What it says shall be considered is not the mileage proportion, i. e., the proportion of Kentucky mileage to the total mileage, but the mileage proportion of the value of the capital stock. What the board considered was the one, and not the other. It considered the mileage proportion in averaging it with the gross receipts proportion and the net income proportion. But a consideration of the mileage proportion is not a consideration of the mileage proportion of the value of the capital stock. Had it considered the latter, it would have apportioned to this state the mileage proportion of the value of the capital stock, and then made an addition thereto on account of the excess value in this state in order to allot to this state the full value of the part of the capital stock in this state. Had it first made such an apportionment, it could not have made such an allotment otherwise than by making such an addition. Instead of so doing, it considered the mileage proportion in and of itself by averaging it with the other two proportions, and then left it for good and apportioned to this state the average proportion of the value of the capital stock as the value of the part in this state. Such I maintain was not a consideration of the mileage proportion of the value of the capital stock. The distinction here attempted to be made may be a nice one, but it seems to me that it is a true one.

In another view of the matter the statute excludes the use of such an average proportion. It certainly so did before the amendment of June 9, 1893. The allotment then was limited to the mileage proportion of the value of the capital stock. The sole object of the amendment was to make it so that it should not be so limited. This is accomplished by providing that such mileage proportion should be considered in fixing, instead of that it should, less the assessed value of the tangible property, be the value of the franchise. It is a well-known rule of interpretation that the mention of one thing excludes another thing of like character. This is particularly so here where no substitution of an apportioning unit is needed in order to accomplish the object of the statute, which is to have the assessment include no part of the capital stock elsewhere and all of it in this state, and where another portion of the statute, to wit, section 4080, mentions another apportioning unit, to wit, the gross receipts proportion. The original

method provided for in that section is subject to the criticism that it required the apportionment of the tangible as well as the intangible property of the companies covered by it on the gross receipts basis. It seems not to have worked well in practice, and because of this the alternative method was provided, by which an apportionment was abandoned and the part of the capital stock in this state was treated as an independent whole. It was a backward step to so construe the statute as to compel the use of both methods. In the case of such companies, inasmuch as they do not operate and conduct their business along definite and fixed lines, the gross receipts belonging to this state and those belonging elsewhere can be readily determined, which is not the case as to those covered by section 4081. Besides, no express provision was made for companies covered by section 4081 making such a showing as would enable an apportionment as to them being made on such a basis. I have already alluded to a consideration for limiting the second sentence of section 4079 providing for the making of such a showing to the companies covered by section 4080. An additional consideration makes it conclusive that it should be so limited. That sentence was in the original act the same as it is now. At that time section 4081 provided that the apportionment should be absolutely on the mileage basis. It therefore served no purpose as to such companies and could not have been applicable to them. Finally, as already noted, the Indiana statute involved in the Railroad & Telegraph Companies Cases is substantially the same as section 4081 after the amendment of June 9, 1893, in providing that in making the assessment an apportionment of the capital stock on a mileage basis shall be considered. Yet in neither one of those cases is there the slightest intimation that an excess value elsewhere can be cared for by an apportionment on any other basis than the mileage basis. They recognize that the apportionment on the mileage basis is the basis of the assessment and that the excess value elsewhere is to be cared for by a deduction therefrom.

The defendants rely on certain expressions in the opinion of the Southern Pacific Railroad Company Case and in the case of Commonwealth v. U. S. Express Co., 149 Ky. 759, 149 S. W. 1037. In the former case Judge Hobson said:

"The statute does not provide that the proportion between the lines in this state and the lines in and out of this state shall be conclusive. It simply provides that this fact shall be considered by the board. The relative length of the lines in and out of this state would throw much light on the value of the franchise exercised in this state; but there might be other facts throwing light on the question."

In the other case Judge Carroll said:

"We do not think that the mileage basis is exclusive, or that in every case this method should be resorted to in ascertaining the value of the franchise of a common carrier. The statute does not confine either the state board or the courts to the mileage basis, but leaves them at liberty to adopt any other basis within the statutory limits that will aid in reaching a fair valuation. A state of case might be presented in which it would be unjust to the commonwealth to fix the value of a franchise on the mileage basis alone, but, under the facts in this record, we think the court did not err in arriving at the value of the franchise on this basis."

Each of these statements is a dictum, and the latter shows on its face that it is such, for there the apportionment was not only on a mileage basis, but such apportionment less the assessed value of the tangible property was fixed as the value of the franchise. As to the statement of Judge Hobson, I have no criticism to make of it. I said as much in the case of Louisville & Nashville R. Co. v. Coulter (C. C.) 131 Fed. 282, 305, when I said:

"This amendment was, no doubt, passed in order that the board should not be found) absolutely to accept such proportion of the cash value of the entire property as the value of the part in this state, and might be at liberty, in determining the value of such .part, to consider the difference in character and value, if any, between the mileage in and out of the state."

And I have said nothing herein that is in conflict with this statement of Judge Hobson. What I have said is that the apportionment on the mileage basis is not conclusive, i. e., absolutely determinative of the value of the franchise. I have said, also, that it is not wholly exclusive. My position is that it is exclusive of any other method of apportionment, but .it is not exclusive of deducting from or .adding to the part so apportioned, if there is an excess value elsewhere or in this state, so that by using the mileage basis of apportionment, as the basis of the assessment, property elsewhere .will not be taxed in this state, and none of the property therein will escape taxation therein. The statement of Judge Carroll is broader, and possibly goes the length of saying that it is not even necessary that there should be an apportionment on any basis. This, of course, if intended, cannot be sound in the face of the statute providing that an apportionment on the mileage basis shall be considered. What was said was under the misapprehension that, if the mileage basis be held exclusive of any other basis of apportionment, the amount so apportioned would be conclusive of the value of the franchise, so that if it were really of more value such excess value could not be assessed. But, as we have seen, such is not the case.

I am therefore driven to hold that the board did not follow the statute in making an apportionment on any other basis than the mileage basis. If its position that the value of the part of plaintiff's stock in this state was more than the mileage proportion was sound, it should have apportioned a part thereof to this state on the mileage basis, and then cared for the excess value in this state by an addition to such mileage proportion. The board, in taking the position that the part of plaintiff's capital stock in this state was proportionately of more value than the part elsewhere, and in undertaking to care for the excess value in this state, was dealing with a delicate matter. This was so because there was a question of jurisdiction involved. Its valuation was not limited to property in this state. It covered interstate property and its determination was not limited to a mere valuation. It included a finding as to how much of such interstate property was in this state. Had it proceeded along right lines, its conclusion as to how much of plaintiff's capital stock was in this state, however it may have been as to its value, would have been presumptively correct only. It would not have had the binding force as to the valuation of property

admittedly within its jurisdiction. But it did not proceed along right lines, and its assessment must therefore be held void.

[6] 6. Though the fact that I have come to this conclusion might relieve me of the necessity of considering whether the assessment is void on the other two grounds relied on, I have deemed it important that I should reach conclusions regarding them also, and that I should make such conclusions known. I therefore proceed with the case. And it is next in order to dispose of the plaintiff's claim that the board did not follow the statute in the matter of the hearing prescribed thereby. The provision in relation thereto is section 4083, which is in these words:

"It shall be the duty of the Auditor, immediately after fixing such value by said board, to notify the corporation of the fact; and all such corporations shall have thirty days from the time of receiving the notice to go before such board and ask a change of the valuation and may introduce evidence, and the chairman of the board is hereby authorized to summons and swear witnesses and, after hearing such evidence, the board may change such valuation as it may deem proper, and the action of the board shall be final."

The claim is not that the board did not give plaintiff notice that it had made a preliminary assessment of its franchise and give it an opportunity to appear before it and be heard. It did give such notice, and plaintiff appeared before it and presented evidence and made arguments in regard to the matter. The claim is that the board failed to inform it as to the method by which it had reached such assessment, and, without its knowledge, used a report by it to the Railroad Commission in reaching the conclusion which it came to; and that by reason thereof it had no opportunity to be heard as to those matters, and hence was denied such hearing as the statute contemplates.

It is well settled that the assessment of property for taxation is a judicial function, and that the taxpayer is entitled to be heard in regard thereto before his property is assessed. But this right to a hearing does not involve a right to know in advance of the assessment the amount at which the assessor thinks the property should be assessed, and hence as to the method by which he has reached such amount. Ordinarily in judicial proceedings against one he is entitled to know specifically what is the charge against him. But this is not so as to the assessment of property for taxation. It is sufficient that the taxpayer has notice that his property is about to be assessed, and that he is given full opportunity to be heard as to the amount at which he thinks it should be assessed. And this notice need not be other than a statutory provision fixing the time and place when the assessment is to be made. This has been held to be true as to the assessment of such property as is involved here as well as to the assessment of the real or personal estate of the taxpayer.

In the Pittsburg, C., C. & St. L. R. Co. Case, Mr. Justice Brewer said:

"It is contended specifically that the act fails of due process of law respecting the assessment, in that it does not require notice by the state board at any time before the assessments are made final, and several authorities are cited in support of the proposition that it is essential to the validity of any proceeding by which the property of the individual is taken that notice

must be given at some time and in some form, before the final adjudication. But the difficulty with this argument is that it has no foundation in fact. The statute names the time and place for the meeting of the assessing board, and that is sufficient in tax proceedings; personal notice is unnecessary. In State Railroad Tax Cases, 92 U. S. [575, 23 L. Ed. 663], are these words, which are also quoted with approval in the Kentucky Railroad Tax Cases: 'This board has its time of sitting fixed by law. Its sessions are not secret. No obstruction exists to the appearance of any one before it to assert a right, or redress a wrong; and, in the business of assessing taxes, this is all that can be reasonably asked.'"

Again he said:

"It is urged that the valuation as fixed was not announced until shortly before the adjournment of the board, and that no notice was given of such valuation in time to take any steps for the correction of errors therein. If by this we are to understand counsel as claiming that there must be notice and a hearing after the determination by the assessing board, as well as before, we are unable to concur with that view. A hearing before judgment, with full opportunity to present all the evidence and the arguments which the party deems important, is all that can be adjudged vital."

But possibly, in view of the fact that such an assessment involves a question of jurisdiction, a different rule should prevail as to it. If then this position is sound, due process of law did not require that plaintiff should in advance of the assessment of its franchise in this state be advised of the amount at which the board had concluded it should be assessed or of the method and the various steps therein by which it had come to such conclusion. But, though due process of law did not so require, the Legislature had power to require that he should have notice thereof. And if it has so provided by section 4083, the giving of such notice was essential to the validity of the assessment. I do not think that there is any dispute as to this. Nor is there any dispute that such notice was not given. The board's records contain this minute in regard to plaintiff's assessment, to wit:

"It is resolved by the Board of Valuation and Assessment of Kentucky, after having given full and due consideration to the returns to the Auditor made by the Louisville & Nashville Railroad Company, a corporation under the laws of Kentucky, and, having taken into consideration the gross and net earnings of said company in Kentucky and elsewhere, and having considered the proportion and length of the lines owned, operated, leased or controlled by said company in Kentucky bears to the total length of the lines owned, operated, leased or controlled in this state or elsewhere; and having considered the value of its shares and the market value thereof and the amount of its bonded debt; and having considered the amount of its surplus fund and undivided profits and the value of all other taxable assets of said company; and after having heard and considered all before the board including the evidence of the witnesses introduced by the company and the exhibits filed therewith; and after having heard and considered the arguments of counsel for the company and after said board had ascertained the value of the capital stock of said company in Kentucky, and, from the amount thus found did deduct the assessed value of all tangible property assessed in the state of Kentucky, it is the judgment of said board, all the members thereof concurring therein, that the taxable value of the franchise of said company exercised in Kentucky as so determined is $45,428,074.00; and the board does hereby ascertain and fix the value thereof at said sum or amount for the purpose of taxation and assessment in Kentucky for the year 1912.

"August 31st, 1912, the foregoing resolution was offered by H. M. Bosworth, was seconded by Thomas S. Rhea. Upon call of the roll of the members on

the resolution, Bosworth voted 'Yes'; Crecelius voted 'Yes'; Rhea voted 'Yes.' The chairman declared the resolution carried and ordered that same be recorded."

The secretary of the board states in his affidavit that this minute "embodies the acts of the board in making said assessment," and the members of the board in their affidavits state that "it is a true and correct record of the judgment and findings of said board." It is to be taken, therefore, that this minute is the only minute on the records of the board in relation to the assesment. This minutes relates to the board's final assessment. The board's records contain no minute in relation to the preliminary assessment and hence gives no information whatever in regard thereto. All that is known in regard thereto is to be obtained from the notice which the board gave of the preliminary assessment. It is in these words and figures, to wit:

State of Kentucky,

Office of Auditor of Public Accounts,

Frankfort, Ky.  April 12th, 1912.

To Louisville & Nashville Railroad Company,
    9th & Broadway, Louisville, Ky.:

The State Board of Valuation and Assessment have had the report of the above corporation for June 30th, 1911, for the taxes of 1912, under consideration and have assessed the value of your franchise as follows:

Capital stock...................................................... $81,670,377
  Less amount of tangible property assessed by assessor for
    state taxes.......................................................... 29,170,377

Value of franchise........................................................ 52,500,000
Tax at 50 cents on each $100................................... $   262,500

Under the law you will have thirty days in which to appear before the board, introduce evidence, and ask for a change in the assessment.

Should the thirty days expire without a protest, this assessment becomes final.

Yours truly,                                              H. M. Bosworth, Auditor.

Make checks payable to Treasurer but mail to this office.

The words "capital stock" in the notice is vague, in that it is not stated whether what is meant is the entire capital stock or the part apportioned to this state. But there is no question that it was the latter that was meant, and that it was so understood. The only information, then, which the notice contained as to the method by which the assessment had been reached, was as to the part of the entire property allotted to this state and the amount deducted therefrom on account of the tangible property therein. It contained no information whatever as to the amount at which the entire property had been valued, nor as to the basis on which a part thereof had been so allotted. Thereafter the plaintiff appeared before the board and asked a change in the assessment, introduced evidence, and argued the matter. But, after receipt of the notice and before appearing, the plaintiff, in writing, requested the Auditor to furnish it a statement "showing the principle on which the board proceeded or the mode or manner employed by it of estimating the value of this company's franchise." In answer to this request the Auditor wrote to plaintiff as follows, to wit:

"In response to your request that I furnish you by return mail with a state-ment showing the principle on which the board proceeded or the mode or man-ner employed by it of estimating the value of the company's franchise, I beg to advise you that as a member of the board making the assessment I was guided by the statutes of Kentucky, under which we were proceeding in mak-ing the assessment and the several opinions of the Court of Appeals of Ken-tucky which have construed those statutes, and the evidence before the board in arriving at my conclusion and forming my judgment as to the value of this property for assessment purposes. The board had before it, when the assessment was made, the several reports made by the officers of the com-pany to the Auditor of Kentucky and the annual report of the company to its stockholders for the year ending June 30th, 1911. If it is made to appear upon a hearing before the board the tentative assessment is erroneous or incorrect, as a member of that board, I will urge that it take such action as will in my judgment do complete justice to the company and the state of Kentucky alike. I do not know of any statutory provision that requires the board to submit its calculations to the company in advance of a hearing or at all."

At the hearing the plaintiff introduced the Auditor, chairman of the board, as a witness, and asked him a series of questions, answers to. which would have elicited the valuation which the board had fixed on the whole property and the method by which it had arrived at such valuation and the basis on which the part of such valuation was allotted to this state, and he declined to answer each one of these questions on the advice of the Attorney General. It is clear, therefore, that, in advance of the final assessment, no notice was given to plaintiff of the method by which it had reached the preliminary assessment and the various steps therein, save in so far as the notice thereof contained such information, and it came short of notifying plaintiff whether or not the whole property had been valued and a part allotted to this state, and, if so, at what it had been valued and the basis on which it had been allotted. The minute in relation to the final assessment contains no statement as to these matters. The sole information as to that assessment which it contains is that in making it the value of the entire property in this state was ascertained and the assessed value of the tangible property therein deducted therefrom, and in the notice there-of it was shown that in making it the value of the entire property in Kentucky was changed from $81,670,377 in the preliminary assess-ment to $74,598,451, thereby changing the assessment of the intangible property in this state from $52,500,000 in the preliminary assessment to $45,428,074. So I take it that there is not any dispute in this case that plaintiff did not receive the notice heretofore stated, and, in that it did not receive such notice, it claims that it did not have the hearing contemplated by the statute. The sole dispute here is as to whether the board was bound to give such notice. The defendants claim that it was not. According to its position it was not bound to give even as much information as was given by the notices of the preliminary and final assessments. It was sufficient for it to give notice of the amount at which the plaintiff's franchise had been assessed without more. The plaintiff, on the other hand, contends that it was entitled to notice of the method by which that assessment had been reached and the different steps in it. On this point I have not the slightest doubt that the plaintiff is in the right. I am satisfied not only that it was entitled to notice thereof, but that it was the duty

of the board to enter on its records the preliminary assessment show-ing the different steps in the method pursued by it in making it, and that they resulted in such valuation and such changes therein as were made in the final assessment, and that they resulted in the valuation finally fixed, so that an inspection of its records would give full in-formation in regard to such matters. As it is, the board made no record whatever of its preliminary assessment, and in the record of the final assessment nothing is set forth except the final result of what-ever method was adopted.

In the Fargo Case, it was held, as heretofore stated, that certain stocks and bonds owned by the express company were not used by it in its business, and hence constituted no part of the unit a part of which was in Indiana and assessable there. Mr. Justice Holmes, in disposing of the case, considered whether as a matter of fact the tax-ing board had included those stocks and bonds in the assessment of the entire property, a part of which had been apportioned to that state, on the mileage basis. It was essential that they had been in order to overthrow the assessment. The main evidence which he relied on as showing that they had been was that the minutes of the board did not show that they had been deducted. He said:

"We may add that it appears by a stipulation as to facts that 'the minutes of said State Board of Tax Commissioners' are in evidence. This means the complete minutes. It must be assumed that the minutes show all that took place in the proceedings, and therefore that we have before us all the evidence that was put in as well·as a report of what was said."

There could have been but one basis for the assumption that the min-utes showed all that had taken place in the proceedings, and that was that they should have shown it. It was the duty of the board to enter of record its proceedings in full. He noted that the company proceeded before the board on the idea that it had or was going to include them in the valuation, and said:

"If the company had been mistaken, common fairness required that it should be informed and allowed to give further evidence of the undoubted truth."

And finally he said that:

"There was no alternative open and no other could be pressed consistently with the candor to be expected from the officers of a state, in face of a con-stitutional question and dealing with great affairs."

There is nothing in the case of Chicago, B. & Q. R. R. Co. v. Bab-cock, 204 U. S. 585, 27 Sup. Ct. 326, 51 L. Ed. 636, against this posi-tion. The question there raised was whether, after the assessment had been made, the companies in a suit impeaching the assessment had a right to put the members of the board on the witness stand and exam-ine them "with regard to the operation of their minds in valuing and taxing the roads." It was held that they had not the right to do so. And one of the reasons which led Mr. Justice Holmes to this conclu-sion is thus set forth by him:

"Again this board necessarily kept and evidently was expected by the stat-utes to keep a record. That was the best evidence at least of its decisions and acts. If the roads had wished an express ruling of the board upon the deduc-

tions which they demanded, they could have asked for it, and could have asked to have the action of the board or its refusal to act noted in the record."

This reasoning against the right to put the members of the board on the stand after it had completed its work and inquire into the operation of their minds is that the companies, instead of so doing, should go to the records of the board, where they ought to be able to find all that they ought reasonably to know, and, if they did not contain all they wanted to know, they had themselves only to blame for the fact that they did not. It was in their power in the course of the work of the board to make the records full and complete. A decision that the members of the board cannot be quizzed after they have completed their work as to the operation of their minds in doing it is not against the position that their records should exhibit in full the various steps in their work. And the reason given why they should not be so quizzed is, in effect, that their records should contain such steps, which was all that the company was entitled to know.

The position of the board and of the defendants herein is that all that was essential to the validity of their work was that the company before it was finally assessed should have notice of the automatic result of the taking of the various steps in the method applicable to it, and that its record should show that result as affected by the changes made in it after hearing the plaintiff constituting the final assessment. The board had nothing whatever to do directly with such result. It was the creature of the statute. In the case of each method, as we have seen, the statute prescribes certain specific steps to be taken by the board, the taking of which will result automatically in the assessment of the franchise in this state. This is less apparent as to the method involved here than the others. Section 4081 only mentions expressly the first two steps, to wit, the valuation of the capital stock and the apportionment of a part of the value to this state on a mileage basis; but the other two, to wit, the deduction from or the addition to this part, as the case may be, on account of any excess value by reason of a special circumstance, if any there be, and the deduction of the assessed value of the tangible property in this state, are implied and as really prescribed as the two which are expressed. The statute provides that the board shall take these various steps, i. e., shall reach conclusions first as to the value of the capital stock and then as to how much thereof is in this state, which involves a determination whether as much as and no more than the mileage proportion thereof is therein, and, if it is determined either that not as much as or more than such mileage proportion, how much less or more, and that it shall, after so determining how much of the capital stock is in this state, deduct therefrom the assessed value of the tangible property therein, and that the result thereof shall be the value of the franchise in this state.

Yet it is contended that the board has the right to keep to itself these weighty conclusions which the statute requires it to reach, on the correct determination of which depends the question whether the board has exceeded its jurisdiction or exhausted its full power, which it could keep only as long as its members remembered them, and, in view of the extent of its work, not very long, if for any length of time, and

make no entry thereof on its record or give any notice in regard thereto, and that all that was required was that it should enter of record and give notice of the automatic result of its work. The mere statement of this position is sufficient to condemn it. It is inconceivable that the Legislature had any such idea. Had it had any such idea, it would never have provided for a preliminary assessment and notice thereof, to the company, so that it might appear before it and point out any errors that the board might have fallen into in the operation of a complicated piece of machinery. It would have contented itself with a provision fixing the time and place for making the assessment at which the companies might appear and introduce such evidence and present such arguments as they saw fit without more.

The Court of Appeals of Kentucky, in the two American Surety Company Cases, held that, if the board in making an assessment does not follow the method prescribed by the statute, the assessment is void. If such is the case, then the company to be affected thereby is entitled to know that method, so that, if the method or any step in it is wrong, it can have the preliminary assessment corrected by the board in the final assessment, and, if it cannot succeed in so doing, may appeal to the courts to overthrow it.

The necessities of this case do not require that I should determine whether, if the board had supplied plaintiff with full information as to the steps taken by it, the assessment would be invalid because the record of the board does not show the conclusions which it reached concerning those matters as to which the statute required it to reach conclusions. It is sufficient to say that plaintiff was entitled to notice thereof, and that the failure to give such notice is an additional reason for holding the assessment void.

[7] 7. I am clear, also, that the board did not have the right to use plaintiff's report to the Railroad Commission without its being notified thereof and given an opportunity to be heard in regard to the matters therein relied on as affecting the assessment. It was from items in that report, in connection with items in plaintiff's report to its stockholders, that the board was enabled to determine the gross receipts proportion and the net income proportion which it averaged with the mileage proportion, thereby obtaining the percentage which it used in apportioning a part of plaintiff's capital stock to this state. Without those items it would have been unable to make such apportionment and would have been limited to the mileage proportion. By means thereof it was enabled to raise the apportionment 10 per cent. and thereby add possibly as much as $25,000,000 to plaintiff's assessment. This it did without an opportunity on plaintiff's part to say one word in regard to it.

An authority in support of plaintiff's position that it was entitled to know of the contemplated use of this report and to an opportunity to be heard in regard thereto is the case of Interstate Commerce Commission v. L. & N. R. R. Co., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431. Mr. Justice Lamar there said:

"The government further insists that the Commerce Act * * * requires the commission to obtain information necessary to enable it to perform the

duties and carry out the objects for which it was created, and, having been given legislative power to make rates, it can act, as could Congress, on such information, and therefore its findings must be presumed to have been supported by such information, even though not formally proved at the hearing. But such a construction would nullify the right to a hearing for manifestly there is no hearing where the party does not know what evidence is offered or considered and is not given an opportunity to test, explain, or refute."

And again he said:

"The commission is an administrative body and, even where it acts in a quasi judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. * * * But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are awarded or defended. In such cases the commissioners cannot act on their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given an opportunity to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense."

The fact that it was plaintiff's own report which was used does not make a difference. Whilst plaintiff can hardly be heard to say that its own statement is not true, it can be heard to say in what sense it intended the statement to be taken as true. It was not made for assessment purposes or to enable any one to form a judgment as to the gross receipts or net income proportions of the plaintiff. According to the affidavit of plaintiff's comptroller, the items therein relied on were made for comparative purposes only, i. e., to compare one year with another, and otherwise they were arbitrary in character. A consideration of all he says in regard thereto suggests the possibility at least that plaintiff has been done an injustice in the use which the board made of those items. The plaintiff had the right to make the explanation to the board, and it is not to be presumed that. it would not have given it whatever weight it is entitled to.

[8] 8. Finally, I come to plaintiff's claim that the assessment is void because in violation of the fourteenth amendment.

The defendants make a preliminary contention here, as they have done, against the consideration of the merits of this suit. This preliminary contention is that the assessment made by the board is not the action of the state and hence cannot be in violation of the fourteenth amendment, the applicable clause whereof is in these words:

"Nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

They argue that if a suit against state officers to enjoin them from taking action which they threaten to take in the name and for the state, under color of their office, as this is, is not a suit against the state, as I have held, then the action of the board in making the assessment complained of in the name and for the state under color of its office is not action on the part of the state, and hence not prohibited by the fourteenth amendment, even though it may deny plaintiff the equal protection of the laws. And they cite and rely on the decision of the Supreme Court in the case of Barney v. New York, 193 U. S. 430, 24 Sup. Ct. 502, 48 L. Ed. 737. That was a suit begun in the

federal court. As there was no diversity of citizenship between the parties thereto, jurisdiction depended solely on the question whether the action complained of therein was a violation of the fourteenth amendment and hence arose under the federal Constitution. The plaintiff in the suit was an abutting lot owner, and the action of which he complained was the construction of a rapid transit tunnel under a city street, so as to obstruct the easement of access to his lot, without compensation therefor, under the authority of the Board of Rapid Transit Railroad Commissioners for the City of New York. The theory on which the plaintiff proceeded was that such action was not only unauthorized but was forbidden by state legislation. It was held that the federal court in which it was brought was without jurisdiction because the action of the board under whose authority the tunnel was being constructed was not the action of the state, and hence not in. violation of the fourteenth amendment, and the suit, therefore, did not arise under the federal Constitution, and it was dismissed on this ground. The case was disposed of on the assumption that the Board of Rapid Transit Railroad Commissioners for the City of New York were state officers, or a state agency. Mr. Chief Justice Fuller said:

"The bill on its face proceeded on the theory that the construction of the easterly tunnel section was not authorized, but was forbidden by the legislation, and hence was not action by the state of New York within the intent and meaning of the fourteenth amendment, and the Circuit Court was right in dismissing it for want of jurisdiction."

The Chief Justice seems to have been of the opinion that, in order for the action of state officers to be in violation of the fourteenth amendment, it is essential that such action be authorized by the Legislature. But a little reflection will convince one that this position is not sound, and there is no inconsistency between my holding that this is not a suit against the state and the further holding that the assessment complained of is in violation of the fourteenth amendment. In the Poindexter Case, heretofore referred to, Mr. Justice Matthews said:

"The distinction between the government of a state and the state itself is important, and should be observed. In common speech and common apprehension they are usually regarded as identical; and as ordinarily the acts of the government are the acts of the state, because within the limits of its delegation of power, the government of the state is generally confounded with the state itself, and often the former is meant when the latter is mentioned. The state itself is an ideal person, intangible, invisible, immutable. The government is an agent and, within the sphere of the agency, a perfect representative; but, outside of that, it is a lawless usurpation. The Constitution of the state is the limit of the authority of its government, and both government and state are subject to the supremacy of the Constitution of the United States, and of the laws made in pursuance thereof. So that, while it is true in respect to the government of a state, as was said in Langford v. U. S., 101 U. S. 341, 25 L. Ed. 1010, that the maxim, that the king can do no wrong, has no place in our system of government, yet, it is also true, in respect to the state itself, that whatever wrong is attempted in its name is imputable to its government, and not to the state, for, as it can speak and act only by law, whatever it does say and do must be lawful. That which, therefore, is unlawful because made so by supreme law, the Constitution of the United States, is not the word or deed of the state, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name."

This, I take it, amounts to saying that the state is a political entity separate and distinct from its officers who act in its name and for it. By the government of the state nothing more is meant than its officers so acting. According to it, the acts of the officers of a state are never the acts of the state unless rightful. If wrongful, though done in the name of and for the state and under the color of their offices, they are not the acts of the state in any sense, but are their own individual acts, just as much so as they would have been had they not been done in the name of and for the state and under color of their offices. It is because such is the case that a suit against state officers complaining of a past, present, or threatened wrong on their part and seeking relief against them on the basis of it is never suit against the state, but a suit against the officers individually. And, in view of the fourteenth amendment, wrongful acts on the part of state officers are not otherwise than the individual acts of such officers. In no sense are they the acts of the state. It is never because they are such that they come within its reach. They come within its reach because the fourteenth amendment is leveled against them, and not against rightful acts which may be said to be acts of the state. Though the letter of the fourteenth amendment says that "no state shall" or "nor shall any state" do so and so, that is not what is really meant. What is really meant is that the government of the state, the state officers, or state agencies, shall not do so and so. It cannot mean anything else. The state itself cannot act except in a metaphorical sense. It is only its officers or an agency of it that can act. The fourteenth amendment is not a brutum fulmen or leveled against rightful action. It does not prohibit from acting that which does not act except metaphorically and then rightfully only. It prohibits from acting that which alone can act literally, to wit, its officers, and they only when their acts will be wrongful. Hence it is directed against state officers and state agencies and is to be interpreted as if it had provided in express terms, instead of "nor shall any state" deprive or deny, nor shall any state officers or state agency deprive or deny. So interpreted, it takes in any state officer or agency. There is no room to limit its sweep to any of the state government departments. It takes in every department thereof and every branch of every department. Every state officer and state agency is prohibited from depriving any person of his life, liberty, or property without due process of law or denying him the equal protection of the laws, and the act of such officer or agency so doing is absolutely void.

The idea intended to be here conveyed was expressed early by the Supreme Court in the case of Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676. Mr. Justice Strong said therein as follows, to wit:

"They (i. e., the war amendments) have reference to actions of the political body denominated a state, by whatever instruments or in whatever modes that action may be taken. A state acts by its Legislature, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the state, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a state government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the

laws, violates constitutional inhibition; and as he acts in the name and for the state, and is clothed with the state's power, his act is that of the state. This must be so, or the constitutional prohibition has no meaning. Then the state has clothed one of its agents with powers to annul or evade it."

This statement is subject to but one criticism, and that in so far as it says that the act of the officer who violates the fourteenth amendment "is that of the state." I submit that in no sense is it the act of the state. It is the individual act of the officer himself and none other. It is not necessary that it be the act of the state in order for it to be prohibited by the amendment. What it prohibits is not acts of the state, but acts of state officers or agencies of the character therein described, i. e., wrongful acts on their part. Had Mr. Chief Justice Fuller had this idea clearly in mind, he could not have permitted the decision in the Barney Case to have the appearance of holding that the action of state officers prohibited or even not authorized by the Legislature did not come within the fourteenth amendment. He confused two entirely distinct ideas, to wit, action in violation of the fourteenth amendment, and action in violation of state laws. Seemingly he thought that action in violation of state laws could not at the same time be action in violation of the fourteenth amendment. He was undoubtedly correct when he said:

"Controversies over the violation of the laws of New York are controversies to be dealt with by the courts of the state."

And also:

"It is for state courts to remedy acts of state officers done without the authority of or contrary to state laws."

But the fact that action on the part of state officers may be in violation of state laws is no reason why it may not at the same time be action in violation of the fourteenth amendment. If it deprives a person of his life, liberty, or property without due process of law, or denies him the equal protection of the laws, it is a violation of the real intent and meaning of the fourteenth amendment, even though at the same time it is a violation of the state law.

And he was affected by two irrelevant considerations. One was that, under section 641 of the United States Revised Statutes (U. S. Comp. St. 1901, p. 520), providing for a removal from the state to the federal court by one who is denied or unable to enforce in the judicial tribunals of the state rights secured to him by any law providing for the equal civil rights of all persons, citizens of the United States, a defendant, in a state court, is not entitled to removal on the ground of a denial of such rights unless the denial is a legislative denial. This was finally settled in the case of Commonwealth v. Powers, 201 U. S. 1, 26 Sup. Ct. 387, 50 L. Ed. 633, 5 Ann. Cas. 692. But this removal statute is narrower than the fourteenth amendment. Though, as thus construed, it is so limited, the fourteenth amendment is not. It is not limited to any state officers or officer, and therefore takes in every state officer or agency. The other irrelevant consideration was that a suit against a state officer for a wrongful act is not a suit against the state within the fourteenth amendment, which consideration I have heretofore dealt with.

209 F.—29

But he recognized that if power to act in relation to a certain matter is conferred by legislation on a state tribunal, and it acts in excess of its power, such action is in violation of the fourteenth amendment as was held in the Farmers' Loan & Trust Company Case, to which he alluded, where confiscatory rates of transportation fixed by the Texas Railroad Commission were invalidated because in violation of the amendment. And that is just the case we have here. The Board of Valuation and Assessment has power conferred on it to assess plaintiff's intangible property, and the claim is that it exceeded its power in thereby denying plaintiff the equal protection of the laws and in not following the statute. So that, even if the decision in the Barney Case is sound, it is not against the claim of plaintiff herein that the assessment complained of is in violation of the fourteenth amendment. Such a consideration, however, is not essential to bring action of state officers within the amendment. It is essential only in the case of those who are not state officers, such as municipal officers, and it is essential as to them to make them a state agency. It is not entirely certain that the point actually decided in the Barney Case is not sound. It all depends on the question whether the Board of Rapid Transit Railroad Commissioners for the City of New York, whose action was complained of, were state officers or officers of the city of New York. If they were the latter and their action was not only not authorized but prohibited by state legislation, then the board was not a state agency, and hence its action did not come within the fourteenth amendment.

But whatever difficulty is presented by the Barney Case has been removed by two later cases, to wit, Raymond v. Chicago Union T. Co., 207 U. S. 20, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757, and Home Tel. & Tel. Co. v. Los Angeles, 227 U. S. 278, 33 Sup. Ct. 312, 57 L. Ed. 510. Perhaps the difficulty was not fully removed by the Chicago Union T. Co. Case, but it has been by the Home Telegraph & Telephone Company Case. The action complained of in the first of the two cases was exactly the same as that complained of here, to wit, an assessment by the Board of Equalization of the intangible property of the plaintiff, and it was complained of on the same ground. The Supreme Court upheld the attack on the assessment on that ground and overthrew it. In that case, however, the assessment had been made pursuant to the command of the Supreme Court of Illinois in mandamus proceedings, and this circumstance has given rise to a claim that it has no application here. But in reality, as the later case shows, it in no wise affected the matter. The Barney Case was distinguished simply on the ground that the action there complained of was forbidden by the state Legislature. This was not, however, a true ground of distinction. The only possible ground of distinction is the one which I have referred to, to wit, that the board of whose action complaint was made therein was not a state agency, but an agency of the city of New York, and the fact that it had been prohibited by the Legislature from acting as it had had bearing on the question whether it was in fact a state agency. And in Mr. Justice Peckham's opinion therein may be found expressions which are calculated to confuse. They are expressions to the effect that action by state officers or a state agency in violation of the fourteenth amend-

ment are acts of the state. As, for instance, referring to the assessment complained of which was held to violate the fourteenth amendment, he said:

"It is not the mere action of individuals, but, under the facts herein detailed,' it was the action of the state through the board."

I have heretofore criticised language to the same effect of Mr. Justice Strong in the Ex parte Virginia Case. I would respectfully submit that the action was the mere action of individuals and not action of the state through the board. It came within the fourteenth amendment, not because it was action of the state, but because what the fourteenth amendment in reality prohibits is not action of the state but of state officers, which, because of its character, is wrongful, and hence not the action of the state, but the individual action of the state officers, though in the name and for the state and under color of their offices.

The question, however, came to a head in the Home Telephone & Telegraph Company Case. The action complained of in that case was an ordinance of the city of Los Angeles establishing telephone rates which were claimed to be confiscatory. It was claimed that by reason thereof the ordinance was in violation of the fourteenth amendment. This was the sole ground of jurisdiction, as there was no diversity of citizenship, and the lower court dismissed the suit because it held that the ordinance was not in violation of the fourteenth amendment. The ground upon which it so held was that the enactment of the ordinance by the city council was not state action. The city council was a state agency because it had been empowered by the state Legislature to fix telephone rates. And the ground upon which it was held that the ordinance was not state action, though by a state agency, was because the Constitution of California contained a provision to the effect that no person should be deprived of his life, liberty, or property without due process of law.. The ordinance, therefore, on plaintiff's claim, was in violation of the state Constitution, and hence could not be the act of the state, and, as it was not state action, it was not in violation of the fourteenth amendment. The position was taken that because of this constitutional provision not even state legislation could be in violation of the fourteenth amendment unless upheld by the state courts. It is difficult to see how, on this view, the fact that it or such an ordinance was so upheld would make it a violation of the fourteenth amendment, and why the position was not taken that all a state had to do to nullify the fourteenth amendment, so far as its limits were concerned, was to adopt in its Constitution a provision in the exact terms of the fourteenth amendment. Thereafter no action by any state officer or officers, no matter who they might be, could be in violation of that amendment, because their action was prohibited by the state Constitution, and hence was not action on the part of the state, and the fourteenth amendment is limited to state action.

But the position taken was denied, and the judgment of the lower court was reversed. It was held that on plaintiff's claim the action complained of was in violation of the fourteenth amendment. It was

sufficient that it was the action of a state agency, though in violation of the state Constitution. The Barney Case was dealt with by Mr. Chief Justice White, though he did not suggest the ground upon which possibly it may be upheld to which I have referred. He said:

"As to the other—the Barney Case—it might suffice to say, as we have already pointed out, it was considered in the Raymond Case, and if it conflicted with the doctrine in that case and the doctrine of the subsequent and leading case of Ex parte Young, it is now so distinguished or qualified as not to be here authoritative or even persuasive. But on the face of the Barney Case it is to be observed that, however much room there may be for the contention that the facts in that case justified a different conclusion, as the doctrine which we have stated in this case was plainly recognized in the Barney Case, and the decision there rendered proceeded upon the hypothesis that the facts presented took the case out of the established rule, there is no ground for saying that that case is authority for overruling the settled doctrine which, abstractly, at least, it recognized. If there were room for such conclusion, in view of what we have said, it would be our plain duty to qualify and restrict the Barney Case in so far as it might be found to conflict with the rule here applied."

That there is not the slightest inconsistency between the position heretofore taken, that this is not a suit against the state, and that now taken, that the assessment complained of is a violation of the fourteenth amendment, if it denies plaintiff the equal protection of the laws, is made plain by the Hopkins Case. That, as heretofore noted, was a suit to recover damages against a state agency for action claimed to have been taken in violation of the fourteenth amendment. It was brought in the state court and carried from thence through the Supreme Court of the state to the Supreme Court of the United States. The latter court had no jurisdiction of the case unless it contained a federal question, i. e., unless the action complained of was in violation of the fourteenth amendment, or plaintiff's claim that it was, was not colorable. No question as to jurisdiction was raised. It was conceded. And the court made no point of the matter, which it would had there been any question about it. Yet it held that the suit was not a suit against the state, and hence forbidden by the common-law rule that a sovereign is not suable. It was within the amendment, and yet not within such rule.

[9.] 9. I therefore conclude that the assessment complained of is a violation of the fourteenth amendment, if thereby plaintiff is denied the equal protection of the laws. It is claimed that it is denied, in that the assessing officers, to wit, the county assessors and boards of supervisors and the State Board of Equalization, who have to do with the assessment of the property of individuals and of corporations not subject to the jurisdiction of the Board of Assessment and Valuation, constituting the bulk of the assessable property in this state, uniformly and purposely assessed such property for the same year at less than 60 per cent. of its fair cash value, and the board itself, which has jurisdiction of the assessment of the property of the banks and trust companies in the state, assessed the whole of same for the same year at 80 per cent. of the par value, whereas the assessment of plaintiff's franchise made by the board was at more than its fair cash value. That such a discrimination against plaintiff is a denial of the equal protection of the laws and a violation of the fourteenth amendment

is settled beyond question. A direct authority to this effect is the case of Taylor v. Louisville & N. R. Co., 88 Fed. 350, 31 C. C. A. 537, containing a decision of the Sixth Circuit Court of Appeals. It went there from the Circuit Court of Tennessee. By the Constitution of that state it is provided that all property shall be taxed "according to its value," to be ascertained as the Legislature shall direct, "so that taxes shall be equal and uniform throughout the state." These provisions are substantially the same as those in the Constitution of this state, to which allusion has heretofore been made. It was held in that case that an assessment upon a railroad property at its full value when it was the uniform practice in the various counties of the state to assess real property at not exceeding 75 per cent. of its true value, which was both in violation of the Constitution and of a statute passed pursuant thereto requiring all property to be assessed at its full value, was invalid under the fourteenth amendment.

To the same effect is the decision of the same court in the case of Louisville Trust Co. v. Stone, 107 Fed. 305, 46 C. C. A. 299, which went there from the Circuit Court of this state. It involved the validity of an assessment by the Board of Valuation and Assessment, the same board whose assessment is involved here, under the provisions empowering it to assess the property of banks and trust companies. A similar discrimination to that relied on in the earlier case was relied on therein. And it was held that if there had been in fact such discrimination, the assessment would have been invalid. The relief sought was denied solely on the merits.

And both these decisions find support in the Chicago Union T. Company Case, heretofore referred to; the decision in the Louisville Trust Company Case being cited therein by Mr. Justice Peckham with approval. The facts in the case differed somewhat from the facts as they really were in the Louisville & Nashville Railroad Company Case, and as they were claimed to be in the Louisville Trust Co. Case; but the principle involved and applied therein was exactly the same as that involved and upheld in those two cases. There the discrimination was between corporations of the same class and made by the same board. Seemingly under the Illinois Constitution the franchises of a corporation may be assessed at a different rate from that of other property in that state, so that there was no claim of a discrimination between the assessment of the franchise of the plaintiff in that case and the assessment of other property in the state. The sole discrimination was between the assessment of plaintiff's franchise and that of the franchise of other corporations, and this discrimination was made by the board whose assessment was complained of. It is in these particulars that the facts of that case differ from this. But there is nothing in the circumstance that the discrimination was between corporations of the same class to render the decision inapplicable here. The thing that made the discrimination fatal to the assessment complained of was that the law required uniformity as to all members of the class. So here the fundamental law of the state requires uniformity between all persons, and the plaintiff is discriminated against in that all property in the state, except possibly that of other railroad companies like it, is assessed at much less than its fair cash value, whereas its prop-

erty is assessed at not less than its fair cash value. In that it has been so discriminated against it has been denied the equal protection of the laws. I am now assuming the fact of a discrimination. Whether in fact there has been a discrimination as claimed will be considered later..

Nor is there anything in the circumstance that the discrimination there was made by one board to render this decision inapplicable here, in so far as discrimination was brought about by the action of the county assessors and boards of supervisors and State Board of Equalization, in assessing the property subject to their jurisdiction at less than 60 per cent. of its fair cash value and the action of the Board of Valuation and Assessment in assessing plaintiff's franchise in this state at its fair cash value or more. It is urged by defendants that the members of the board in so doing complied with the Constitution and laws of the state and respected their oaths and consciences, and their action should not be condemned because the other assessing officers of the state did not do likewise. Instead of seeking to have their work overthrown, steps should be taken calculated to make those officers do their duty likewise. This line of argument was advanced in the case of Louisville Railway Company v. Com., 105 Ky. 710, 49 S. W. 486, where it was held in accordance with the defendant's contention here. In order that the full force of this position may be grasped, I quote from Judge Paynter's opinion therein quite fully. He said:

"The contention of counsel for appellant is to the effect that, if other officers of the state disregard the constitutional provision and the statutes requiring them to assess property at its fair cash value, the courts should adjudge that the action of the Board of Valuation and Assessment in assessing franchises at their fair cash value, estimated at the price they would bring at a fair voluntary sale, should be set aside. It is certainly an unusual demand that the action of officers should be disregarded although they may have acted in strict conformity to the law imposing the duty. The officers take an oath that they will faithfully discharge their duties, and, if they have due respect for their oaths, they are bound to follow the requirements of the organic and statutory law of the state. There never can be exact equality and uniformity in taxation. The purpose of the constitutional provision in question was to require all property to be assessed at its fair cash value. There is no way to execute that provision of the Constitution, except officers be selected by the people for the purpose of assessing the property, that revenue may be raised to carry on the government. It does not seem to be logical, or sound in principle, to say that because one officer, or a class of officers, disregard the law, the action of those who strictly follow it, for that reason, should be annulled. If that be a proper view, then the constitutional provision and statutes become a dead letter, and the courts will be continually called upon to disregard the legal actions of legally constituted officers because other officers in the state have acted illegally. The court is called upon to constitute itself an instrument, not to uphold the Constitution, but to make complete the utter disregard of its provisions, by not sustaining a proper and legal action of the officers of the state in the performance of their duties. If the officers of the state are not properly assessing the real and personal property of the several counties of the state, and if the Railroad Commissioners of the state are not faithful in the discharge of their duties in assessing the railroad property of the state, then there must be a change of the personnel in the various officers of the state so as to bring about a condition, in so far as possible, that equality of assessment and taxation can be had. A speedier way would be to enforce the penal and criminal statutes of the state, if they are being violated.

If they are, the prosecution of an officer would suffice to correct the evil complained of. It may be said that this will take time, and leave some of the taxpayers of the state to bear an unequal proportion of the burdens of taxation. It is far better that this should be done for a short time, rather than for the courts to adjudge illegal that which the organic law of the state declares is legal. We cannot give our consent to declare void a proceeding because such proceeding conforms to the law."

But the invalidation of plaintiff's assessment because of such discrimination would not be because it conformed to the law. Neither it nor the board for making it would be condemned. The condemnation would be of the other assessing officers for not doing their duty likewise. It is they, and not the board, who have denied plaintiff the equal protection of the laws. By not assessing the property subject to their jurisdiction at its fair cash value, they have made it so that if the assessment stands plaintiff will have to pay more taxes than it otherwise would. The plaintiff has no other remedy than to have the assessment against it cut down. It can neither prosecute the delinquent officers nor choose their successors. Confessedly, if the board had had jurisdiction of the assessment of such other property and made the discrimination between it and plaintiff's property, the discrimination of the latter could not stand. But the mere fact that the state sees fit not to intrust the matter of assessing all property to one body, but imposes the duty of assessing different properties on different officers, should make no difference. They should be treated as one body; for together they exercise the one function of the state of assessing property for taxation. In the Louisville & Nashville Railroad Company Case Judge Taft said:

"The various boards whose united action is by law intended to effect a uniform assessment on all classes of property are to be regarded as one tribunal, and the whole assessment on all classes of property is to be regarded as one judgment."

Thus far I have proceeded on the idea that this is the only discrimination which the case presents. But it is not. It involves a discrimination made by the Board of Valuation and Assessment itself. The discrimination, it is true, is not between plaintiff and other companies covered by section 4077, i. e., between the companies of the same class, but between plaintiff and possibly other such companies on the one hand, and other companies the assessment of whose property is imposed upon it, to wit, banks and trust companies. There are 623 such companies in this state whose capital stock, surplus, and undivided profits in this state amount to $54,425,369.64, and in the assessment thereof no account is taken of the real value thereof, but same is uniformly assessed by the board at 80 per cent. of the par value, or the sum of $43,140,164.50.

There is nothing in the fact that the discrimination is not between companies of the same class to distinguish this case from the Chicago Union T. Company Case.

The decision in the case of Coulter v. Louisville & Nashville R. Co., 196 U. S. 599, 25 Sup. Ct. 342, 49 L. Ed. 615, is not against the position here taken. The basis thereof was that it was thought that the fact of the discrimination was not sufficiently established to justify the

court in interfering. In the course of the opinion Mr. Justice Holmes said:

"If it be a fact that the franchise of a Kentucky corporation is taxed at a different rate from the tangible property in the state, there can be no question that the state had power to tax it at a different rate, so far as the Constitution of the United States is concerned."

He cited a number of Supreme Court decisions in support of this position.

But it will be noted that what he said was that such a discrimination was not in violation of the United States Constitution, and that he was not careful to indicate that what he meant was that such was not the case if it was permitted by the Constitution and laws of the state. The cases cited show that he could have meant nothing else. In other words, what he meant was that such discrimination was not in and of itself, i. e., nothing else appearing, a violation of the federal Constitution. He did not and could not have meant that, if it was prohibited by the Constitution and the laws of the state, it was not then a violation of the federal Constitution. Such a discrimination is a denial of the equal protection of the laws, and that is prohibited by the express terms of the fourteenth amendment. Inasmuch as in this state the Constitution and laws expressly provide that all property, whether owned by corporations or individuals, shall pay the same rate of tax, the statement was irrelevant to the case in hand. It had no application whatever to it. And the making of it was calculated to mislead in two directions. It was calculated to cause it to be thought that such a discrimination in this state, or in any other state whose Constitution and laws are the same as here in this particular, is not a violation of the federal Constitution. It has naturally misled the defendants in this direction. The other particular in which it was calculated to mislead was in causing it to be thought that the Constitution and laws of this state permit of such discrimination. It actually misled Mr. Justice Peckham in the Chicago Union T. Co. Case in this direction. In his opinion therein he said:

"There is here no contention of illegality simply because of assessing the franchises of these corporations at a different rate from tangible property in the state which the state might do."

And in support of the statement that the state might make such discrimination, he cited the Louisville & Nashville Railroad Company Case under consideration.

There can be no question, therefore, that if there has been such discrimination as claimed by plaintiff, i. e., if its property has been assessed at not less than its fair cash value and the other property in this state, except possibly that of other railroad companies of similar character, has been uniformly and purposely assessed at substantially less than its fair cash value, the assessment is void at least to the extent which it exceeds the percentage of such other property.

That the board has assessed the entire capital surplus and undivided profits of the banks and trust companies throughout the state at at least 20 per cent. less than its real value cannot be disputed. The assessment itself shows that same is assessed at 80 per cent. of its par

value as heretofore stated. And I take it that no one will claim that such property is not worth at least par. The likelihood is that it is worth considerably more than par.

As to the property owned by individuals and corporations subject to assessment by the county assessors and boards of supervisors and the State Board of Equalization, there can be no question that it, too, has been uniformly and purposely assessed at less than its fair cash value, possibly as much as 40 per cent. less. In the case of Louisville & Nashville Railroad Company v. Coulter, supra, which involved plaintiff's franchise assessment for the year 1902, just ten years before the one involved here, I held that such property was underassessed at least 20 per cent. One of the circumstances on which I largely relied as showing that it was not assessed at a greater value than 80 per cent. was the comparison of the transfer sheets required to be laid before the State Board of Equalization with the assessed value; but as property covered by those sheets was generally assessed at a higher rate than other property in order to prevent the showing made by them affecting the assessment of the county by the State Board of Equalization, as the evidence in that case indicated, the conclusion there reached does not shut out absolutely a contention that such property is assessed at lower than 80 per cent. The Supreme Court on the appeal differed with me as to the fact of the discrimination. It did not hold that there had been no discrimination, but that it was not so palpable that the reluctance of federal courts to intervene in such matters should give way and the assessment be overthrown. And the weakness in plaintiff's case was thought to be as much in the claim that its property had been assessed at its fair cash value, essential to constitute the discrimination relied on, as in the claim that the other property had not. Concerning my reasoning therein as to the underassessment relied on, Mr. Justice Holmes said:

"The reasoning is careful and elaborate and cannot be read without an impression that probably it is correct to the extent of establishing a general undervaluation of land."

I confined myself in that case entirely to reasoning from the facts in evidence. I might have been justified in saying then, as now, that it is a matter of common knowledge to any one living in this state with a reasonable acquaintance with its affairs that such is the case.

Here no one claims that such is not the case. On the contrary, it is expressly admitted to be so. In the course of the oral argument; the Attorney General expressed himself in this way:

"I recognize the fact that the people throughout the state of Kentucky, except those who have only small tracts of land, list their property at far less than the value of the property. There are two classes of people who list their property so that you can determine whether it is listed at its fair cash value, and that is the class who own property worth less then $2,000, and the corporations who make a sworn statement from which you can see all the property owned by them. I agree with your honor and the statement the gentlemen have made here that there is throughout the country a disposition, not only on the part of the officers, but on the part of individuals, to violate the Constitution and the law of the state by listing property at less than its fair cash value, estimated at what it would bring at a fair voluntary sale.

It is alleged in this bill that the officers do that. But they will never be able to prove that any officer or set of officers intends to list property differently or to discriminate. As your honor knows from experience, when a man comes to list his farm worth $2,500 or $3,000, he will list it at $1,200 or $1,500. He puts it down himself at that figure, and then, if the assessor or the Board of Equalization attempts to raise him, he brings to bear all the political and personal influence he can command to prevent the board from raising his property to its true value. He does as an individual exactly what the corporations do when they appear before the state board. When the state board finds from their statements filed with the Auditor that they have not fixed the true value on their property, they receive notice to that effect and have a hearing before the board, and what do they do? They use all their influence, and bring to bear the importunities and persuasions of their friends, to keep the board from placing a higher valuation on their property. For these reasons it is almost impossible for any officer, either county or state, to assess the property of individuals or corporations, as his oath requires, at its true value."

And in Mr. Rich's brief he says:

"Defendants do not mean to defend or attempt to defend the acts of the assessors in this state who disregard their oaths of office by assessing property at less than its fair cash value in plain defiance of the statutory and constitutional mandates on this subject, but, on the contrary, regard such conduct on the part of such officers as highly reprehensible. The question is: What is the remedy for this state of affairs?"

In the fact that the board assessed the assets of the banks and trust companies, whose numerous stockholders are scattered all over the state, at 80 per cent. of par value, is a strong circumstance in favor of the position that in its opinion the ordinary property of the state is assessed at no greater percentage of real value than this 80 per cent. of par value is of the real value of such property. There is no accounting for the board's so assessing such property, except on the hypothesis that it thought that the property of banks and trust companies should pay no greater percentage of real value than the ordinary property of the state paid, and such percentage of par value of the one reasonably represents the percentage of real value at which the other is assessed.

The main ground upon which Mr. Justice Holmes hesitated to accept the conclusion which I reached in the Louisville & Nashville Railroad Company Case, and which he said was probably correct, and to act upon it, was the testimony therein of the members of the Board of Equalization. But such a ground for hesitation no longer exists. The board for the years 1910 and 1911 in its reports to the Governor frankly admit the underassessment. In the report for the year 1910 it said:

"The revenue laws provide that all property shall be assesed at its fair cash value. It was not contended that this was done in a single county; therefore, the Board of Equalization was not privileged to reduce any assessment. We selected those counties that most nearly conformed to the requirements of the law and endeavored to equalize the others with them."

And again:

"The increase made by the State Board of Equalization averages 8 per cent., and with this addition, is no measure of the fair cash value of the property in the state."

In the report for the year 1911 it said:

"In this, as in former years, there was no occasion for reducing any county's returned assessment. Not one of them was assessed at a measure of its fair cash value."

And again it said:

"All witnesses who appear before the board are appointed by the county judge after he has received notice of a tentative raise by the board. It is seldom that the judge will select a witness who has not formed an opinion and expressed a desire to appear in defense of his county. All the evidence before the board is ex parte. The record is made up by the county officials and all witnesses selected for the purpose of testifying for the defense.

"There are a few good assessors in the state—we say a 'few' for the lack of a general term that expresses a lesser number.

"The impression seems to be gaining ground throughout the state that we have a 'single tax' system, and that personal property is exempt from taxation, and, inasmuch as real estate is compelled to bear the burden, it is the privilege of the owner and the duty of the officials to connive to list all property at a very low figure. In the matter of personal property no witness testified that the assessor claimed to have assessed it fully, or that the owners had intended to give it in at its worth. In substance, they contend that it is not given in anywhere, and excuse themselves on the ground that it is a matter of perjury or poverty, and exercise their right of choice.

"The result is that, after the number of lists that the assessor arbitrarily increases is added to the number that the county board of supervisors raise, there remains about 95 per cent. of the people in the state who fix the sum themselves upon which they are willing to pay taxes, and it is a safe assertion that 99 per cent. of that 95 per cent. are not inclined to pay a great amount.

"From the testimony of the average witness who appears before the board, there is very little good land in his section of the state, and what is there is mainly in adjoining counties; in his particular county there is a poor streak extending the length and width of the county from which all the timber has been cut and marketed; the process of erosion has carried all the fertile soil into the Gulf of Mexico; that a peculiar and unprecedented condition exists in regard to the bottom lands in his county, unlike the conditions along most streams that enrich the land, but the current of the stream changes and washes it away, and, if by accident there is a deposit, it is always of sand, that destroys its future productiveness; that there is here and there an occasional oasis of small area upon which the tireless farmer can eke out an existence, and, by the addition of a small mortgage, pay his taxes.

"The cities do not labor under the same difficulties, but their difficulties are just as difficult. It seems that in all the cities the railroads have secured quantities of land for terminal facilities that are withheld from assessment; in addition to which, the smoke, noise, and dust has destroyed the value of property for blocks on either side. Schools and churches have also acquired valuable property which is exempt from taxation; this also lessens their total. The money in banks is owned by nonresidents, country banks, and the federal government. The remaining few dollars left among their citizens is mainly for the purpose of street car fare. Business has been removed from the principal streets and is yet unlocated. In fact, the city would go into the hands of a receiver if there were anything to receive or anybody who would receive it.

"Many counties insist that any increase in their present assessment would impoverish them; possibly, this complaint has been loudest from the pauper counties that are a liability of the state, that not only expend every dollar collected from taxes in their own county, but are beneficiaries from the state of many thousand dollars each year."

There is a note of exaggeration as well as humor here. But it is a case where exaggeration was permissible in order to bring out sharply the real truth of things.

These reports are followed by that of 1912, the same year as that of the assessment involved herein. And in it we have this statement:

"Our figures for this year show a decrease in the total assessments on real and personal property. We made raises only where a great falling off was shown in assessment as compared with the preceding year; it being the policy of the board not to increase arbitrarily the assessment of any county."

The existence of this substantial underassessment of such property is confirmed by the showing made by the United States census. According to the census of 1900 the assessed value of farm property in this state, consisting of land, building, machinery, implements, and ·live stock, was 63 per cent. of the cash value; whereas, according to that of 1910, the percentage was 51.6. This fall was no doubt due to the fact that the property had increased substantially in cash value during the ten years there had been no substantial change in the assessed value.

Progress,·therefore, has been made along the line of truthfulness since 1902. No longer do the courts have to contend with the sham and pretense that ordinary property in this state is assessed at its fair cash value or substantially so.

As to whether the board assessed plaintiff's franchise at its fair cash value, it seems certain that the board intended to so fix it and, when it left its hands, thought that it had done so. The board's record sheds·no light on the matter. The notices of the preliminary and final assessments state that the value placed on the part of plaintiff's capital stock apportioned to this state is the "cash value." It is apparent how the value of plaintiff's franchise was arrived at on the preliminary assessment. It was predetermined that the franchise should be assessed at $52,500,000. This predetermination was either arbitrary or what Mr. Justice Holmes terms in the Chicago, B. & Q. R. R. Co. Case an "intuition of experience." It was not the result of a valuation of plaintiff's capital stock and an allotment of a part thereof on some basis to this state. I make this out by the consideration that in the notice of the preliminary assessment the cash value of the part of the capital stock in this state was placed at $81,670,377, and that the assessed value of the tangible property therein, to wit, $29,-170,377, was· deducted therefrom, leaving $52,500,000 as the value of the franchise. This shows that the cash value of the part of the capital stock was obtained by adding to the amount at which it had been predetermined to assess the franchise, to wit, $52,500,000, the assessed value of the tangible property, to wit, $29,170,377 and in no other way. The conclusion is confirmed by the fact that this same course was pursued in the case of the assessments at the same time of the franchises of the Illinois Central Railroad Company, the Chesapeake & Ohio Railway Company, and the Cincinnati, New Orleans & Texas Pacific Railroad Company,· each of which is involved before me in a separate suit. There is therefore not the slightest indication in what is known in regard to the preliminary assessment that the board intended to assess it at less than fair cash value.

That it was the intent of the board to make the final assessment at the fair cash value, and that it thought it had done so, appears from

the statements made in the affidavit of the three members of the board prepared before the oral argument and then filed. They are exactly alike, and in each one a statement is made eight times as to the value at which the franchise had been assessed, and always the phraseology used is the same. It is that in the opinion of the members of the board the amount at which the assessment had been made was "not more than the fair cash value." It is also stated several times that the board did not know or believe it to be true that:

"The assessing and taxing authorities of the state of Kentucky systematically, habitually, intentionally, and designedly assess and have assessed the property of individuals and other corporations for taxation in the state of Kentucky at less than its fair cash value estimated at the price it would bring at a fair voluntary sale."

In view of this ignorance, the board would hardly assess plaintiff's franchise at less than its fair cash value. Then it is stated positively that the board sought "to ascertain the correct value of plaintiff's franchise" and "strictly followed the statutes of Kentucky defining the duty of the board, considering with said statutes the decisions of the Kentucky Court of Appeals." As those statutes require the assessment to be at the fair cash value, and the Kentucky Court of Appeals held in the Louisville & Nashville Railroad Company Case that an assessment at such value would not be invalid, notwithstanding that other property was substantially underassessed, it must be taken that the meaning intended to be conveyed by this language was that the assessment in question was made at the fair cash value.

If then there were nothing else in the case than the considerations to which I have referred, it would have to be accepted as beyond question that the board made no effort to equalize the assessment of plaintiff's franchise with the assessment of ordinary property, but that it intended to assess, and thought it had assessed, plaintiff's franchise at its fair cash value. But this is not all there is bearing on the matter. The supplemental affidavit of the Auditor, heretofore referred to, has to be considered in this connection. It was prepared and filed after the oral hearing of the demurrer and motion for preliminary injunction, which lasted several days, and that because, at that hearing, I made the request that an explanation be given as to the method pursued by the board in making the assessment and the various steps in it. In making the request, I was not prying into the mental process by which the members of the board had come to any conclusion. I called merely for the conclusions, which the statute required it to reach, and which, as I have held, should have been entered upon its record and of which plaintiff should have been informed. And I called for them in the interest, if possible, of upholding the assessment. On its face this affidavit is inconsistent with the original affidavit. As shown, according to the latter, the board made no effort to equalize the assessment of plaintiff's franchise with the assessment of ordinary property and intended and thought that it had assessed same at its fair cash value. According to the supplemental affidavit, it did make an effort to equalize and did not assess the franchise at its fair cash value.

The value of this affidavit as tending to show that it did so is affected by other considerations than that it conflicts with the former affidavit. It presents two different equalizations, both of which could not have been used, and one of these is certainly not real. According to this one, the equalization was at 80 per cent. of fair cash value; but it is evident that it was brought about by finding out what amount the amount at which the value of the part of the capital stock in this state was finally fixed as shown by the notice of the final assessment, to wit, $74,598,451, was 80 per cent. of, and then taking that amount as the amount at which the value of such part was fixed before the equalization. The affidavit indicates just what one would expect, under the circumstances, to wit, an inability on the part of the board to give the exact figures by which it arrived at the amount of $74,598,451 at which it fixed the amount of such part. Unless it preserved a memorandum of its calculations, the members of the board could not retain it in their memory, and there is no indication that it preserved any such memorandum. Besides, apparently no reliance is placed on the statement of the affidavit by the defendants. They do not claim that the board did in fact make any attempt at equalization. Their position is that it was not bound to equalize, and that the validity of its assessment is not affected by the fact that it did not equalize, and the assessment is at fair cash value. I think, therefore, that the true construction to be placed on the affidavit is that it does not undertake to set forth just how the assessment was made, but how it might have been made so as to equalize. Its statements are so involved and confused that possibly I have done it an injustice; but I think that, in the absence of any cross-examination of the members of the board, I should dispose of the motion for a preliminary injunction on the basis that the board in making the assessment intended to fix, and thought it had fixed, the value of the franchise at its fair cash value.

It follows from what I have said that the demurrer should be overruled, and that conditionally, at least, the plaintiff is entitled to the preliminary injunction sought.

[10] The injunction which it seeks is not against the enforcement of the entire assessment, but only so much thereof as exceeds the sum of $11,899,200, the amount of the assessment for the preceding year, to wit, 1911, taxes upon which, state and local, have been paid as required by a previous order herein. In the case of People's Nat. Bank v. Marye, 191 U. S. 272, 24 Sup. Ct. 68, 48 L. Ed. 180, it was held that a court of equity should not grant an injunction against an assessment because of its invalidity except on condition of payment of the taxes fairly and equitably due on plaintiff's own theory as presented in its bill. In the Chicago Union Traction Company Case the lower court, pending the application for the preliminary injunction, determined the amount of taxes fairly and equitably due, and granted it on condition that this amount be paid. The Supreme Court affirmed its action. Judge Grosscup in his opinion, reported in People's Gaslight & Coke Co. v. Raymond (C. C.) 114 Fed. 557, said:

"Injunctions issue as a matter of discretion and conscience, not right. The court may always attach equitable conditions."

And in the Cincinnati & Covington Bridge Company Case Judge Hobson said that, if it affirmatively appeared that a valid assessment would amount to as much as the invalid assessment complained of, an injunction against its enforcement should be denied absolutely, notwithstanding its invalidity. His words are these:

"It is also insisted for the appellee that the basis adopted by the board in this case, on the mode by which it reached its result, was erroneous. If this be conceded, still, if the result reached by the board was correct, or not more onerous on appellee than it should have been, the assessment cannot be disturbed."

Here it cannot be said that it so appears, or that, on plaintiff's own theory as presented in its bill, any larger assessment should fairly and equitably be made for the year 1912 than was made by the board for the preceding year. Nor are there sufficient data before me to enable me now to determine what is a fair and equitable assessment for that year. I may say here that I do not think that it will ever be incumbent on me to determine this question. That is a matter, as I view it, for the determination of the board. My action with reference thereto, so far as I may have anything to do with it, will be limited to determining whether the board has followed the statute or whether its assessment is in violation of the fourteenth amendment. But I feel constrained to hold that the injunction sought should not be granted except on condition that a larger sum be paid on account of that year's taxes than has already been paid. What has led me to this conclusion is this: The case of Siler v. L. & N. R. R. Co., heretofore referred to, was an appeal to the Supreme Court from a decree of this court. It was a suit against the Railroad Commission of this state to enjoin the enforcement of an order made by it fixing maximum rates for transportation of intrastate freight. The plaintiff in its bill, filed therein July 25, 1906, claimed as a basis for the relief sought, amongst other things, that those rates were confiscatory, and, as the value of its railroad in this state was relevant to this contention, the bill contained allegations in regard thereto. It set forth the value thereof as of June 30, 1905, on several different bases. One of these was the cost of reproduction. It was alleged that it would cost $70,599,484.81 to reproduce it. The claim was not simply that it would cost that much to reproduce it, but that it was worth that sum, and was worth it because it would take that much money to reproduce it. The plaintiff referred to this valuation as a "virtually conceded value." The mileage which it thus claimed to be of this valuation was 1,265.23, all of it mileage operated by plaintiff.

Here then was a distinct claim that on June 30, 1905, this amount of mileage was worth $70,599,484.81, and relief was asked of this court on the basis that it was worth that much. It was asked to condemn the rates complained of as confiscatory because on such a valuation they were too low. The operated mileage as of June 30, 1911, the date as of which the assessment speaks, was 1,494.36, or 229.13 miles over that as of June 30, 1905. In addition, the assessment included 190.34 miles of controlled mileage and 70.11 miles of owned mileage. But a deduction has to be made on account of a small amount of mileage included in the estimate which was not included in the assess-

ment. On the basis, then, of the correctness of the plaintiff's claim to which I have alluded, there can be no question that the value of the part of plaintiff's capital stock in this state was at least the sum which the board found it to be, to wit, $74,598,451. As to whether such a value can be worked out by pursuing the method prescribed by the statute is another question, and it is essential that it can be in order to the validity of an assessment calling for a valuation as much as that. I am quite confident that it can be if the necessary pains are taken. As to this matter I do not deem it best for me to say more than this. As I have just said, the determination of what is a fair and equitable assessment is a matter for the board, and, having indicated my views of the method prescribed by the statute, I think I should leave it to do the work unhampered by any ideas I may have. The suppository case which I have put is not to be taken as presenting my views of the matter to any extent. I put it simply to indicate the possible wrong that may have been done plaintiff if the board in making the assessment complained of apportioned to this state a part of plaintiff's capital stock in the manner set forth in the Auditor's supplemental affidavit, and I so did with hesitation.

It is not necessary that I should deal with this matter in any detail to justify my refusing to grant the injunction sought, except on condition that plaintiff make payment of taxes, state and local, on the assumption that the value of the part of its capital stock in this state is at least the sum which the board found it to be, even though it may have reached it by an erroneous method. At least, until the board has had an opportunity to make an assessment in accordance with the statute, I do not think that I should admit of the possibility that an assessment so made will not yield a valuation as much as, according to the representations to this court, it must be taken to be. The board intended this amount as full value, as I have heretofore held. Deduction, therefore, should be made therefrom on account of the under-assessment of ordinary property, and that of banks and trust companies. The plaintiff claims that this property is not assessed at more than 60 per cent. of its fair cash value. It is possible, if not probable, that this is so, and I have a decided impression that it is capable of demonstration that such is the case. On this basis the amount on which payment would have to be made is as follows, to wit:

60% of $74,598,451 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$44,759,070 60
Deduct assessed value of tangible property in this state . . . . . . . . 29,170,377 00

     Leaves a balance . . . . . . . . . . . . . . . . . . . . ' . . . . . . . . . . . . . . . . . . .$15,588,693 60
Deduct amount on which payment has been made . . . . . . . . . . . . 11,899,200 00

     Leave a balance of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 3,889,493 60

—on which payment should yet be made. In plaintiff's brief the assessed value of the tangible property in this state is put at over a $1,000,000 less than as above, which is the amount taken from the board's notice. If this should be the correct amount on which payment should yet be made, it would have to be increased to this extent. But plaintiff's attitude as to the percentage of full value at which such other property is assessed has been equivocal. In the former litiga-

tion as to the assessment for the year 1902, it took the position that the percentage was 80. In the hearing before the board in regard to the assessment here involved, it conceded the possibility that it might be as much as 80 by presenting what it claimed the assessment should be on that basis as well as on the basis of 60, and it has so done in its brief filed before me. But this is not all. It has filed affidavits to the effect that property in Jefferson county, which includes the city of Louisville, and in the important county of Woodford, is assessed on the basis of 80 per cent., and in some other counties as much as 70 per cent. On the basis of 70 per cent., the amount on which payment would have to be made is as follows, to wit:

70% of $74,598,451 .................................................$52,418,875 70
Deduct assessed value of tangible property in this state......... 29,170,377 00

    Leaves a balance of.................................... 23,248,498 70
Deduct amount on which payment has been made............... 11,899,200 00

    Leaves a balance of.................................... 11,349,298 70

—on which payment should yet be made.

This is open to the criticism that tangible property is covered by intangible. But this is the necessary result of the complex method of assessed companies within section 4077, Ky. St. Their tangible property is assessed by other officers, and the board of valuation and assessment is required to fix the difference between the value of the whole property and the assessed value of the tangible as the value of the intangible. If, then, the tangible has been underassessed, the assessment of the intangible necessarily includes tangible property.

In view of everything, I conclude that the injunction should be, and it is, granted on condition that plaintiff pay within 30 days from this date the taxes due the state and subordinate jurisdictions on $11,000,-000 in addition to what it has already paid.